1  MICHAEL J. WRIGHT, CDC# V-91600

2  K.V.S.P.; P.O. Box 5102: FBB3-114-W

3  Delano, Ca. 93216-5102

4

5  IN PRO SE

6

7

8                    UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11  MICHAEL JAMES WRIGHT    ,    )        CV No. 08        2228

12              Petitioner,    )

13      V.                     )        MOTION AND DECLARATION FOR

14  A. HEDGPETH, Warden, K.V.S.P)        STAY, ABEYANCE, OR TOLLING

15  J. TILTON, Secretary,C.D.C.R)    E-filing

16              Respondent(s) )

17

18          Michael J. Wright   , Petitioner, moves the United States Dist.

19  Court, for an Order, granting Petitioner's request to hold his Petition in

20  abayance, and to equitabley toll the Antiterrorism and effective Death Penalty

21  Act, ( AEDPA ) statute of limitations for filing claims, and seeking Federal

22  Habeas Corpus Review.

23

24          Petitioner's motion and request is based on his attached Declaration ,

25  and Brief arguments in support of a Stay, Abayance, or Equitable Tolling pending

26  State exhaustion of all Federal claims.

27

28  ///

[ 1 ]



1        Petitioner incorporates by reference, and makes a part hereof, his

2    accompliceing Petition For Writ of Habeas Corpus, and Exhibits, as set forth,

3    and attached therewith.

4

5        WHEREFORE: Petitioner request that this United States District Court

6    GRANT an ORDER, holding the herein Petition in abayance pending exhaustion of

7    all cognizable Federal claims in State Court.

8

9    DATED:   __April 15__   , 2008          Respectfully Submitted By:

10                                      _Michael J. Wright_

                                       Michael J. Wright

11                                          Petitioner In Pro Se

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        [ 2 ]

1   <u>Memorandum Of Points And Authorities</u>

2   <u>In Support Of Stay And Abeyance</u>

3

4   Petitioner, in his foregoing motion and request that this United

5   States District Court, GRANT a Stay, and hold all subsequent proceedings in

6   Abayance, pending State exhaustion of additional Constitutional claims and

7   grounds for Federal relief.

8

9   Petitioner has filed a mixed Petition with the U.S. District court,

10  and has filed three additional unexhausted claims in the California State Court

11  of Appeals, and The State Supreme Court, in an attempt to exhaust all of his

12  Constitutionaly cognizable claims for review.  Petitioner fears that all of his

13  exhausted claims will be decided by the court before his additional other claims

14  are exhausted in State court proceedings.

15

16  Petitioner repersents that a U.S. District Court has discretion    to

17  hold in abayance a Petition containing exhausted and unexhausted claims.

18

19  In  <u>Duncan</u> v. <u>Walker</u>, 121 S. Ct. 2120, 2130 (2001), the Supreme Court

20  reconized that, "there is every reason" for the federal courts to avoid poten-

21  tial for injustice, by retaining jurisdiction over a meritorious claim and stay-

22  ing further proceedings pending the complete exhaustion of State remedies......

23  when the failure to retain jurisdiction would foreclose federal review of a

24  meritorious claim because of the lapse of "AEDPA's" one year limitations period.

25

26  U.S. District Courts have exercised discretion and held in abayance

27  Petitions that contain only exhausted claims, <u>Calderon</u> v. <u>United States Distric</u>

28  <u>Court</u> (Thomas), 144 F.3d 618, 620 (9th Cir. 1998); <u>Calderon</u> v. <u>United States</u>

1  District Court (Taylor), 134 F.3d 981, 988 (9th Cir. 1998); also  Greenwalt v.

2  Stewart, 105 F.3d 1268, 1274 (9th Cir. 1997), cert. denied, 519 U.S. 1102 (1997)

3

4        The 9th Cir. has held that it's holding in Taylor (supra), in no way

5  granted...."District Courts carte blanch to stay even fully exhausted Habeas

6  Petitions." Taylor (supra) 134 F.3d id 988 n.11. Rather a stay should be grant-

7  ed in exceptional cases only; the claims Petitioner seeks to pursue must be

8  cognizable under §§ 2254; ther must be a likelihod of prejudice to the Petit--

9  ioner should a stay be denied; and there must be no evidence that the motion

10 for a stay is brought to delay, to vex, or harass, or that the request is an

11 abuse of the writ. see Fetterly v. Paskett, 997 F.2d 1295, 1301-02,(9th Cir.1993)

12 cert. denied, 513 U.S. 914 (1994); also Greenwalt (supra).

13

14       In addition, a District Court cannot stay a Habeas Corpus proceeding

15 indefinately pending exhaustion in State Court, as to do so would make this

16 court's compliance with the Antiterrorism and Effective Death Penalty Act's re-

17 quirement for prompt resolution of §§ 2254 Petitions impossible.

18

19       Petitioner's request for a Stay and Abayance is based upon three un-

20 exhausted claims that consist of:  (1) Jury instructional error amounting to a

21 Constitutional deprevation;  (2) Ineffective assistance of trial counsel; and

22 (3) Ineffective assistance of counsel on appeal. (see Exib.    ).

23

24       In Rhines v. Weber (2005) ___ U.S. ___, 161 L.Ed 2d 440, 125 S. Ct.

25 1528; the United States Supreme Court approved the use of Stay and Abeyance

26 procedure when the unexhausted claims are not plainly meritless, and there is

27 good cause for the Petitioners failure to exhaust State remedies, see Jackson v.

28 Roe (9th Cir. 2005), 425 F.3d 464, (applying Rhines).

1    In Olvera v. Giurbino (9th Cir. 2004) 371 F.3d 569,574; the Court of

2   Appeals held, "That the District Court abused it's discretion by denying the

3   Petitioner's motion to allow him to withdraw his unexhausted claims.  The Stay

4   application stated that only  eleven, (11) days remained before the (AEDPA )

5   statutes of limitations would run. 371 F.3d id. 573, also Kelly v. Small (9th

6   Cir. 2003) 315 F.3d 1063-1070.

7

8    The instant petitioner herein has less than (30) Thirty days remain-

9   ing before the §§ 2254 AEDPA (1) year statute of limitations would run.  In the

10  event this District Court summarily dismisses the Petition, the Petitioner

11  request entitlement to Equitable Tolling while while the State Court exhaustion

12  proceedings are pending.

13

14    It has been suggested in Edwards v. Balisok, 520 U.S. 641,649 (1997)

15  "....Federal courts are permitted to Stay or hold in Abeyance, rather than dis-

16  miss previously filed judicial proceedings pending exhaustion of remedies that

17  are prerequisite to final adjudication of previously filed proceedings; Lambrix

18  v. Singletary 520 U.S. 518, 521,524-25(1997).

19

20    As the Court of Appeal reconized in Ford v. Hubbard ___ F.3d ___ ,

21  (9th Cir. 2003),".... There is a growing consensus that a Stay is required when

22  dismissal could jeopardize the Petitioner's ability to obtain Federal review.."

23  (Thomas) and (Taylor) supra.

24

25                                CONCLUSION

26

27    Accordingly, Petitioner's moving request to hold his petition  in

28  in abeyance pending exhaustion of claims of jury instructional error, and  his

[ 3 ]

1  claims alleging ineffective assistance of counsel should be GRANTED.

2

3          Petitioner request the following Proposed ORDER to contain:

4

5     1.    The petition to be HELD IN ABEYANCE until, the earlier of the

6           California Supreme Court's ruling on the state claims or **six**

7           **months** of this Order's date of service;

8

9     2.    Petitioner SHALL PRESENT his unexhausted Federal claims to the

10          California State court within **thirty days** of this Order's date

11          of service.

12

13    3.    Petitioner SHALL FILE status reports to this court **one week**

14          after the claims are filed in State Court, and again within

15          **six months** of this Order's date of service, explaining what

16          documents have been filed in the California State court's,

17          the date they were filed, and any outcomes;

18

19    4.    Within **fifteen days** of any ruling by the California Supreme

20          Court, Petitioner SHALL FILE a copy of the written Order in

21          this Federal Court; and,

22

23    5.    That any other Proposed Orders efecting dismissal of the

24          the submitted Petition be VACATED.

25

26  DATED: ____April 15_____, 2008          Respectfully Submitted By;

27                                          Michael J. Wright

28                                          Michael J.Wright  ,Petitioner

**[ 4 ]**

UNITED STATES OF AMERICA    )                    D E C L A R A T I O N

                            : SS                 [ 28 USC 1746 ]

STATE OF CALIFORNIA         )


        Michael J. Wright , Petitioner, hereby declares:

    1.    I am the Petitioner in this cause of action in Case No. _____

and I make the following declaration under penalty of perjury, in support of my

attached and foregoing _____ Motion For Stay, Abeyance, or Tolling _____ .


    2.    I hereby request a Stay of the proceedings, subsequent to the timely

filing of my attached Petition For Writ of Habeas Corpus; and that all future

proceedings be held in Abayance pending State exhaustion of my unexhausted

claims, and return to Federal Court.


    3.    I also request equitable tolling of this United States District Courts

jurisdiction and retention of jurisdiction over my previously exhausted and all

meritorious claims, because the failure to retain jurisdiction would foreclose

on the lawfull federal review of my exhausted claims.


    4.    That my unexhausted claims consist of jury instructional error of a

Constitutional magnitude, in addition to claims of ineffective assistance of

Trial, and Appointed counsel on appeal.  Moreover, and contrary to fact or truth

I thought that my trial counsel, and appointed counsel on appeal had preserved

and exhausted all Federal claims and issues for review.


    5.    That I have made every reasonable effort to meet and comply with the

Antiterrorism and Effective Death Penalty Act, ( AEDPA ) statute of limitations

for the filing of cognizable §§ 2254 claims, and I have not been in willfull

[ 1 ]

disregard of the court's process; nor is my reruest brought to delay, or vex the Respondent, and there is a realistic likelihood that I would be prejudiced should a stay and abayance be denied.

Pursuant to 28 USC §§ 1746 , I declare under penalty of perjury, and the laws of the United States of America, that the foregoing is true and correct as based upon my information and belief.

Executed on this 15th Day of    April    , 2008, at, KVSP-Delano    , California, 93216, Kern County

Respectfully Submitted By:

Michael J. Wright

Michael J. Wright
Declarant In Pro Se

[ 2 ]

# EXHIBIT 1



No. 1 Crim. A0111006

## IN THE SUPREME COURT

## OF THE STATE OF CALIFORNIA

_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | ) ) ) | SUPREME COURT |
| Plaintiff and Respondent, | ) ) | NO: _____ |
| vs. | ) ) | |
| MICHAEL J. WRIGHT, | ) ) | |
| Defendant and Appellant. | ) | |

_____

### APPELLANT'S PETITION FOR REVIEW

_____

After Decision in the Court of Appeal
First Appellate District, Division Three
Appeal from the Superior Court of Alameda County
Honorable Robert K. Kurtz, Judge

_____

KYLE GEE  (SBN 065895)
2626 Harrison Street
Oakland, CA  94612
(510) 839-9230

Attorney for Appellant
MICHAEL J. WRIGHT

Under Appointment
By the Court of Appeal
Under the First District
Appellate Program's
Unassisted Case System

Court of Appeal, First Appellate District, Div. 3 - No. A111006
S149404

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

THE PEOPLE, Plaintiff and Respondent,

v.

MICHAEL JAMES WRIGHT, Defendant and Appellant.

Petition for review DENIED.

SUPREME COURT
**FILED**

FEB 1 4 2007

Frederick K. Ohlrich Clerk

DEPUTY

GEORGE
_____
Chief Justice

# TOPICAL INDEX

TABLE OF AUTHORITIES CITED . . . . . . . . . . . . . . . . . . . . . . iii


APPELLANT'S PETITION FOR REVIEW

      BY THE SUPREME COURT . . . . . . . . . . . . . . . . . . . . . 1


ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . 2


REASONS REVIEW SHOULD BE GRANTED . . . . . . . . . . . . . 3


BRIEF IN SUPPORT OF PETITION FOR REVIEW . . . . . . . . . . 6


STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . 6


STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     1.     The Prosecution's View of the Evidence. . . . . . . . . . . 7

     2.     The Defense's View of the Evidence. . . . . . . . . . . . . 7

I  THE TRIAL COURT APPLIED IMPROPER LEGAL
STANDARDS TO THE QUESTION WHETHER THE DE-
FENSE HAD MADE A *PRIMA FACIE* SHOWING OF
PURPOSEFUL DISCRIMINATION UNDER *BATSON*
PRINCIPLES. . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

  A. The Trial Court's Legal Misperceptions. . . . . . . . . . 9

    1. *Johnson* v. *California*. . . . . . . . . . . . . . . . 9

    2. *Miller-El* v. *Dretke*. . . . . . . . . . . . . . . . . . 11

  B. The Motion and Ruling in the Trial Court. . . . . . . . . 12

  C. The Trial Court's Ruling Was Based on an
Erroneous Legal View. . . . . . . . . . . . . . . . . . . . . . 14

  D. The Question of the Standard of Prejudice. . . . . . . . . 17

II  CALJIC 8.25 ERRONEOUSLY FAILS TO REQUIRE
EITHER THAT "LYING-IN-WAIT" BE THE "MEANS"
BY WHICH MURDER IS EFFECTED, OR THAT THE
"WATCHING AND WAITING" BE WITH AN INTENT
AND PURPOSE TO KILL OR INJURE. . . . . . . . . . . . . . 18

  A. The Law on Lying-in-Wait. . . . . . . . . . . . . . . . . . 18

  B. The Constitutional Deficiencies. . . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## TABLE OF AUTHORITIES CITED

### FEDERAL CASES

| | |
|---|---|
| *Apprendi* v. *New Jersey* (2000) 530 U.S. 466 | 25 |
| *Batson-Kentucky* (1986) 476 U.S. 79 | 2, 9, 10, 15, 16 |
| *Blakely* v. *Washington* (2004) 542 U.S. 296 | 25 |
| *Bui* v. *Haley* (11th Cir. 2003) 321 F.3d 1304 | 15 |
| *Carella* v. *California* (1989) 491 U.S. 263 | 26 |
| *Francis* v. *Franklin* (1985) 471 U.S. 307 and | 26 |
| *In re Winship* (1970) 397 U.S. 358 | 25 |
| *Johnson* v. *California* (2005) 545 U.S. 162 | 2, 9, 10 |
| *Mahaffey* v. *Page* (7th Cir. 1998) 162 F.3d 481 | 15 |
| *Miller-El* v. *Dretke* (2005) 545 U.S. 231 | 9, 11 |
| *Palmer* v. *Estelle* (9th Cir. 1993) 985 F.2d 456 | 17 |
| *Paulino* v. *R.A. Castro* (9th Cir. 2004) 371 F.3d 1083 | 15 |
| *Riley* v. *Taylor* (3d Cir. 1999) 277 F.3d 261 | 15 |
| *Ring* v. *Arizona* (2002) 536 U.S. 584 | 25 |
| *Sandstrom* v. *Montana* (1979) 442 U.S. 510 | 26 |
| *Turner* v. *Marshall* (9th Cir. 1997) 121 F.3d 1248 | 15 |
| *Ulster County Court* v. *Allen* (1979) 442 U.S. 140 | 26 |
| *United States* v. *Bishop* (9th Cir. 1992) 959 F.2d 820 | 16 |

*United States* v. *Esparsen* (10th Cir. 1991) 930 F.2d 1461      17

*United States* v. *Grandison* (4th Cir. 1989) 885 F.2d 143      17

## STATE CASES

*Auto Equity Sales* v. *Superior Court* (1962) 57 Cal.2d 450      10

*City of Sacramento* v. *Drew* (1989) 207 Cal.App.3d 1287      14

*People* v. *Atchley* (1959) 53 Cal.2d 160      23, 25

*People* v. *Bealoba* (1861) 17 Cal. 389      20

*People* v. *Benjamin* (1975) 52 Cal.App.3d 63      23, 24

*People* v. *Berberena* (1989) 209 Cal.App.3d 1099      4

*People* v. *Cornwell* (2001) 37 Cal.4th 50      2,3, 17

*People* v. *Davis* (1984) 161 Cal.App.3d 796      14

*People* v. *Dickerson* (1972) 23 Cal.App.3d 721      23

*People* v. *Hall* (1983) 35 Cal.3d 161      14

*People* v. *Howard* (1992) 1 Cal.4th 1132      11

*People* v. *Johnson* (1989) 47 Cal.3d 1194      10, 11

*People* v. *Johnson* (2003) 30 Cal.4th 1302      9, 10

*People* v. *Laws* (1993) 12 Cal.App.4th 786      4

*People* v. *Love* (1961) 56 Cal.2d 720      14

*People* v. *Mattison* (1971) 4 Cal.3d 177      4

*People* v. *Sanchez* (1864) 24 Cal. 17      20

*People* v. *Tapia* (1994) 25 Cal.App.4th 984                        14

*People* v. *Thomas* (1953) 41 Cal.2d 470                   22, 23, 24, 25

*People* v. *Tuthill* (1947) 31 Cal.2d 92        4, 20, 21, 23, 24, 25

*People* v. *Ward* (1972) 27 Cal.App.3d 218               23, 24

*People* v. *Wheeler* (1978) 22 Cal.3d 258                       9

*Perko's Enterprises, Inc.* v. *RRNS Enterprises*
    (1992) 4 Cal.App.4th 238                                     14

## FEDERAL CONSTITUTIONAL PROVISIONS

Sixth Amendment                                           25, 27
Fourteenth Amendment                                   25, 26, 27

## STATE RULES OF COURT

Rule 28                                                        1

## OTHER AUTHORITIES CITED

Blackstone, *Commentaries on the Law of England*          18, 19

CALJIC 8.25                                    2, 4, 5, 18, 24, 25

Haywood and Burch, *Penal Code of California, Annotated* (1874)   19

Moreland, *The Law of Homicide* (1952)                    19, 20

1856 Amendment to the Act Concerning Crimes and Punishment    19

IN THE SUPREME COURT

OF THE

STATE OF CALIFORNIA

———————————————————

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | ) ) ) |
| Plaintiff and Respondent, | ) ) |
| vs. | ) ) |
| MICHAEL J. WRIGHT, | ) ) |
| Defendant and Appellant. | ) |

## APPELLANT'S PETITION FOR REVIEW

## BY THE SUPREME COURT

TO: The Honorable RONALD M. GEORGE, Chief Justice, and to the Honorable Associate Justices of the Supreme Court:

Appellant MICHAEL J. WRIGHT petitions this Court for review of the unpublished opinion of the First District Court of Appeal, Division Three, filed on December 12, 2006, a copy of which is appended.

It is respectfully submitted that review should be granted to settle significant issues of law and to ensure uniformity of decision (Rule 28, subdivision (b)(1), California Rules of Court). The Petition is also necessary to exhaust Mr. Wright's state remedies.

1

## ISSUES PRESENTED FOR REVIEW

A.    The Batson-Wheeler Issues.

1.  Did the trial court err prejudicially in applying improper legal standards to the question whether the defense had made a *prima facie* showing of purposeful discrimination under *Batson* principles?

2.  When this Court found in *People* v. *Cornwell* (2001) 37 Cal.4th 50 that the evidence did not "support an inference" of purposeful discrimination, was this Court applying a "sufficiency of the evidence" standard (under which no reasonable jurist would have viewed the evidence as satisfying the standard of *Johnson* v. *California* (2005) 545 U.S. 162, under which the defendant must have "produc[ed] evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred"), or was this Court undertaking independent review of the evidence (concluding for itself, on a cold record, that the defendant had not "produc[ed] evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred")?

B.    The CALJIC 8.25 Issue.

Is CALJIC 8.25 erroneous in its failure to require either that "lying-in-wait" be the "means" by which murder is effected, or that the "watching and waiting" be with an intent and purpose to kill or injure?

2

## REASONS REVIEW SHOULD BE GRANTED

A.    The Batson-Wheeler Issues.

In this case, a *Batson-Wheeler* motion was made based on the prosecutor's peremptory challenges against three women, two of whom were African-American, based on issues of gender and race.  The motion was denied on the basis that no *prima facie* showing had been made.

A California trial court in March, 2005, when Mr. Wright's jury was selected, operated under legal misconceptions, then binding on the trial court by operation of the doctrine of *stare decisis*.  Not the least of those was that a *prima facie* showing of purposeful discrimination imposed on a defendant a "more likely than not" burden of persuasion.

There is also a significant issue with regard to the standard of prejudice to be applied on appeal, when there has been a denial of a *Batson-Wheeler* motion by a trial court applying an erroneous legal standard.  This Court found in *People* v. *Cornwell*, *supra*, 37 Cal.4th at 66-74 that the evidence did not "support an inference" of purposeful discrimination.  However, the Court did not explain what standard it was applying in reaching that conclusion.

Was the Court applying a "sufficiency of the evidence" standard, under which the Court concluded on the *Cornwell* record that no reasonable jurist would have viewed the trial record as containing "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred"?  Or was the Court undertaking independent review of the lower court record, concluding on a cold record that the defendant had not "produc[ed] evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred")?

3

The issue of the proper standard on review of these cases is a significant one, and it was the primary matter addressed at oral argument. Yet the Court of Appeal's opinion does not fully address the question. Mr. Wright now asks this Court to grant review to consider this and the other *Batson-Wheeler* issues presented in the case.

B.     The CALJIC 8.25 Issue.

A third of a century ago, this Court stated:

> ....[I]n the case of a killing committed by lying in wait, it is not sufficient to merely show the elements of waiting, watching and concealment.  It must also be shown that the defendant did those physical acts with the intent to take his victim unawares and for the purpose of facilitating his attack. (*People* v. *Tuthill* (1947) 31 Cal.2d 92, 100 [ ].)

> > *People* v. *Mattison* (1971) 4 Cal.3d 177, 183.

This has been California law for decades.  In order for lying-in-wait to establish first degree murder, an assaultive intent and purpose must be shown.  A concealment and waiting to accomplish other goals will not suffice, even if a murder closely follows the period of concealment and waiting.

Yet CALJIC 8.25, "Murder by Means of Lying in Wait," says nothing about the intent or purpose of the actor while lying in wait.  In that regard, it is flawed.

Variations on this argument have been rejected by the Third District (*People* v. *Laws* (1993) 12 Cal.App.4th 786), and by Division One of this Court (*People* v. *Berberena* (1989) 209 Cal.App.3d 1099). Mr. Wright brings the argument anew, because it has federal constitution-

4

al underpinnings, and because this Court has yet to rule on the issue, and because the error infected his case.

There are several problems with CALJIC 8.25. First is the focus of the instruction solely on the *temporal* relationship between the watching and waiting, and the murder. Second is the failure of the instruction to limit the range of "intents" with which one watches and waits, that will support a first degree murder verdict under a lying-in-wait theory.

As the instruction is drafted, one could watch and wait with an intent merely to frighten a person as a joke, and if the "humorous" confrontation were to turn ugly and the person were to be murdered, a first degree murder would be proven irrespective of premeditation or deliberation as to the killing. Similarly, one could watch and wait intending to commit any number of crimes outside the felony murder definition, and a first degree murder would be proven if the defendant thereafter acted with implied malice.

Mr. Wright contends that the policy considerations which sustain lying-in-wait first-degree murder in California favor a doctrine which requires a causal relationship between the lying-in-wait and murder, and an intent during the period of watching and waiting to inflict injury. He further contends that lying-in-wait decisions of this Court support his contention on this issue.

In a nutshell, Mr. Wright submits that lying-in-wait murder has causal and "intent and purpose" elements. CALJIC 8.25 does not reflect either element, and the instruction is constitutionally flawed. He asks this Court to grant review on that issue.

5

BRIEF IN SUPPORT OF PETITION FOR REVIEW

STATEMENT OF THE CASE

Mr. Wright was convicted by a jury of first degree murder, attempted murder, and felony assault (Pen. Code §§ 187, 664, and 245(a)),[1] as well as "possession of cocaine for sale" (Health and Safety Code § 11351). There were firearm arming findings (§ 12202(a)), and the admission of the truth of a "controlled substance" prior allegation (Health & Safety Code § 11370.2(a)).

Mr. Wright was tried on a Second Amended Information filed March 7, 2005, which added the Health and Safety Code violation. 2-CT 241.[2] Jury trial commenced on February 28, 2005 (1-CT 223), and the jury's verdicts and findings were returned on April 5, 2005. 2-CT 293, 389. Also on that day, Mr. Wright admitted the prior. 2-CT 294.

On July 22, 2005, Mr. Wright was sentenced to State Prison for a determinate term of twelve years, consecutive to an indeterminate term of twenty-five-years-to-life, enhanced by a year for firearm arming. Credits were allowed, fines were imposed, and actual restitution was ordered. 2-CT 427, 429, 444.

Notice of Appeal was timely filed July 25, 2005. 2-CT 431.

STATEMENT OF FACTS

For the purposes of this Petition, Mr. Wright refers to the factual summary at page 2 of the Slip opinion. The case presented distinct theories as to what had occurred in November 2002, when two men

---

[1] All code references are to the Penal Code, unless otherwise noted.

[2] Clerk's Transcript.

6

broke into a home shared by cocaine middleman Macario Toscano, his sister, and his nephew. The prosecution's three theories were first degree felony-murder, premeditated and deliberate murder, and lying-in-wait murder. The defense's view was substantially different.

1.    The Prosecution's View of the Evidence.

The prosecution's primary theory was as follows: Mr. Wright was a cocaine dealer who regularly purchased cocaine through Macario Toscano, the "middleman" between Mr. Wright and cocaine distributors such as Victor Barbosa. Mr. Wright had arranged a cocaine purchase at Mr. Toscano's home, intending not to pay for the drugs but to steal them, and Mr. Wright brought along two accomplices. Mr. Barbosa arrived with the cocaine, after which two of Mr. Toscano's friends also arrived.

Mr. Wright stalled under the guise of "testing" the cocaine while he called one of his cohorts on a cell phone. When Mr. Toscano's sister arrived, an accomplice hiding in the shrubs, and another hiding in Mr. Wright's van, assaulted the sister, broke into the house, fatally shot Victor Barbosa, and tried to shoot Macario Toscano. One accomplice fled on foot, and Mr. Wright and the other accomplice fled with the money and cocaine in the van.

However, the prosecution had secondary theories of the evidence. Instead of relying solely on first degree felony-murder as a theory of liability, the prosecution also sought and was allowed instructions on premeditated and deliberate murder, and on lying-in-wait murder.

2.    The Defense's View of the Evidence.

The defense's factual theory was this: There had been a previous dispute between Mr. Wright on the one hand, and Mr. Toscano and his

7

cocaine distributor on the other, with regard to the amount of cash Mr. Wright had provided in a prior purchase of cocaine. Mr. Wright had come again to the house to purchase cocaine, having been contacted by Macario Toscano a few days earlier, with Mr. Toscano encouraging Mr. Wright to make another purchase. Mr. Wright was leery that he was being set up to be robbed of his drug money, because of the previous dispute over money.

Not trusting Mr. Toscano or the cocaine distributor, Mr. Wright brought two friends as "backup." Mr. Wright was inside the house testing the drugs, when the distributor, Mr. Barbosa, came to him and claimed he had been "shorted." In the meanwhile, two of Mr. Toscano's two friends had also arrived, which made Mr. Wright and his friends waiting outside even more suspicious. Mr. Wright spoke to his "back up" on his cell phone.

When Mr. Toscano's sister also arrived and saw Mr. Wright's two

Mr. Toscano and his cohorts. One of Mr. Wright's friends broke into the house, the distributor was shot, and other shots were fired. One of Mr. Wright's friends fled on foot, and Mr. Wright and his other friend fled in the van. They tried to elude police because of the drugs, but the van crashed and they were forced to flee on foot.

In other words, the defense theory was that this was a drug deal gone bad, in which Mr. Wright's "backup" believed -- correctly or incorrectly -- that the middleman, distributor and his friends were a threat to Mr. Wright. Mr. Wright turns now to the evidence in greater detail.

8

I

THE TRIAL COURT APPLIED IMPROPER
LEGAL STANDARDS TO THE QUESTION
WHETHER THE DEFENSE HAD MADE
A *PRIMA FACIE* SHOWING OF PURPOSEFUL
DISCRIMINATION UNDER *BATSON* PRINCIPLES.

A.    The Trial Court's Legal Misperceptions.

On June 13, 2005, the United States Supreme Court decided two

important cases. Those decisions, filed on the same day, have sent a

clarion call to all state appellate courts, including those of California.

The two cases are *Johnson* v. *California* (2005) 545 U.S. 162 [162

L.Ed.2d 129] (hereinafter, "*Johnson II*") and *Miller-El* v. *Dretke* (2005)

545 U.S. 231 [162 L.Ed.2d 196] (hereinafter, "*Miller-El II*"). The United

States Supreme Court made clear in *Johnson II* and *Miller-El II* that it

demands a high level of attention to the problem of systematic exclusion

of cognizable groups from jury service, and that the state courts --

including those of California -- have fallen short in that regard.

1.    *Johnson v. California.*

In *People* v. *Johnson* (2003) 30 Cal.4th 1302, this Court reached

the following conclusion with regard to a *prima facie* showing of pur-

poseful discrimination under *Batson-Kentucky* (1986) 476 U.S. 79 and

*People* v. *Wheeler* (1978) 22 Cal.3d 258:

> We conclude that *Wheeler*'s terms, a "strong likeli-
> hood" and a "reasonable inference," refer to the same test,
> and this test is consistent with *Batson.* Under both *Wheeler*
> and *Batson*, to state a prima facie case, the objector must
> show that it is *more likely than not* the other party's pe-

9

remptory challenges, if unexplained, were based on imper-
missible group bias.

> *People* v. *Johnson, supra*, 30
> Cal.4th at 1306; emphasis added.

This was the law in effect in California at the time of trial. Under
well-established principles of *stare decisis*, it is the law which would
have been applied by the trial court in ruling on Mr. Wright's *Batson*
motion. *See Auto Equity Sales* v. *Superior Court* (1962) 57 Cal.2d 450.

However, the United States Supreme Court granted certiorari from
the decision in *People* v. *Johnson, supra*. After an initial misfire, the
Court on June 13, 2005 issued its opinion in *Johnson II*. In that opinion,
the United States Supreme Court rejected this Court's "'more likely than
not' standard," deeming it "an inappropriate yardstick by which to
measure the sufficiency of a prima facie case." *Johnson II, supra*, 162
L.Ed.2d at 138.

In discussing its opinion in *Batson*, the United States Supreme
Court explained in *Johnson II*, as follows:

> We did not intend the first step to be so onerous that a
> defendant would have to persuade the judge -- on the basis
> of all the facts, some of which are impossible for the
> defendant to know with certainty -- that the challenge was
> more likely than not the product of purposeful discrimina-
> tion. Instead, a defendant satisfies the requirements of
> *Batson*'s first step by producing evidence *sufficient to
> permit the trial judge to draw an inference* that discrimina-
> tion has occurred.

> *Johnson II, supra*, 162 L.Ed.2d
> at 139; emphasis added.

10

According, Mr. Wright's trial court was applying the incorrect legal standard of persuasion to the issue of a *prima facie* showing.

2.      *Miller-El v. Dretke*.

The United States Supreme Court also decided *Miller-El II* on June 13, 2005. Prior to *Miller-E II*, this Court had taken the position that comparative juror analysis is a disapproved concept in California. *See, e.g., People v. Johnson* (1989) 47 Cal.3d 1194, 1219-1222. This Court's views also included that a trial court presented with a *Batson-Wheeler* motion could ruled based solely on defense counsel's "showing," with no duty independently to go beyond defense counsel's showing. *See People v. Howard* (1992) 1 Cal.4th 1132, 1154. The Court had also taken the position that a trial court might merely examine the record as to the jurors in the suspect group, to determine whether a theoretical basis for a valid, race-neutral challenge existed as to each such juror, and could validly deny the motion without finding that a *prima facie* case had been made. *Id.*, at 1155. In *Miller-El II*, the United States Supreme Court exposed the fallacies of these positions.

In *Miller-El II*, the Supreme Court, in reviewing the procedural and factual circumstances before it, made "side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve," even though this had not been done in the state court. *Miller-El II, supra*, 162 L.Ed.2d at 214. In a footnote, the Court made clear that comparative juror analysis is not limited to comparison of "identical" jurors. *Id.*, at 218 fn. 6. In another footnote, the United States Supreme Court made clear that the trial court's responsibility in ruling on a *prima facie* case is not limited to the matters identified by defense counsel. *Id.*, at 215 fn. 2.

11

Accordingly, *Johnson II* and *Miller-El II* illuminate the standards under which Mr. Wright's trial court should have evaluated Mr. Wright's attempted showing of a *prima facie* case. The question thus becomes the effect of *Johnson II* and *Miller-El II* on Mr. Wright's appeal.

B.    The Motion and Ruling in the Trial Court.

After prospective jurors had been called into the jury box (1B-RT 249-250), and after cause challenges had been granted (1B-RT 342-345), the twelve prospective jurors in the box when peremptory challenges began were as follows:  (1) Ms. Kilgore; (2) Ms. [Juror 2]; (3) Ms. Hirwe; (4) Ms. Chatman (who was African-American); (5) Ms. [Juror 5]; (6) Mr. [Juror 6]; (7) Ms. [Juror 7]; (8) Ms. Gibson (who was African-American); (9) Ms. Engel; (10) Ms. [Juror 10]; (11) Mr. Gu; and (12) Mr. Tsuyemura.  Accordingly, there were three men and nine women in the box, with two of the women being African-American.

The prosecutor's first peremptory challenge was against African-American woman Ms. Gibson (seat eight), which led to a bench conference.  1B-RT 358.  Ms. Gibson was replaced by Mr. Davis, such that the prospective panel now had one African-American (Ms. Chatman), and a balance of four men and eight women.

After the defense passed the challenge, the prosecutor's second challenge was against Ms. Engel (seat nine).  1B-RT 366.  Ms. Engel was replaced by Ms. [Juror 9], which left the racial and gender balance in the jury box unchanged.

After the defense again passed, the prosecutor's third peremptory challenge was against African-American woman, Ms. Chatman.  This led to a second bench conference.  1B-RT 371.

12

The hearing on the *Batson-Wheeler* motions was not held until later that day. See, 1B-RT 436. Defense counsel noted that the *Wheeler-Batson* motions during the bench conferences had been based on the prosecutor's use of two of his first three challenges to remove African-American women Ms. Gibson and Ms. Chatman. However, counsel was also moving based on the prosecutor's use of his first three challenges against older women, those challenges having been used to remove Ms. Engel, Ms. Gibson, and Ms. Chatman. 1B-RT 436-437.

The trial court stated its unwillingness to make a finding of a *prima facie* showing. The court noted that Ms. Chatman's brother had been convicted of "the very offense that we are dealing with here." 1B-RT 437. The court noted further that Ms. Gibson had a family member facing charges in Alameda County. 1B-RT 438. The court could recall nothing noteworthy about Ms. Engel, but the court failed to see "any pattern," for the reason there were still women on the jury, some of whom appeared to be over 40. *Ibid.* The trial court declined to require a statement of reasons from the prosecutor, and the *Wheeler-Batson* motion was denied. *Ibid.*

After the motion had been denied, the prosecutor volunteered as to Ms. Gibson that she had gone to her family member's court proceedings, and on each occasion, the case "did not go forward because the D.A. was still putting the case together." The prosecutor also noted that she had been "wearing sunglasses in court." 1B-RT 438-439.

The prosecutor referred further to Ms. Chatman's lack of opinion as to whether her brother had been "justly treated or not and may have gone to prison for a murder he did not commit." The prosecutor noted further that Ms. Chatman had sought a hardship excusal "based on the

13

fact that she did not want to be here." 1B-RT 439. The prosecutor made no observations with regard to Ms. Engels.

C.    The Trial Court's Ruling Was Based on an Erroneous Legal View.

Error occurs where a lower court rules while unaware of the legal parameters controlling its ruling. *See Perko's Enterprises, Inc.* v. *RRNS Enterprises* (1992) 4 Cal.App.4th 238, 245; and *City of Sacramento* v. *Drew* (1989) 207 Cal.App.3d 1287, 1298. *See, also, People* v. *Hall* (1983) 35 Cal.3d 161, 168-169; *People* v. *Love* (1961) 56 Cal.2d 720, 728-729; *People* v. *Tapia* (1994) 25 Cal.App.4th 984, 1014-1020; *City of Sacramento* v. *Drew* (1989) 207 Cal.App.3d 1287, 1297-1298; and *People* v. *Davis* (1984) 161 Cal.App.3d 796, 802-803.

The trial court's ruling here involved both legal and factual misperceptions. As discussed, the trial court was applying a "more likely than not" rather than a "supports an inference" standard, with the former having been disapproved in *Johnson II*

The trial court was also unmoved by the statistical disparity in the use of two of thee challenges to remove African-American women, and with the use of three challenges to remove to remove older women. As for two of three challenges against the only two African-American persons in the jury box, the chance probability of such an event -- independent of considerations of race -- is only 3.8%.[3] Moreover, the chance probability of the first three challenges against women is also low (33.3%), even where the panel on each occasion had more women than

---

[3]/ That figure is computed as follows: 2/12 [the first challenge], times 11/12 [the second challenge], times 1/12 [the third challenge], times a factor of three [which must be used where only two of there challenges were against a particular group].

men.[4]  Such chance probabilities are clearly sufficient to "support an inference" of purposeful discrimination.

Furthermore, the trial court's ability to posit its own reasons for challenges to two of the three women jurors did not defeat the inference of purposeful discrimination, since a conjectural reason "cannot be mistaken for the actual reasons for a challenge." *Mahaffey* v. *Page* (7th Cir. 1998) 162 F.3d 481, 483-484 fn. 7.  Stated another way:  "Apparent or potential reasons do not shed any light on the prosecutor's intent or state of mind when making the peremptory challenge." *Riley* v. *Taylor* (3d Cir. 1999) 277 F.3d 261, 282 (*en banc*).[5]

The same issue arose in another context in *Paulino* v. *R.A. Castro* (9th Cir. 2004) 371 F.3d 1083.  In *Paulino*, the trial court erroneously failed to find that a *prima facie* showing had been made, with the court interrupting defense counsel's arguments in favor of a *prima facie* finding to posit its own reasons for the prosecutor's challenges.  The Ninth Circuit stated in *Paulino*, as follows:

> The process employed by the trial court to evaluate Paulino's objection clearly contravened the procedure outlined in *Batson*.  The trial court never permitted defense counsel to explain the basis for his objection in the first instance.  Instead, the trial court interrupted defense counsel and offered, sua sponte, its *speculation* as to why the

---

[4]/  9/12 x 8/12 x 8/12 = 576/1728.

[5]/  *See, also, Bui* v. *Haley* (11th Cir. 2003) 321 F.3d 1304, 1313-1314 [reasons posited at a post-trial hearing as to bases on which she *might* have exercised a challenge do not satisfy *Batson*]; and *Turner* v. *Marshall* (9th Cir. 1997) 121 F.3d 1248, 1253 ["The arguments that the State has made since the evidentiary hearing do not form a part of the prosecutor's explanation"].

15

prosecutor may have struck the five potential jurors in question. But it does not matter that the prosecutor might have had good reasons to strike the prospective jurors. What matters is the *real* reason they were stricken.

> *Id.*, at 1089-1090; first emphasis added; second emphasis in original.[6]

Finally, the trial court was of the view that other older women on the panel defeated the *prima facie* showing, despite three-of-three challenges against such women. Since the prosecutor could have used these challenges no more quickly than he did, this suggests the trial court deemed the presence of older women -- alone -- to undermine the defense's showing. No so.

The Ninth Circuit in *United States* v. *Bishop* (9th Cir. 1992) 959 F.2d 820 confronted a claim that a "proportionally representative" trial jury validated an apparently discriminatory use of challenges against black jurors. While the Court of Appeals rightly deemed such a circumstance relevant to the determination whether a *prima facie* case had been made, that circumstance did not validate unconstitutional conduct.

> In this case, the trial judge apparently believed that, the issue of discriminatory intent notwithstanding, *Batson* is satisfied if a "representative jury" remains after jury selection -- i.e., if the percentage of blacks on the jury panel is at least as great as the percentage of blacks on the original venire. *See supra.* This is a question of law which we review *de novo.* [Citation.]

---

[6] Later in *Paulino*, the Ninth Circuit observed that "the trial court never required the prosecutor to [explain her actual motivations for her peremptory challenges], relying instead on its own *speculation as to what might have been* the prosecutor's reasons." *Id.*, at 7062; emphasis added.

It is true that representativity and, more generally, a prosecutor's acceptance of black jurors, are factors that a trial judge may take as an indication of non-discriminatory motive. [Citation.] However, there is a critical distinction between using proportional representation as evidence of the government's sincerity and using it to offset a constitutional violation, thereby rendering the violation somehow harmless. The latter scenario collides with the fundamental principle that "under *Batson*, the striking of *one black juror* for a racial reason violates the Equal Protection Clause." [Citations.]

> *Id.*, at 827 [emphasis in original].

*See, also, Palmer* v. *Estelle* (9th Cir. 1993) 985 F.2d 456, 458; *United States* v. *Esparsen* (10th Cir. 1991) 930 F.2d 1461, 1467 n. 5; and *United States* v. *Grandison* (4th Cir. 1989) 885 F.2d 143, 147.

In short, this Court should respectfully refuse to follow what will be respondent's inevitable invitation to treat the trial court's ruling as a valid ruling by an informed judge.

D.    The Question of the Standard of Prejudice.

As explained, there is a significant issue with regard to the standard of prejudice to be applied on appeal. This Court found in *People* v. *Cornwell, supra*, 37 Cal.4th at 66-74 that the evidence did not "support an inference" of purposeful discrimination. However, the Court did not explain the standard it was applying in reaching that conclusion:  a "sufficiency of the evidence" standard, or independent review of the lower court record. Mr. Wright now asks this Court to grant review to consider this and the other *Batson-Wheeler* issues presented. Mr. Wright asks that review be granted on the set of *Batson-Wheeler* issues.

17

II

## CALJIC 8.25 ERRONEOUSLY FAILS TO REQUIRE EITHER THAT "LYING-IN-WAIT" BE THE "MEANS" BY WHICH MURDER IS EFFECTED, OR THAT THE "WATCHING AND WAITING" BE WITH AN INTENT AND PURPOSE TO KILL OR INJURE.

A.    The Law on Lying-in-Wait.

Penal Code section 189 defines as first degree murder "[a]ll murder which is perpetrated by means of ... lying-in-wait ...." In this case, and over defense objection (10-RT 1586-1587), the prosecutor obtained an instruction on the "lying in wait" theory of first degree murder. The instruction given was CALJIC 8.25, which read as follows:

> Murder which is immediately preceded by lying in wait is murder of the first degree.

> The term "lying in wait" is defined as a waiting and watching for an opportune time to act, together with a concealment by ambush or some other secret design to take the other person by surprise. The lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.

12-RT 1767.

Lying-in-wait is of ancient origin. Blackstone suggests it was introduced into English law by King Canute "to prevent his countrymen, the Danes, from being privily murdered by the English; and was afterwards continued by William the Conqueror for the like security of his own Normans." Blackstone, *Commentaries on the Law of England*, Book IV (1769) p. 194.

18

Moreland explains its early development as a response to assassinations by the Saxons of the Normans. Moreland, *The Law of Homicide* (1952), 198-199. Moreland observed that murders by lying-in-wait, poison or torture, are "historic survivors"; and "while originally they had a reason for being in the law, the original reason for their being has largely ceased and they have all been re-rationalized as acts which conclusively indicate deliberate and premeditated murder". *Id.*, at 206.

Lying-in-wait became part of California law by an 1856 amendment to the Act Concerning Crimes and Punishment (Stats. 1850, Ch. 99, p. 231). As amended, § 21 of the Act divided murders into degrees, providing, in part, that murder "perpetrated by ... lying-in-wait ... shall be deemed murder of the first degree." (Stats. 1856, Ch. 139, § 1, p. 219). The amended statute was copied from Pennsylvania's Statute of 1794. *See, e.g.*, Haywood and Burch, *Penal Code of California, Annotated*, 82, 83 (1874).

Blackstone, who influenced the framers of the Pennsylvania Statute, viewed lying-in-wait as a form of *proof* of mental state:

> Express malice is when one with a sedate and deliberate mind and formed design doth kill another: which formed design is evidenced by external circumstances discovering that inward intention; as lying in wait, antecedent menaces, former grudges, and concerted schemes to do him some bodily harm.
>
> *Blackstone, supra* at 199.

In 1861, this Court, addressing the 1856 amendment to the Act Concerning Crimes & Punishment, considered murder by acts such as poison, lying-in-wait, or torture to "carry with them conclusive evidence

19

of premeditation." *People* v. *Bealoba* (1861) 17 Cal. 389, 393-394.  In
1864, the Court reasoned that first-degree murder was fully defined by
whether the murder was willful, deliberate and premeditated; lying-in-
wait, like poison or torture, was merely a form of proving premeditation.
*People* v. *Sanchez* (1864) 24 Cal. 17, 29.

The degrees-of-murder statute remained unchanged with the
enactment of the Penal Code in 1872.  The Code Commissioner's Notes
as to Section 189 explained lying-in-wait in accordance with the *Sanchez*
decision:  lying-in-wait, like torture and poison, reflected conclusive
*evidence* of premeditation.[7]

In more recent years, this Court has arguably departed from the
"re-rationalization" explanation of lying-in-wait, the use of poison, and
the use of torture.  For example, first-degree torture-murder need not be
premeditated, or even intentional.  Murder by torture is understood to be
a *moral* equivalent of premeditated murder.

murder with willful, deliberate and premeditated murder.  Lying-in-wait
stands on its own, as a legislatively defined form of first-degree murder.
Death need not be intended.

Lying-in-wait in California case law has suffered significant
vagueness and inconsistency.  In 1947, the Court stated "there appears to
be no California case precisely defining the phrase 'lying in wait'."
*People* v. *Tuthill, supra,* 31 Cal.2d 92.  Unfortunately, that observation is
equally true today.

---

[7] The "re-rationalization" which equates murder by poison, lying-in-
wait, or torture with premeditated and deliberate murder has been criti-
cized.  Lying-in-wait alone does not necessarily entail an intent to inflict
serious injury, or to inflict any injury.  *See e.g., Moreland, supra,* at 206.

20

The "causal" element of lying-in-wait, and the mental state element, are both illustrated by *Tuthill*, a case of special significance in this area of law, because it first held that the victim need not be attacked while unaware of the "ambush" in order for lying-in-wait to be established. In *Tuthill* the defendant had gone to the cabin where his wife was staying, loaded a rifle, and he lay down with the rifle hidden by his body and fell asleep. When his wife and her friend returned, she woke him, and he rose, revealing the rifle and pointing it at his wife. The wife and friend walked out of the cabin a few feet, but the wife decided to return. As she re-entered the cabin, she was shot fatally. *Id.*, at 94-95.

The defendant in *Tuthill* urged, *inter alia*, that "in order to commit a murder 'by means of ... lying in wait ...' (Pen. Code § 189), the lying in wait must be the 'means,' method or proximate cause by which the defendant is enabled to kill his victim before he can escape; ...." This contention was accepted. The Court did not, however, accept the further contention that the wife's becoming aware of the defendant's presence terminated the lying-in-wait.

> The elements of waiting, watching, and secrecy all were present.... Defendant's presence in the cabin was unexpected, and obviously [the wife] was unaware of her danger, of *the tenacity of his grim objective* and *of his purpose to kill her.* .... The fact that she was shot on her return to the doorway indicates that defendant's action was not hasty, and that his *watch to kill* was continuous and unbroken. *This lying in wait was the "means" through which defendant accomplished his purpose.* The evidence was sufficient to support the inference that the lying in wait was *a part of the defendant's plan to kill* and *the means by which he carried out the plan.*
>
> *Id.*, at 101; emphasis added.

21

These concepts of "the 'means' through which defendant accomplished his purpose," of a "watch to kill," and of the lying-in-wait's being "a part of the defendant's plan to kill," have been lost in the current statement of the doctrine, which is concerned with the temporal proximity of the waiting to the killing.  Only the most nebulous "mental state" considerations are suggested.

Mr. Wright cannot, consistent with the current state of the law, argue that lying-in-wait requires a "plan to kill" while the waiting and watching are ongoing.  In *People* v. *Thomas* (1953) 41 Cal.2d 470 the Court considered a challenge to a set of lying-in-wait instructions which included the following:

> "'The gist of "lying in wait" is that the person places himself in a position where he is *waiting and watching and concealed from the person killed with the intention of inflicting bodily injury upon such person or of killing such person.*'

> \*          \*          \*

> "'Where the killing is by "lying in wait," and the act causing death was intentional, it is murder of the first degree, whether the killing was intentional or unintentional, as in such case it is not necessary that there exist in the mind of the perpetrator an intent to kill.'"

> *Id.*, at 473-474; emphasis added.

The court found the instruction adequate, albeit "not as exact as it might be." *Id.* at 475.

Subsequent cases distilled from *Thomas* the following definition of lying-in-wait:

22

The elements necessary to constitute lying in wait are watching, waiting, and concealment from the person killed *with the intention of inflicting bodily injury upon such person.* (*People* v. *Thomas*, [*supra*, at] 473."

*People* v. *Atchley* (1959)
53 Cal.2d 160, 175.

Other cases followed *Thomas* and similarly held that "intent to kill" is not an element of lying-in-wait. *See People* v. *Benjamin* (1975) 52 Cal.App.3d 63, *People* v. *Ward* (1972) 27 Cal.App.3d 218, and *People* v. *Dickerson* (1972) 23 Cal.App.3d 721. *Ward* and *Benjamin* reflect an unfortunate and -- in Mr. Wright's view -- unintended drift away from the *causal* approach to lying-in-wait, and from the necessity of a lying-in-wait done with a specific intent to kill or inflict bodily injury.

For example, in *Ward*, the instruction given retained the significant language, "perpetrated by means of lying-in-wait ..." *People* v. *Ward*, *supra*, at 228 n. 2. There was no longer, however, any reference to lying in wait *while harboring* an assaultive intent, but rather to striking the fatal blow with such intent. *Id.*, at 229 n. 2.

In *Benjamin* the drift was even further off the course set by *Tuthill* and *Thomas*. The instructions given in *Benjamin* substituted the term "immediately *preceded* by lying in wait" for "perpetrated by means of lying in wait" (*People* v. *Benjamin, supra*, at 81), and concluded with the following: "To constitute murder by means of lying in wait there must be, in addition to the aforesaid conduct by the defendant, an intentional infliction upon the person killed of bodily harm involving a high degree of probability that it will result in death and which shows a wanton disregard for human life." *Id.*, at 82. In other words, the *Benjamin*

23

instructions did away with the *causal* view of lying-in-wait and substitut-
ed a *temporal* approach.

The instructions given in Mr. Wright's case took the last step, by
excising all references to what the actor intended while watching and
waiting, so long as, whatever he intended, he gave it careful thought.
CALJIC 8.25 has no language suggesting that there need be a causal
relation between the lying-in-wait and the murder. It did not refer to
"perpetrated by," as in *Thomas*, *Atchley*, and *Ward*; or "accomplished by,"
as in *Ward*; or the "means by which," as mentioned in *Tuthill*. The
phrase selected was "immediately preceded by," a term merely of tempo-
ral relationship. Furthermore, no "intent" element was included -- neither
"plan to kill" (*Tuthill*), nor "intention of inflicting bodily injury ... or of
killing" (*Thomas*), nor mere "intention of inflicting bodily injury" (*Thom-
as*, *Atchley*, *Ward*, *Benjamin*).

The sole -- and doubtless perplexing -- reference to the actor's

show a state of mind equivalent to premeditation or deliberation."
Precisely how a juror would have understood this latter reference is
highly speculative. Must the "duration" have been "such as [ordinarily]
to show a state of mind equivalent to.premeditation and deliberation," or
must the actor have personally had while watching and waiting "a state of
mind equivalent to premeditation or deliberation?"

For that matter, what is "a state of mind equivalent to premedita-
tion or deliberation"? Does this mean *factually* equivalent or *morally*
equivalent? The jury would not reasonably understand it to be an exact
factual equivalent to premeditation and deliberation in the usual first
degree murder sense, as the decision there being weighed is the decision

24

whether or not to kill, which is not required by CALJIC 8.25. Nor could the jury be expected to understand the instruction to tell them they should consider whether there was a state of mind "morally" equivalent to premeditation, as such a charge is virtually incomprehensible.

The most logical meaning the jury could discern in the "equivalent state of mind" language, if one were discerned at all, would be that the duration of waiting must be such as to show a state of mind reflecting an intention to act, arrived at as a result of thought and weighing, *whatever it was the actor intended to do*. It could be an intention to frighten, or to falsely imprison, or unlawfully to brandish a weapon. Yet none of these intents, no matter how long the duration of premeditation and deliberation, is sufficient to establish first degree lying-in-wait murder, as the intent must be to kill or injure. *People v. Atchley, supra; People v. Tuthill, supra;* and *People v. Thomas, supra.* The instruction is clearly flawed.

B.    The Constitutional Deficiencies.

The United States Supreme Court has decided a lengthy and consistent series of cases, to the effect that the facts necessary to establish guilt, to establish the degree of guilt, and to establish the factual elements on which punishment is to turn, must be found by a jury beyond a reasonable doubt. From *In re Winship* (1970) 397 U.S. 358, to *Apprendi v. New Jersey* (2000) 530 U.S. 466, through *Ring v. Arizona* (2002) 536 U.S. 584, and finally to *Blakely v. Washington* (2004) 542 U.S. 296, the United States Supreme Court has never wavered from its commitment to factual findings, by a jury, regardless of whether the factual issues are deemed an "element," or an "aggravating factor." Without such findings, the Sixth and Fourteenth Amendments are not satisfied.

25

Furthermore, there is the line of United States Supreme Court cases dealing with "presumptions." In that regard, respondent may argue that anyone who waits in concealment, and who shortly thereafter attacks someone, can safely be presumed to have waited in concealment with the intent and purpose of making such an attack. However, the United States Supreme Court explained in *Carella* v. *California* (1989) 491 U.S. 263 the constitutional flaw in such an instruction.

> The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense. [Citation.] Jury instructions relieving States of this burden violate a defendant's due process rights. [Citations.] Such directions subvert the presumption of innocence accorded to accused persons and also invade the truth-finding task assigned solely to juries in criminal cases. [¶] [P] We explained in [*Francis* v. *Franklin* (1985) 471 U.S. 307...and *Sandstrom* v. *Montana* (1979) 442 U.S. 510...that mandatory, that is, whether the specific instruction, both alone and in the context of the overall charge, could have been understood by reasonable jurors to require them to find the presumed fact if the State proves certain predicate facts.
>
> *Carella* v. *California, supra*, 491 U.S. at 265.

*See, also, Ulster County Court* v. *Allen* (1979) 442 U.S. 140, 157; and *Sandstrom* v. *Arizona* (1979) 442 U.S. 510, 524.

This omission becomes doubly important as to one whole liability for lying-in-wait first degree murder is predicated on his role as an aider-and-abettor. How does a jury determine whether one showed the intent

26

of the person who lay in wait, if the court has not defined for the jury the intent and purpose element for lying-in-wait? How does a jury evaluate the "natural and probable consequences" doctrine for an aider-and-abettor without any focus on the criminal intent and purpose of the person who lay in wait.

In short, the instruction permitted conviction without critical factual findings by the jury. It violated the Sixth and Fourteenth Amendments.

## CONCLUSION

For the reasons stated, Mr. Wright respectfully urges that this Court should grant review. On review, the judgment of conviction should be reversed in its entirety.

Dated: December 28, 2006        Respectfully submitted,

KYLE GEE

Attorney for Appellant
MICHAEL J. WRIGHT

27

CERTIFICATE OF WORD COUNT

IN COMPLIANCE WITH RULE 33, SUBDIVISION (B)


I hereby certify, pursuant to Rule 33, subdivision (b), California Rules of Court, that the attached brief contains 6821 words. In this certificate, I am relying on the word count produced by Wordperfect 5.1.

Dated:  December 28, 2006

_____
KYLE GEE

Attorney for Appellant
MICHAEL J. WRIGHT

# EXHIBIT 2

COPY

COPY

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

FILED
Court of Appeal First Appellate District

DEC 1 2 2006

Diana Herbert, Clerk
By_____ Deputy Clerk

THE PEOPLE,

    Plaintiff and Respondent,

v.

MICHAEL JAMES WRIGHT,

    Defendant and Appellant.

A111006

(Alameda County
Super. Ct. No. H36730)

    Defendant Michael Wright appeals his conviction of first degree murder. He contends that the trial court erred in determining that he did not make a prima facie showing that the prosecutor engaged in racial and gender discrimination in exercising his peremptory challenges and that the instructions to the jury defining murder by means of lying in wait were defective. Finding no error, we shall affirm the judgment.

**Factual and Procedural History**

    By a second amended information, defendant was charged with murder (Pen. Code, § 187, subd. (a)),[1] attempted murder (§§ 187, subd. (a), 664), assault with a firearm (§ 245, subd. (a)(2)), and possession of cocaine for sale (Health & Saf. Code, § 11351). The information further alleged defendant was armed with a firearm (§ 12022, subd. (a)(1)), and had a controlled substance prior conviction (Health & Saf. Code, § 11370.2, subd. (a)). Because the issues raised on appeal concern only jury selection and the correctness of a single instruction, the facts can be briefly stated.

---

[1]    All statutory references are to the Penal Code unless otherwise indicated.

In November 2002 Victor Barbosa, a cocaine distributor, was shot and killed during a cocaine purchase gone awry. The event started when "middleman" Macario Toscano arranged for Barbosa to meet defendant and Toscano at the Toscano residence where Barbosa was to deliver a kilogram of cocaine. It was the prosecution's theory that defendant had arranged the transaction, not intending to purchase the drugs but to steal them. After money had been exchanged and while the cocaine was being tested for potency, defendant had a brief telephone conversation. Shortly afterwards, one of defendant's accomplices, who had been hiding outside the residence in defendant's van, broke into the home by kicking in the front door. He opened fire towards the area of the home where Barbosa was located. Barbosa's dead body was later found face down on the floor of Toscano's kitchen, having received multiple bullet wounds. Defendant and his accomplices fled but defendant was later apprehended.

The jury was instructed on several theories of murder, including murder by means of lying in wait using CALJIC No. 8.25 and, as to the defendant, accomplice liability and aiding and abetting. The jury found defendant guilty on all counts and defendant was sentenced to 28 years to life imprisonment. Defendant filed a timely notice of appeal.

## Discussion

1. *Jury Selection*

The 12 prospective jurors in the box when peremptory challenges began included nine women and three men. Of the 12, only Ms. C and Ms. G were African-American. The prosecutor used his first peremptory challenge on Ms. G. After the defense passed, the prosecutor exercised a second peremptory challenge on prospective juror Ms. E. The defense passed again, and the prosecutor excused Ms. C. Defendant then made a motion under *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) and *Batson v. Kentucky* (1986) 479 U.S. 79 (*Batson*).

After the jurors were excused for the day, the court heard defendant's *Batson/Wheeler* motion. Defense counsel noted that all three of the prosecutor's challenges had been to women, and that all three were over the age of 40. Defense counsel pointed out that prospective Jurors G and C were both African-American, and

2

were the only two African-Americans that had been in the jury box. Defendant argued
that both prospective jurors were steadily employed and that they were excused because
of their race.

The court noted that voir dire examination had disclosed that Ms. C's brother had
been "convicted of the very offense that we're dealing with here," and that Ms. G
currently had a family member facing similar charges in Alameda County. The court
could not recall anything in particular about Ms. E, but observed that a number of
women, "some of whom appear to be [age] 40 or more," remained on the jury. The court
ruled that defendant had not made a prima facie case, but nonetheless asked the
prosecutor if he wished to add anytning.

The prosecutor stated that prospective juror G's grandson was in custody
apparently facing murder charges and that the prosecutor for the case worked for the
same office as he did. The prosecutor also stated that Ms. G was wearing dark sunglasses,
preventing him from making eye contact with her. The prosecutor said his main concern
with respect to Ms. C was that her brother had been charged and convicted of murder by
his office. He added that Ms. C stated she did not know if her brother had been fairly
treated and thought he may have gone to prison for a murder he did not commit.

Under article I, section 16 of the California Constitution, a defendant's right to
trial by a representative jury is violated by the use of peremptory challenges to exclude
jurors solely on the basis of group bias. (*Wheeler*, *supra*, 22 Cal.3d 258.) *Batson*, *supra*,
479 U.S. 79, affords similar protection to an accused under the federal Constitution's
equal protection clause. "Under *Wheeler*, there is a presumption that a prosecutor uses his
preemptory challenges in a constitutional manner." (*Wheeler*, *supra*, at p. 278; *People v.
Alvarez* (1996) 14 Cal.4th 155, 193.) Therefore, a defendant who believes the prosecutor
is using peremptory challenges to strike prospective jurors on the ground of group bias
alone carries the burden of establishing a prima facie case of purposeful discrimination.
(*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1122; *People v. Alvarez*, *supra*, at p. 193;
*People v. Arias* (1996) 13 Cal.4th 92, 134-135.)

3

"In . . . [*Johnson v. California* (2005) 545 U.S. 162], the United States Supreme Court reaffirmed that B*atson* states the procedure and standard to be employed by trial courts when challenges such as defendants are made. 'First, the defendant must make out a prima facie case by "showing that the totality of the relevant facts give rise to an inference of discriminatory purpose." [Citations.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justification for the strikes. [Citations.] Third, "if a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." ' " (*People v. Cornwell* (2005) 37 Cal.4th 50, 66-77.)

Defendant contends that the trial court applied an erroneous legal standard in evaluating whether he had made a prima facie showing of discrimination. At the time of trial, the latest pronouncement by the California Supreme Court as to the proper standard was *People v. Johnson* (2003) 30 Cal.4th 1302, 1306, in which the court held that a defendant is required to establish a strong likelihood or reasonable inference of discrimination, stating "the objector must show that it is more likely than not the other party's peremptory challenges, if unexplained, were based on impermissible group bias." Subsequently, however, in *Johnson v. California, supra*, 545 U.S. 162, the United States Supreme Court reversed this decision, holding that the "more likely than not" standard was inconsistent with *Batson*. According to the high court, a defendant can make a prima facie showing of racial discrimination "by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.' " (*Johnson v. California, supra*, at p. 169, fn. omitted, quoting *Batson, supra*, 476 U.S. at p. 94.) "[A] defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." (*Johnson v. California, supra*, at p. 170.)

The record here does not disclose whether the trial court applied the standard as articulated by the California Supreme Court or the less exacting standard required by the later decision of the United States Supreme Court. Defendant argues that we must

4

presume the trial court applied the standard prescribed as of the time of trial by the California Supreme Court. It is not necessary to speculate as to the thinking of the trial court, however, because defendant failed to make the necessary prima facie showing under either standard. (*People v. Gray* (2005) 37 Cal.4th 168, 187 [regardless of standard employed by trial court, record did not support inference that prosecutor excused juror on the basis of race; *People v. Cornwell, supra*, 37 Cal.4th at p. 73 [same].)

The record as a whole fails to support a reasonable inference that the prosecutor's peremptory challenges reflected the discriminatory purpose of eliminating African-Americans from the jury. The only basis for drawing such an inference in this regard stated in the trial court was that the prosecutor challenged one prospective juror who was African-American (Ms. C) after he had previously dismissed another African-American (Ms. G). However, the sole fact that challenges were used to excuse prospective jurors of a particular race is not necessarily sufficient to state a prima facie case. Although decided before the United States Supreme Court decision in *Johnson v. California, supra*, 542 U.S. 162 decisions of the California Supreme Court holding that "the removal of all members of a cognizable group, standing alone, is [not] dispositive on the question of whether defendant has established a prima facie case of discrimination" remain instructive. (*People v. Young* (2005) 34 Cal.4th 1149, 1173, fn. 7; see also *People v. Box* (2000) 23 Cal.4th 1153, 1188-1189.)

While in some contexts the use of two peremptory strikes on African-American prospective jurors might provide an inference of purposeful discrimination, we must evaluate the "totality of the relevant circumstances" surrounding the use of the two strikes. (See *Johnson v. California, supra*, 545 U.S. at p. 168.) Initially, the record fails to reflect the number of prospective African-Americans remaining in the panel, or whether any of the jurors ultimately selected were African-American. More importantly, as the trial court noted, the voir dire examination had brought out compelling reasons for striking the two prospective jurors that were African-Americans. Ms. G stated that her grandson had been in jail for two or three months in connection with a murder investigation but had not been charged. According to Ms. G, the police had questioned

5

her grandson and decided to keep him in custody because "he knows who the person is." She stated that every time her grandson goes to court the case is continued because the prosecutor, a member of the Alameda County District Attorneys office, is not ready. Similarly, Ms. C revealed that her brother had been convicted of murder. She believed someone may have lied to convict him, and was unable to answer whether she thought he was treated fairly. Under these circumstances, it is difficult to believe that any competent prosecutor would have permitted these two women to remain on the jury. Their peremptory removal, standing alone, hardly supports an inference that the challenges were made for an improper purpose.

Defendant states that the "chance probability of such an event"—two of three peremptory challenges being used to remove the only two African-Americans in the jury box of 12—"is only 3.8%."[2] Defendant argues that "[s]uch chance probabilities are clearly sufficient to 'support an inference' of purposeful discrimination." But while a statistical disparity may in some circumstances be sufficient to establish a prima facie case of discrimination, here it fails to do so. A defendant asserting racial discrimination in jury selection has the burden of creating as complete a record as possible. (*Wheeler, supra*, 22 Cal.3d at p. 280.) Defendant does not support his arguments with citations to the record, and we have found nothing in the record to indicate the racial composition of the venire or, as indicated above, whether any African-Americans were ultimately selected as jurors. (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115 [appellate court may treat as waived any factual contentions not supported by a citation to the record].) Moreover, in the context of this record as a whole, in which there existed such obvious and persuasive reasons for challenging Ms. G and Ms. C, the significance of defendant's statistics is minimal.

Defendant also suggested to the trial court that the use of three peremptory challenges to eliminate three women over 40 years of age reflected the discriminatory

---

[2]    Defendant arrives at this figure as follows: "2/12 [the first challenge], times 11/12 [the second challenge], times 1/12 [the third challenge], times a factor of three [which must be used when only two of three challenges were against a particular group]."

purpose of eliminating women, or possibly middle-aged women, from the jury. The trial court also rejected this suggestion and defendant makes only passing reference to it in his appellate briefs. There is nothing about the charges being tried suggesting that the gender of the jurors would be of any significance. The record does reflect, however, that the jury panel consisted of a disproportionate number of women and the jury as sworn ultimately included at least seven women. We see no basis to question the trial court's determination that there was no prima facie showing that the prospective jurors were excused because of their gender.

Even if one were to conclude that defendant had made a prima facie showing of purposeful discrimination, the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18.) Although ruling that such a showing had not been made, the trial court gave the prosecutor an opportunity to explain his challenges and the prosecutor provided several nondiscriminatory reasons for the peremptory strikes. Where the burden has shifted, "[t]he prosecutor need only identify facially valid race-neutral reasons why the prospective jurors were excused. [Citations.] The explanation need not justify a challenge for cause." (*People v. Gutierrez, supra*, 28 Cal.4th at p. 1122.) Here the prosecutor explained, "As to Ms. [G.] a factor in addition to the fact that her son is in custody at Santa Rita – or her grandson – excuse me – is in custody at Santa Rita, apparently facing charges of murder. She also had been to the court proceedings on his behalf, and it was her impression that each time he came to court, the case did not go forward because the D.A. was still putting the case together, of course being the same district attorney's office that I work for. [¶] . . . [¶] As additional factor as to Ms. [C] – obviously my major concern was the fact that her brother had been prosecuted for murder, had been convicted of murder in Alameda County by my office. [¶] Her belief about that case was she didn't know if he was justly treated or not and may have gone to prison for a murder that he didn't commit. [¶] Given that that was her feeling about what the system had wrought concerning her own brother, that was a major concern of mine." By moving on without commenting on the validity of these justifications, the trial court implicitly accepted them as genuine, race-neutral reasons. Whether or not there was an

7

adequate prima facie showing, it is clear that the prospective jurors were properly excluded.

*Lying in Wait*

Penal Code section 189, as relevant here, provides: "All murder which is perpetrated by mean of . . . lying in wait, . . . or by any other kind of willful, deliberate, and premeditated killing, . . . is murder of the first degree." The trial court instructed the jury on murder by means of lying in wait in accordance with CALJIC No. 8.25, as follows: "Murder which is immediately preceded by lying in wait is murder of the first degree. [¶] The term 'lying in wait' is defined as a waiting and watching for an opportune time to act, together with a concealment by ambush or some other secret design to take the other person by surprise. The lying in wait need not continue for a particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation."

Defendant's attack on CALJIC No. 8.25 is twofold. First, defendant argues that the instruction inaccurately defines murder perpetrated by lying in wait by focusing solely on the temporal relationship between the lying in wait and the killing, ignoring the causal relationship. Second, defendant contends that the instruction fails to inform the jury of the element of intent.

The validity of CALJIC No. 8.25 has been upheld repeatedly. (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139; *People v. Berberena* (1989) 209 Cal.App.3d 1099). In *People v. Laws* (1993) 12 Cal.App.4th 786, 796, the Court of Appeal rejected the argument that CALJIC No. 8.25 erroneously focuses on the temporal relationship between the lying in wait and the murder rather than emphasizing the causal relationship, stating that this argument "ignores a commonsense reading of the instruction as a whole. The instruction did not simply inform the jury that murder which is 'immediately preceded by lying in wait' is murder of the first degree. The jurors were told lying in wait requires a finding that the perpetrator waited and watched for an opportune time *to act*, together with a concealment by ambush or some other secret design to *take the other person by surprise*. Intelligent jurors would construe this instruction as requiring them to

8

find that the act constituting murder had to be accomplished by means of lying in wait in order to be first degree murder under the theory that it was perpetrated by means of lying in wait."

Defendant's contention that CALJIC No. 8.25 fails to require a finding that the lying in wait was done with the intent to kill or injure is similarly unavailing. "[N]othing in section 189 requires the lying in wait to have been done with the intent to kill, [nor does] the statute require[] the lying in wait to have been done with the intent to injure." (*People v. Laws, supra,* 12 Cal.App.4th at p. 794.) When a murder is perpetrated by lying in wait, no further evidence of defendant's mental state is required. (See *People v. Dickerson* (1972) 23 Cal.App.3d 721, 727 ["Section 189 leaves no room for doubt. If the murder was perpetrated by means of lying in wait, it need not be independently determined to have been 'willful, deliberate and premeditated.' [Citations.] . . . If it was perpetrated by means of lying in wait it is, by definition, first degree murder"]; *People v. Ruiz* (1988) 44 Cal.3d 589, 614; *People v. Hyde* (1985) 166 Cal.App.3d 463, 475.) CALJIC No. 8.25 contains the substance of all the elements of murder by lying in wait. (*People v. Ceja, supra,* 4 Cal.4th at pp. 1139-1140.) There was no error in the court's instructions.

## Disposition

The judgment is affirmed.

9

_____
Pollak, J.

We concur:

_____
Parrilli, Acting P. J.


_____
Siggins, J.

A111006

10

PROOF OF SERVICE

I declare that:

I am employed in the County of Alameda, California. I am over the age of eighteen years and not a party to the within cause; my business address is 2626 Harrison Street, Oakland, California 94612.

On December 28, 2006, I served the within PETITION FOR REVIEW on the interested parties in said cause, by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Mail at Oakland, California, addressed as follows:

Attorney General
Department of Justice
455 Golden Gate Avenue
Suite 11000
San Francisco, CA  94102-3664

FDAP
730 Harrison St., #201
San Francisco, CA  94107

Michael J. Wright
V91600
High Desert State Prison
P.O. Box 3030 - B1/146
Susanville, CA 96127-3030

Hon. Robert K. Kurtz, Judge
c/o Superior Court Clerk
Alameda County
Rene C. Davidson Courthouse
1225 Fallon Street
Oakland, CA 94612-4293

District Attorney
1225 Fallon St., Rm. 900
Oakland, CA 94612

Court of Appeal
First Appellate District
Division Three
350 McAllister Street
San Francisco, CA 94102

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on December 28, 2006 at Oakland, California.

_____
Kyle Gee

EXHIBIT 3

COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, | ) ) ) | CASE NO. A111006 |
| Plaintiff and Respondent, | ) ) | Alameda Co. Superior No. H36730 |
| vs. | ) ) | |
| MICHAEL J. WRIGHT, | ) ) | |
| Defendant and Appellant. | ) | |

---

APPELLANT'S OPENING BRIEF

---

Appeal from the Superior Court of Alameda County
Honorable Robert K. Kurtz, Judge

---

KYLE GEE  (SBN 065895)
2626 Harrison Street
Oakland, CA  94612
(510) 839-9230

Attorney for Appellant
MICHAEL J. WRIGHT

Under Appointment
By the Court of Appeal
Under the First District
Appellate Program's
Unassisted Case System

# TOPICAL INDEX

TABLE OF AUTHORITIES CITED  . . . . . . . . . . . . . . . . . . . . . .  v

STATEMENT OF APPEALABILITY  . . . . . . . . . . . . . . . . . .  1

STATEMENT OF THE CASE  . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . . . . . .  3

    A.    Introduction and Overview.  . . . . . . . . . . . . . . . . .  3

        1.    The Prosecution's View of the Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

        2.    The Defense's View of the Evidence. . . . . . . .  4

    B.    The Neighbor. . . . . . . . . . . . . . . . . . . . . . . . . . .  5

    C.    The Police Response. . . . . . . . . . . . . . . . . . . . . .  5

        1.    The First Officer at the Scene. . . . . . . . . . . . .  5

        2.    The Chase. . . . . . . . . . . . . . . . . . . . . . . . . .  5

D.    The Testimony of Macario Toscano's Friends
      and Family, and Macario Toscano Himself. . . . . . . .    6

      1.    Cesar Hernandez. . . . . . . . . . . . . . . . . . . . .    6

      2.    Rudy Yanez. . . . . . . . . . . . . . . . . . . . . . .    7

      3.    Patricia Toscano. . . . . . . . . . . . . . . . . . . .    8

      4.    Patricia Toscano's Son. . . . . . . . . . . . . . . .    11

      5.    Macario Toscano Himself. . . . . . . . . . . . . . .    11

E.    The Police Investigation. . . . . . . . . . . . . . . . . . .    14

F.    The Autopsy. . . . . . . . . . . . . . . . . . . . . . . . . .    15

G.    Mr. Wright's Hospitalization. . . . . . . . . . . . . . . . .    15

H.    Evidence Relating to Mr. Wright's Daughter. . . . . . . .    16

I.    Much Ado About Cell Phones. . . . . . . . . . . . . . .    17

I      THE TRIAL COURT APPLIED IMPROPER LEGAL STANDARDS TO THE QUESTION WHETHER THE DE-FENSE HAD MADE A *PRIMA FACIE* SHOWING OF PURPOSEFUL DISCRIMINATION UNDER *BATSON* PRINCIPLES. . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    A.    Introduction to the Issue. . . . . . . . . . . . . . . . . . . . . 19

    B.    The Trial Court's Legal Misperceptions. . . . . . . . . . . 19

        1.    *Johnson* v. *California*. . . . . . . . . . . . . . . . . 20

        2.    *Miller-El* v. *Dretke*. . . . . . . . . . . . . . . . . . 22

        3.    *Williams* v. *Runnels*. . . . . . . . . . . . . . . . . 23

    C.    The Motion and Ruling in the Trial Court. . . . . . . . . 24

    D.    The Trial Court's Ruling Was Based on an Erroneous Legal View. . . . . . . . . . . . . . . . . . . . 26

    E.    The Question of Remedy. . . . . . . . . . . . . . . . . . . . 31

II    CALJIC 8.25 ERRONEOUSLY FAILS TO REQUIRE
      EITHER THAT "LYING-IN-WAIT" BE THE "MEANS"
      BY WHICH MURDER IS EFFECTED, OR THAT THE
      "WATCHING AND WAITING" BE WITH AN INTENT
      AND PURPOSE TO KILL OR INJURE. . . . . . . . . . . . . 35

      A.    Introduction to the Issue. . . . . . . . . . . . . . . . . . . 35

      B.    The Law on Lying-in-Wait. . . . . . . . . . . . . . . . . 36

      C.    The Constitutional Deficiencies. . . . . . . . . . . . . . 44

      D.    The Error Requires Reversal of the First De-
            gree Murder Conviction. . . . . . . . . . . . . . . . . . . 46


CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

iv

## TABLE OF AUTHORITIES CITED

### FEDERAL CASES

*Apprendi* v. *New Jersey* (2000) 530 U.S. 466        44

*Batson-Kentucky* (1986) 476 U.S. 79        seriatim

*Blakely* v. *Washington* (2004) 542 U.S. 296        44

*Bui* v. *Haley* (11th Cir. 2003) 321 F.3d 1304        29

*Carella* v. *California* (1989) 491 U.S. 263        45

*Draper* v. *Washington* (1963) 372 U.S. 487        33

*Francis* v. *Franklin* (1985) 471 U.S. 307 and        45

*Griffin* v. *Illinois* (1956) 351 U.S. 12        33

*Griffin* v. *United States* (1991) 502 U.S. 46        47

*In re Winship* (1970) 397 U.S. 358        44

*Johnson* v. *California* (2004) 541 U.S. 428        20, 21

*Johnson* v. *California* (2005) ___ U.S. ___
    [162 L.Ed.2d 129]        20, 21

*Mahaffey* v. *Page* (7th Cir. 1998) 162 F.3d 481        28

*Miller-El* v. *Dretke* (2005) ___ U.S. ___
    [162 L.Ed.2d 196]        20, 22, 23

*Palmer* v. *Estelle* (9th Cir. 1993) 985 F.2d 456        31

*Paulino* v. *R.A. Castro* (9th Cir. 2004) 371 F.3d 1083        29

*Riley* v. *Taylor* (3d Cir. 1999) 277 F.3d 261        29

*Ring* v. *Arizona* (2002) 536 U.S. 584     44

*Sandstrom* v. *Montana* (1979) 442 U.S. 510     45

*Turner* v. *Marshall* (9th Cir. 1997) 121 F.3d 1248     29

*Ulster County Court* v. *Allen* (1979) 442 U.S. 140     32, 45

*United States* v. *Bishop* (9th Cir. 1992) 959 F.2d 820     30

*United States* v. *Esparsen* (10th Cir. 1991) 930 F.2d 1461     31

*United States* v. *Grandison* (4th Cir. 1989) 885 F.2d 143     31

*Williams* v. *Runnels* (9th Cir. 2006) 432 F.3d 1102     20, 23, 24, 28


### CALIFORNIA CASES

*Auto Equity Sales* v. *Superior Court* (1962) 57 Cal.2d 450     21

*City of Sacramento* v. *Drew* (1989) 207 Cal.App.3d 1287     26, 27

*In re Carmaleta B.* (1978) 21 Cal.3d 482     27

*In re Steven B.* (1979) 25 Cal.3d 1     33

*People* v. *Allen* (2004) 115 Cal.App.4th 542     31, 32

*People* v. *Apalatequi* (1978) 82 Cal.App.3d 970     33

*People* v. *Atchley* (1959) 53 Cal.2d 160     41, 44

*People* v. *Bealoba* (1861) 17 Cal. 389     38

*People* v. *Benjamin* (1975) 52 Cal.App.3d 63     42, 43

*People* v. *Berberena* (1989) 209 Cal.App.3d 1099     35

*People* v. *Davis* (1984) 161 Cal.App.3d 796     27

*People* v. *Deloza* (1998) 18 Cal.4th 585                     27

*People* v. *Dickerson* (1972) 23 Cal.App.3d 721               42

*People* v. *Garcia* (2000) 77 Cal.App.4th 1269               31

*People* v. *Gore* (1993) 18 Cal.App.4th 692                 31, 32

*People* v. *Green* (1980) 27 Cal.3d 1                       46, 47

*People* v. *Guiton* (1993) 4 Cal.4th 1116                   46, 47

*People* v. *Hall* (1983) 35 Cal.3d 161                         26

*People* v. *Heard* (2003) 31 Cal.4th 946                    32, 33

*People* v. *Howard* (1992) 1 Cal.4th 1132                   22, 33

*People* v. *Johnson* (1989) 47 Cal.3d 1194                  21, 22

*People* v. *Johnson* (2003) 30 Cal.4th 1302                    20

*People* v. *Laws* (1993) 12 Cal.App.4th 786                   35

*People* v. *Love* (1961) 56 Cal.2d 720                        27

*People* v. *Mattison* (1971) 4 Cal.3d 177                     35

*People* v. *Rodriguez* (1996) 50 Cal.App.4th 1013            31

*People* v. *Sanchez* (1864) 24 Cal. 17                        38

*People* v. *Sedeno* (1994) 10 Cal.3d 703                      47

*People* v. *Snow* (1987) 44 Cal.3d 216                      31, 32

*People* v. *Tapia* (1994) 25 Cal.App.4th 984         26, 27, 31, 33

*People* v. *Thomas* (1953) 41 Cal.2d 470             41, 42, 43, 44

*People* v. *Tuthill* (1947) 31 Cal.2d 92                      35

*People* v. *Tuthill* (1947) 31 Cal.3d 92       39, 40, 42, 43, 44

*People* v. *Ward* (1972) 27 Cal.App.3d 218       42, 43

*People* v. *Wheeler* (1978) 22 Cal.3d 258       20

*People* v. *Williams* (2000) 78 Cal.App.4th 1118       24, 31, 32

*Perko's Enterprises, Inc.* v. *RRNS Enterprises*
    (1992) 4 Cal.App.4th 238       26

## FEDERAL CONSTITUTIONAL PROVISIONS

Sixth Amendment       44, 46

Fourteenth Amendment       33, 44, 45, 46

## CALIFORNIA STATUTES

Penal Code section 189       36, 38

## OTHER AUTHORITIES CITED

Blackstone, *Commentaries on the Law of England* (1769)       37, 38

CALJIC 8.25       35, 36, 37, 43

Haywood and Burch, *Penal Code of California,*
    *Annotated* (1874)       38

Moreland, *The Law of Homicide* (1952)       37, 39

COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

PEOPLE OF THE STATE OF
CALIFORNIA,

      Plaintiff and
        Respondent,

vs.

MICHAEL J. WRIGHT,

      Defendant and
      Appellant.

_____/

## STATEMENT OF APPEALABILITY

This appeal is from a judgment that finally disposes of all issues between the parties.

## STATEMENT OF THE CASE

Appellant MICHAEL J. WRIGHT brings this appeal after conviction by a jury of first degree murder, attempted murder, and felony assault (Pen. Code §§ 187, 664, and 245(a)),[1] as well as "possession of

---

[1] All code references are to the Penal Code, unless otherwise noted.

1

cocaine for sale" (Health and Safety Code § 11351).  There were firearm arming findings (§ 12202(a)), and the admission of the truth of a "controlled substance" prior allegation (Health & Safety Code § 11370.2(a)).

Mr. Wright was charged by an Information filed July 29, 2004.  1-CT 179.[2]  He was tried on a Second Amended Information filed March 7, 2005, which added the Health and Safety Code violation.  2-CT 241.

Jury trial commenced with hearings on motions *in limine* on February 28, 2005.  1-CT 223.  The jury heard arguments on March 30, 2005 (2-CT 290), with instructions given on April 4, 2005.  2-CT 291.  Deliberations began the morning of April 4th (2-CT 291), and the jury's verdicts and findings were returned the following day.  2-CT 293, 389.  Also on that day, Mr. Wright admitted the prior.  2-CT 294.

On July 22, 2005, Mr. Wright was sentenced to State Prison for a determinate term of twelve years, consecutive to an indeterminate term of twenty-five-years-to-life, enhanced by a year for firearm arming.  Credits CT 427, 429, 444.

Notice of Appeal was timely filed July 25, 2005.  2-CT 431.  This appeal follows.

---

[2]/ Clerk's Transcript.

## STATEMENT OF FACTS

A.   Introduction and Overview.

This case presents distinct theories as to what had occurred on the evening of November 26, 2002, when two men broke into a home shared by cocaine middleman Macario Toscano, his sister, and his nephew. The prosecution's three theories were first degree felony-murder, premeditated and deliberate murder, and lying-in-wait murder. The defense's view was substantially different.

### 1.   The Prosecution's View of the Evidence.

The prosecution's primary theory was as follows:  Mr. Wright was a cocaine dealer who regularly purchased cocaine through Macario Toscano, the "middleman" between Mr. Wright and cocaine distributors such as Victor Barbosa. Mr. Wright had arranged a cocaine purchase at Mr. Toscano's home, intending not to pay for the drugs but to steal them, and Mr. Wright brought along two accomplices. Mr. Barbosa arrived with the cocaine, after which two of Mr. Toscano's friends also arrived.

Mr. Wright stalled under the guise of "testing" the cocaine while he called one of his cohorts on a cell phone. When Mr. Toscano's sister arrived, an accomplice hiding in the shrubs, and another hiding in Mr. Wright's van, assaulted the sister, broke into the house, fatally shot Victor Barbosa, and tried to shoot Macario Toscano. One accomplice fled on foot, and Mr. Wright and the other accomplice fled with the money and cocaine in the van.

However, the prosecution had secondary theories of the evidence. Instead of relying solely on first degree felony-murder as a theory of liability, the prosecution also sought and was allowed instructions on premeditated and deliberate murder, and on lying-in-wait murder.

3

2.    <u>The Defense's View of the Evidence</u>.

The defense's factual theory was this: There had been a previous dispute between Mr. Wright on the one hand, and Mr. Toscano and his cocaine distributor on the other, with regard to the amount of cash Mr. Wright had provided in a prior purchase of cocaine. Mr. Wright had come again to the house to purchase cocaine, having been contacted by Macario Toscano a few days earlier, with Mr. Toscano encouraging Mr. Wright to make another purchase. Mr. Wright was leery that he was being set up to be robbed of his drug money, because of the previous dispute over money.

Not trusting Mr. Toscano or the cocaine distributor, Mr. Wright brought two friends as "backup." Mr. Wright was inside the house testing the drugs, when the distributor, Mr. Barbosa, came to him and claimed he had been "shorted." In the meanwhile, two of Mr. Toscano's two friends had also arrived, which made Mr. Wright and his friends

on his cell phone.

When Mr. Toscano's sister also arrived and saw Mr. Wright's two friends outside, she was wrestled to the ground to prevent her warning Mr. Toscano and his cohorts. One of Mr. Wright's friends broke into the house, the distributor was shot, and other shots were fired. One of Mr. Wright's friends fled on foot, and Mr. Wright and his other friend fled in the van. They tried to elude police because of the drugs, but the van crashed and they were forced to flee on foot.

In other words, the defense theory was that this was a drug deal gone bad, in which Mr. Wright's "backup" believed -- correctly or incor-

4

rectly -- that the middleman, distributor and his friends were a threat to
Mr. Wright. Mr. Wright turns now to the evidence in greater detail.

B.    The Neighbor.

Greg Nealon lived across the street from 606 White Fir Drive in
San Leandro. 2-RT 560. On November 26, 2002, he was in the back of
his house when his son announced he had heard gunshots. 3-RT 563.

When Mr. Nealon looked out, he saw a blue van and Honda
Accord, with a screaming child behind the Honda. 3-RT 564. He told
his wife to call police, after which he saw a black man exit the house,
open the side door of the van, and climb inside. 3-RT 565. The man
wore no mask and did not appear to be carrying anything. 3-RT 575-
576. The van immediately drove off. 3-RT 569-570. After the van had
left, a Hispanic man ran out of the house. 3-RT 570.

C.    The Police Response.

1.    The First Officer at the Scene.

At around 7:20 p.m., Officer Fischer received the call of a shoot-
ing at 606 White Fir Drive. The front door appeared to have been kicked
open. A hysterical woman stood just inside the door, and a man lay on
the kitchen floor. The sliding glass door to the backyard was open, and
the screen from that door lay outside. 2-RT 551-556.

2.    The Chase.

On his way to the house, Officer Moss heard a dispatch that the
"suspect vehicle" -- a blue older-model van with tinted windows -- was
possibly southbound on Interstate 880 from Davis Street. 3-RT 720-721.

5

While Officer Moss sat on an overpass watching the freeway, a further dispatch stated a witness was following the van. 3-RT 721.

Officer Moss saw a rapidly moving blue van with dark windows on the southbound 880 on-ramp from eastbound Marina, followed by a compact car. Officer Moss joined the pursuit. 3-RT 722.

The van moved to the left lane, after which it quickly crossed to the far right lane. Officer Moss activated his lights and siren, and he followed the van onto Highway 238. 3-RT 724-725.

Because of traffic on 238, the van drove on the shoulder. They exited at Mission Boulevard, reaching Hampton Road. 3-RT 726-728. The van crashed into a stump in front of a house, and two occupants fled. 3-RT 730, 734.

As Officer Moss was leaving, he saw a white object in the street. 4-RT 746. When someone later mentioned a kilogram, Officer Moss asked an officer at the scene to collect that item. 4-RT 748.

D.    The Testimony of Macario Toscano's Friends and Family, and Macario Toscano Himself.

1.    Cesar Hernandez.

Mr. Hernandez was the stepbrother of Macario and Patricia Toscano. 3-RT 577. Mr. Hernandez knew Mr. Toscano dealt drugs, and he knew Mr. Yanez to be gang-related. 3-RT 602-603.

Mr. Hernandez and Rudy Yanez went to Mr. Toscano's house that afternoon, because they were supposed to play basketball. 3-RT 578-579. When they arrived, they entered through the unlocked front door, which Mr. Hernandez locked after he entered. 3-RT 580, 613. Mr. Toscano and Mr. Barbosa were inside, and Mr. Hernandez went to the kitchen. 3-RT 581-583. A black man was by the stove in the kitchen. 3-RT 583.

6

Mr. Toscano said they would have to wait a few minutes, and Mr. Hernandez and Mr. Yanez went into the garage. Moments later, Mr. Hernandez heard a child screaming outside the house, and sounds of the front door being kicked open. 3-RT 585-588.

There were gunshots, and Mr. Yanez left the garage through a side door while Mr. Hernandez hid behind a sofa. 3-RT 590-591. Mr. Hernandez heard someone enter the garage and leave. 3-RT 591-592.

When Mr. Hernandez left the garage, he found Patricia Toscano at the front door, screaming. Mr. Hernandez and Mr. Yanez took Mr. Hernandez's nephew to Mr. Hernandez's father's house. 3-RT 593-594.

Mr. Hernandez told police Mr. Barbosa had entered the garage while he and Mr. Yanez were there. 3-RT 625. Mr. Hernandez did not see Mr. Barbosa take anything from the garage. 3-RT 626.

2.    Rudy Yanez.

Mr. Yanez admitted he was "Norteno gang-related." 3-RT 688. Mr. Yanez had felony convictions for sale of heroin and assault with a deadly weapon. 3-RT 676-677, 689. Mr. Yanez knew Macario Toscano was a drug dealer, and in 1996 and 1997, Mr. Yanez had dealt drugs with Mr. Toscano. 3-RT 677.

On November 26, 2002, Mr. Yanez's plan had been to play basketball with Mr. Toscano. 3-RT 650. Mr. Yanez picked up Mr. Hernandez and drove to where Mr. Toscano lived with his sister and her children. 3-RT 651-653.

Mr. Yanez and Mr. Hernandez went to the unlocked front door and entered. Mr. Yanez asked Mr. Toscano why he had left the door un-locked, and Mr. Hernandez locked the door. 3-RT 655-656.

7

Mr. Yanez entered the kitchen, where he saw Mr. Toscano and Mr. Wright "cooking dope" in a pot on the stove. Mr. Yanez had previously seen Mr. Wright twice. 3-RT 656-658.

Mr. Yanez went to the garage and tried to play a video game. Mr. Yanez recalled telling police of a "Mexican dude" walking back and forth from the kitchen to the garage. 3-RT 660. Mr. Yanez saw a brick of cocaine on the garage floor. 3-RT 674.

While in the garage, Mr. Yanez and Mr. Hernandez heard noises. Someone said, "Help," and Mr. Yanez went to the French doors leading from the garage through a bedroom into the front hallway. 3-RT 663.

Through the doors, Mr. Yanez saw a man with a revolver turn and fire. 3-RT 664, 702. The man was wearing a ski mask. 3-RT 665-666. The man was not Mr. Wright. 3-RT 703.

Mr. Yanez left the garage through a side door, fleeing down the street. 3-RT 664, 667. As far as he knew, the cocaine was still on the

Mr. Yanez saw the gunman walk around the house. After the gunman had left, the blue van drove by and someone called "Ant." 3-RT 668-669. As Mr. Yanez reentered the house, Mr. Toscano came out, got in a little car, and drove away. 3-RT 671-672.

Mr. Yanez entered the kitchen and saw the Mexican man on the ground. 3-RT 673. Mr. Yanez then left the house, for two reasons: Patricia asked him to take Juan to Mr. Hernandez's father's house; and Mr. Yanez was on parole. 3-RT 678.

3.    Patricia Toscano.

As of November 26, 2002, Patricia Toscano and her children had been living at 606 White Fir Drive for a couple of weeks. Her brother,

8

Mr. Toscano, visited regularly, kept things at the house, and sometimes spent the night in the converted garage where he kept his belongings. 4-RT 765-766. Cesar Hernandez was her stepbrother. 4-RT 766.

By way of general impeachment of Patricia, she admitted she had committed perjury in the past. 4-RT 840. Years earlier, she pled guilty to welfare fraud. 4-RT 841.

On November 26, 2002, Patricia picked up her children from school, after which she shopped. When she called Mr. Toscano around 6:30 p.m. and told him she was on her way home, he told her not to come home. 4-RT 767-769.

In a subsequent call, Mr. Toscano said someone "was there." She argued with Mr. Toscano because she had not wanted anyone to know where she lived. 4-RT 769. Mr. Toscano told her he was with "him," and Patricia assumed Michael Wright was at the house doing a narcotics transaction. 4-RT 815-817.

Patricia believed Mr. Toscano was dealing drugs, and she did not want people coming to her house or having "that stuff" around her children. Patricia had told Mr. Toscano she wanted no one at her house except family, and she decided to go home and tell everyone to get out. 4-RT 770-771.

When she arrived home, she saw a van in her parking space and a man lying in the bushes. The man was African-American, about five eight, and slim, and he wore no mask. When she asked if he were okay, he hit her with a black gun, and she began to scream. 4-RT 771-774, 821.[3]

---

[3]/ Patricia had bruises to her face, arms and legs. 4-RT 791-792.

9

Patricia and the man were struggling, and they ended up by the van. Another black man opened the van door, and the two tried to pull her into the van. 4-RT 775, 831. The man inside the van wore a ski mask, and he also had a gun. 4-RT 776.

The masked man from the van walked toward the front door. 4-RT 777. Patricia heard the door being forced. 4-RT 822.

At the same time, the man from the shrubs released Patricia and ran. Patricia heard about six gunshots, and someone said: "Let's go. Let's get out." 4-RT 778-780.

Patricia saw the man with the mask leave the house with Mr. Wright, whom she had seen with her brother several times previously. 4-RT 781. Mr. Wright was also African-American. 4-RT 831.

Mr. Wright carried what appeared to be a clear or white plastic bag, and the other man held a gun. 4-RT 783. Mr. Wright went to the van, while the other man walked down the sidewalk. 4-RT 784.

Barbosa bleeding on the kitchen floor. 4-RT 784. After calling 911, Patricia saw a beaker containing a white substance on the stove, and she flushed the substance down the toilet because she feared going to jail. 4-RT 785. Mr. Yanez and Mr. Hernandez entered, and Patricia told them to take her son outside. 4-RT 787.

After police arrived, Patricia spoke to Mr. Toscano by phone. 4-RT 793. Mr. Toscano told her not to say anything. 4-RT 795. Mr. Yanez also told Patricia not to tell police anything. 4-RT 796.

Patricia told police she had seen Mr. Wright come to the house. 4-RT 807. She also told police Mr. Barbosa would bring drugs to Mr. Toscano, Mr. Toscano would give the drugs to Mr. Wright, Mr. Wright

10

would give money to Mr. Toscano, and Mr. Toscano would give the money to Mr. Barbosa. 4-RT 808.

At trial, Patricia testified she never saw a gun in Mr. Wright's hands. 4-RT 824. However, she had told police that night Mr. Wright was the person with the mask and gun exiting the house. 4-RT 839. She also told police that night she had seen only two people, one of whom was Mr. Wright. 4-RT 832-834.

### 4.    Patricia Toscano's Son.

Eleven-year-old Juan testified that when his mother got out of the car, a man in the bushes attacked her. The man was African-American, wore a dark sweater and dark pants, and had a gun. 5-RT 865.

Another man wearing a ski mask jumped out of the blue van and kicked in the front door to the house. Juan then heard three gunshots. 5-RT 866, 868. Juan saw the man with the ski mask and the man who had attacked his mother exit the house and get in the van. 5-RT 868. He did not see Mr. Wright at the house that night. 5-RT 875.

### 5.    Macario Toscano Himself.

Mr. Toscano had been told before he testified he would not be prosecuted for drugs. 7-RT 1216-1217. He had a 1992 conviction for discharging a firearm into an occupied vehicle. 7-RT 1222.

Macario Toscano testified that he had known Mr. Wright about twelve years. 7-RT 1149. Macario acted as a "middle man" between Mr. Wright and sellers of cocaine, having brokered 50 to 100 cocaine deals, usually involving a kilo 7-RT 1150-1151. Mr. Toscano's cut for a kilo would be approximately $1000. 7-RT 1219.

Mr. Toscano asserted he had been "shorted" by $5000 in a drug transaction with Mr. Wright four or five months before November, 2002. 7-RT 1222. When Mr. Toscano contacted Mr. Wright, Mr. Wright claimed all of the money had been there, and Mr. Toscano had done nothing to recoup his loss. 7-RT 1223.

On November 26, 2002, at about 6:30 p.m., Mr. Toscano met Mr. Wright in the Wal-Mart parking lot. 7-RT 1152-1153. The two had arranged the meeting by phone several days earlier. 7-RT 1153. This was their first deal since Mr. Toscano had been "shorted." 7-RT 1223.

Mr. Toscano parked behind Mr. Wright's van. Mr. Wright said he would go for his money, and Mr. Toscano said he would broker the deal. 7-RT 1154.

Mr. Toscano called Victor Barbosa, who had a kilo, after which Mr. Wright called Mr. Toscano. 7-RT 1157. They met again at Wal-Mart, and Mr. Toscano told Mr. Wright to follow him. 7-RT 1158.

way and Mr. Wright parked on the side of the house. 7-RT 1160-1161. Mr. Wright had a bag of money in a white grocery bag. 7-RT 1163.

When Mr. Barbosa arrived, they went to the converted garage. Mr. Wright had never met Mr. Barbosa, although Mr. Toscano had acted as middle-man in deals between them. 7-RT 1164.

Mr. Barbosa handed Mr. Toscano the kilo, Mr. Wright gave Mr. Toscano the money, and Mr. Toscano gave the money to Mr. Barbosa. 7-RT 1166. Mr. Toscano cut open the kilo and removed approximately an ounce, to which he added baking soda. 7-RT 1166, 1168. Mr. Toscano and Mr. Wright took the mixture to the kitchen, while Mr. Barbosa remained in the garage with the remaining cocaine. 7-RT 1169.

12

While Mr. Wright was "rocking up" the cocaine to test it, Cesar and Rudy arrived. 7-RT 1170, 1173. Mr. Toscano told them they could wait in the garage with Mr. Barbosa. 7-RT 1175.

Mr. Barbosa came to the kitchen and told Mr. Toscano, in Spanish, that the money was "short" by $1200 or $1300, and Mr. Toscano relayed this in English to Mr. Wright. 7-RT 1176. Mr. Wright said he had just counted it, and Mr. Toscano told Mr. Barbosa to double-check to see if bundles had fallen. 7-RT 1177. Mr. Wright remained at the stove, but the "rocking up" process was not occurring as it should. 7-RT 1179. While they were in the kitchen, Mr. Wright made or received a phone call. 7-RT 1256-1257.

Soon thereafter, Mr. Toscano heard his niece and nephew yelling outside, and he heard the door being kicked in, followed by gunshots. 7-RT 1180. Mr. Toscano and Mr. Wright moved to the hallway, but when Mr. Toscano turned toward the patio, Mr. Wright turned toward the gunman in the hall. 7-RT 1183-1184. Mr. Toscano fled outside through the patio door, hearing more gunshots and feeling bullets passing. 7-RT 1181-1182, 1185.

Mr. Toscano jumped a fence and hid. 7-RT 1185. He heard the van start and saw it back up. 7-RT 1187. The van stopped in the street, and the driver opened his door and stood briefly on the running board. 7-RT 1188. The van then left. 7-RT 1189.

Mr. Toscano saw his sister's car, and he followed the van on Davis Street. 7-RT 1191, 1194, 1196-1197. They got onto the freeway, exited on Marina, and got back on the freeway heading south. 7-RT 1200-1201. Mr. Toscano called 911 while following the van. 7-RT 1275.

13

A police car began chasing the van, and Mr. Toscano followed until the van stopped on a lawn. Someone with a white plastic bag exited the passenger side and ran, with the officer in pursuit. Mr. Toscano left without speaking to the officer. 7-RT 1202-1206.

Mr. Toscano's cell phone number was 384-7697. 7-RT 1224. He reached his sister on her cell phone, and she told him Mr. Barbosa was dead and he needed to return home to speak to police. 7-RT 1210-1211. After going to his truck on 98th Avenue for his phone charger, he drove to his sister's house. 7-RT 1213-1214.

Mr. Toscano admitted that, in his first statement to police, he had not been truthful. He had not said Mr. Wright had followed him to the house or gone inside the house. 7-RT 1301. He had not said that Mr. Wright had been inside the house when Mr. Barbosa was in the house, or that an exchange of money and drugs had taken place. 7-RT 1302.

E.    The Police Investigation.

Police searched the house. 5-RT 932-933. In the converted garage were a digital scale, a razor blade, plastic wrapping, suspected narcotics, a bag of marijuana, and paperwork in the name of Mr. Toscano. 5-RT 942, 948. Newspapers lay on the garage floor, and the scale and razor blade sat atop them. 5-RT 949.

The screen from the sliding glass door lay on the patio. 5-RT 978, 985. In the yard, there were bullet holes in the planter boxes and fence. 5-RT 978. A kitchen knife was found on the patio. 5-RT 986.

No weapons were found, and no knife was seen near the decedent. 5-RT 964. A slug was recovered from a dresser in the garage, and another from the kitchen floor. 5-RT 944, 962. Both slugs were consistent with a .44 Magnum caliber handgun, both were semi-jacketed, and

14

the general class characteristics of the rifling were the same.  6-RT 1018-1021.

At 7:30 p.m., an officer was sent to Hampton Road, where he recovered a plastic bag of white powder from a driveway.  5-RT 901, 906.  The "brick" contained 942.68 grams of cocaine.  5-RT 1005-1006.

On November 27, 2002, the van was searched.  9-RT 1396.  The registration card showed the van to be registered to Irene Knox and insured in the name of Johnnie Knox.  9-RT 1413.  Three ski masks were found, as was a sales tag for a ski mask.  9-RT 1417, 1421-1422, 1424.

Currency in the amount of $3740 was found on the driver's seat. A Motorola cell phone, with the battery missing, was between the bench and back of the driver's seat, and a Samsung cell phone was behind the driver's seat.  A battery cover for the Motorola phone was in a white plastic bag on the passenger's seat, along with $4010 in cash.  On the driver's seat was another $3740 in cash.  9-RT 1399-1402, 1405, 1407.

A crime scene investigator recovered twelve latent fingerprints from the van.  4-RT 852, 854-857.  A latent fingerprint from the interior driver's door window matched Mr. Wright's left thumb.  9-RT 1500.  A print from the sales tag matched his right index finger.  9-RT 1496.

F.    The Autopsy.

Dr. Thomas Rogers performed the autopsy.  There were "through and through" gunshot wounds to the left neck and right wrist.  A single slug could have caused both wounds.  5-RT 888-893.

G.    Mr. Wright's Hospitalization.

November, 2002, James Lambert was a charge nurse in the emergency room at Valley Care Medical Center in Pleasanton.  Sometime

15

after midnight, "Mike" came in with an open fracture of the lower leg. Mike said he had been hurt when he and a friend hopped a fence in his friend's backyard. 8-RT 1321-1323.

When Mr. Lambert placed "Mike's" jacket on the floor, he saw cash in the pockets. Mr. Lambert put "Mike's" belongings into a bag and gave the bag to "Jackie." 8-RT 1325-1326.

Police went to the Valley Care Hospital. 6-RT 1112. They found Mr. Wright there under the name "Michael Foster." 6-RT 1113-1114.

H.    Evidence Relating to Mr. Wright's Daughter.

In November, 2002, Mr. Wright's daughter, Kamajia, was living on Hampton Road in Hayward. 6-RT 1029-1030. One night in November, 2002, police cars were in the neighborhood, and police knocked, asking to search her backyard. 6-RT 1030-1032.

Later that night, her father arrived with an African-American man with gold teeth. Her father's leg was hurt. and he wanted her mother to take him to the hospital. However, her mother refused. 6-RT 1032-1035.

Ms. Wright called her father's wife, Jackie, who arrived with her son, and the son and the man with gold teeth helped her father to the car. 6-RT 1036, 1039. The man with gold teeth was not referred to by name, and Ms. Wright had never seen him. 6-RT 1040.

On December 9, 2002, Officer Calcagno searched Jackie Wright's apartment. 6-RT 1068-1069. Ms. Wright directed him to a hospital bag, and she gave the officer approximately $1200 dollars in cash, saying it had come from a coat inside the bag. 6-RT 1070. Also in the bag were "indicia" for Michael Wright, a black jacket, and a shirt and a sock with apparent bloodstains. 6-RT 1074-1079.

16

I.    <u>Much Ado About Cell Phones</u>.

Detective Pickard gave a great deal of testimony about cell phones, and in general the testimony was confounding. Much of the confusion relates to the fact the Samsung cell phone could not make up its mind what time it was, or what time calls had occurred.

As for the more sensible aspect of the detective's testimony, she explained that, in November, 2002, she had turned on the Samsung phone and determined its number to be 282-0800. 9-RT 1440. The detective asserted that, because the battery was low, she did not bother to record dates, times and durations of calls, but she reported five outgoing calls (to numbers 427-4253, 997-2356, 760-4105, and 569-8214), and seven incoming calls (from numbers 427-1002, 384-7697, 798-3341, 427-4253, 760-4105, 534-3618, and 534-4353). 9-RT 1442-1443.

Also in 2002, Detective Pickard used a borrowed battery to obtain information from the Motorola phone. 9-RT 1446. Its phone number was 427-1002. Its last ten received calls, in reverse order, were from: 282-0800 (November 26, 7:04 p.m.); "Tiffany B." (November 26, 6:16 p.m.); "Karlee Lee" (November 25, 3:20 p.m.); 324-4609 (November 24, 6:17 p.m.); 282-0800 (November 24, 5:34 p.m.); "Ant Twiggy" (November 24, 5:18 p.m.); "Ant Twiggy" (November 24, 5:11 p.m.); 282-0800 (November 24, 5:09 p.m.); "Ant Twiggy" (November 24, 4:07 p.m.) and "Ant Twiggy" (November 24, 3:52 p.m.). 9-RT 1447-1448. Its last four outgoing calls were all to 282-0800, all on November 26th, and at these times: 6:32, 7:04, 7:05, and 7:08 p.m. 9-RT 1449.

Things became more murky in March, 2004, when Detective Pickard purchased a charger for the Samsung and a battery for the Motorola, and she tried again to access the information in the phones. 9-

17

RT 1451.  First, the date and time shown on March 8 were January 1 and 12:45 p.m.  Second, the phone did not have the same stored phone information it had in 2002.  9-RT 1452-1453.

Both phones were turned on again on March 24, 2005, at 3:35 p.m., with the Motorola showed a correct date and time, but with the Samsung showing January 17 and 3:16 p.m.  9-RT 1453.  When the detective searched the calls in the Samsung, she concluded that the times for all calls were off by twelve hours and either 18 or 19 minutes, which adjustments resulted in "matches" between the Samsung and Motorola phones.  9-RT 1457-1459.

Ultimately, the detective formed the opinion that the Motorola phone connected to the Samsung phone at 7:08 p.m. on November 26, for a minute and three seconds.  There were other calls between the phones which did not connect.  9-RT 1460-1465, 1477-1478.

Detective Pickard never explained why the Samsung incoming and outgoing calls she recorded in November, 2002, did not remotely match the calls she found on the phone in March, 2003.  See, page 17, ¶ 2, above.

18

I

## THE TRIAL COURT APPLIED IMPROPER LEGAL STANDARDS TO THE QUESTION WHETHER THE DEFENSE HAD MADE A *PRIMA FACIE* SHOWING OF PURPOSEFUL DISCRIMINATION UNDER *BATSON* PRINCIPLES.

A.    Introduction to the Issue.

In this case, a *Batson-Wheeler* motion was made based on the prosecutor's peremptory challenges against three women, two of whom were African-American, based on issues of gender and race. The motion was denied on the basis that no *prima facie* showing had been made.

Mr. Wright submits the judgment must be reversed. A California trial court in March, 2005, when Mr. Wright's jury was selected, operated under a number of legal misconceptions, based on California Supreme Court case law then binding on the trial court by operation of the doctrine of *stare decisis*. Not the least of those misconceptions was that a *prima facie* showing of purposeful discrimination imposed on a defendant a "more likely than not" burden of persuasion.

Recent United States Supreme Court decisions have made clear that the California Supreme Court was wrong in several of its *Batson-Wheeler* rulings. As a result, Mr. Wright's trial court was applying improper legal standards in resolving the question of a *prima facie* showing. For these reasons, the judgment should be reversed.

B.    The Trial Court's Legal Misperceptions.

On June 13, 2005, the United States Supreme Court decided two important cases. Those decisions, filed on the same day, have sent a clarion call to all state appellate courts, including those of California.

19

The two cases are *Johnson* v. *California* (2005) ___ U.S. ___ [162 L.Ed.2d 129] (hereinafter, "*Johnson II*") and *Miller-El* v. *Dretke* (2005) ___ U.S. ___ [162 L.Ed.2d 196] (hereinafter, "*Miller-El II*"). The United States Supreme Court made clear in *Johnson II* and *Miller-El II* that it demands a high level of attention to the problem of systematic exclusion of cognizable groups from jury service, and that the state courts -- including those of California -- have fallen short in that regard.

Finally, the Ninth Circuit has recently had occasion in *Williams* v. *Runnels* (9th Cir. 2006) 432 F.3d 1102 to discuss the implications of *Johnson II* and *Miller-El II* on the manner in which a *prima facie* showing may be made. In particular, California's "numbers do not suffice" rule has also been laid to rest by *Johnson II* and *Miller-El II*.

    1.    *Johnson v. California*.

In *People* v. *Johnson* (2003) 30 Cal.4th 1302, the California Supreme Court had reached the following conclusion with regard to a *prima facie* showing of purposeful discrimination under *Batson-Kentucky* (1986) 476 U.S. 79 and *People* v. *Wheeler* (1978) 22 Cal.3d 258:

> We conclude that *Wheeler*'s terms, a "strong likelihood" and a "reasonable inference," refer to the same test, and this test is consistent with *Batson*. Under both *Wheeler* and *Batson*, to state a prima facie case, the objector must show that it is *more likely than not* the other party's peremptory challenges, if unexplained, were based on impermissible group bias.

> *People* v. *Johnson, supra*, 30 Cal.4th at 1306; emphasis added.

20

This was the law in effect in California at the time of trial. Under well-established principles of *stare decisis*, it is the law which would have been applied by the trial court in ruling on Mr. Wright's *Batson motion. See Auto Equity Sales* v. *Superior Court* (1962) 57 Cal.2d 450.

However, the United States Supreme Court granted certiorari from the decision in *People* v. *Johnson, supra.* After an initial misfire,[4] the Court on June 13, 2005 issued its opinion in *Johnson II*. In that opinion, the United States Supreme Court rejected the California Supreme Court's "'more likely than not' standard," deeming it "an inappropriate yardstick by which to measure the sufficiency of a prima facie case." *Johnson II, supra,* 162 L.Ed.2d at 138.

In discussing its opinion in *Batson*, the United States Supreme Court explained in *Johnson II*, as follows:

> We did not intend the first step to be so onerous that a defendant would have to persuade the judge -- on the basis of all the facts, some of which are impossible for the defendant to know with certainty -- that the challenge was more likely than not the product of purposeful discrimination. Instead, a defendant satisfies the requirements of *Batson*'s first step by producing evidence *sufficient to permit the trial judge to draw an inference* that discrimination has occurred.
>
> *Johnson II, supra,* 162 L.Ed.2d<br>at 139; emphasis added.

According, Mr. Wright's trial court was applying the incorrect legal standard of persuasion to the issue of a *prima facie* showing. Mr. Wright did not confront a "more likely than not" burden of persuasion.

---

[4]/ *Johnson* v. *California* (2004) 541 U.S. 428.

2.    *Miller-El v. Dretke.*

The United States Supreme Court also decided *Miller-El II* on June 13, 2005. Prior to *Miller-E II*, the California Supreme Court had taken the position that comparative juror analysis is a disapproved concept in California. *See, e.g., People* v. *Johnson* (1989) 47 Cal.3d 1194, 1219-1222. The views of the California Supreme Court also included that a trial court presented with a *Batson-Wheeler* motion might content itself with ruling based solely on defense counsel's "showing," with no seeming duty independently to go beyond defense counsel's showing. *See People* v. *Howard* (1992) 1 Cal.4th 1132, 1154. The California Supreme Court had also taken the position that a trial court might merely examine the record as to the jurors in the suspect group, to determine whether a theoretical basis for a valid, race-neutral challenge existed as to each such juror, and could validly deny the motion without finding that a *prima facie* case had been made. *Id.*, at 1155. In *Miller-*

positions.

In *Miller-El II*, the Supreme Court, in reviewing the procedural and factual circumstances before it, made "side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve," even though this had not been done in the state court. *Miller-El II, supra*, 162 L.Ed.2d at 214. In a footnote, the Court made clear that comparative juror analysis is not limited to comparison of "identical" jurors.

> None of our cases announces a rule that no comparison is probative unless the situation of the individuals compared is identical in all respects, and there is no reason to accept one. ... A *per se* rule that a defendant cannot win a *Bat-*

22

*son* claim unless there is an exactly identical white juror
would leave *Batson* inoperable; potential jurors are not
products of a set of cookie cutters.

*Id.*, at 218 fn. 6.

In another footnote, the United States Supreme Court made clear
that the trial court's responsibility in ruling on a *prima facie* case is not
limited to the matters identified by defense counsel:

The dissent contends that comparisons of black and
nonblack venire panelists, along with Miller-El's arguments
about the prosecution's disparate questioning of black and
nonblack panelists and its use of jury shuffles, are not
properly before this Court, not having been "put before the
Texas courts." [Citation.] .... There can be no question
that the transcript of *voir dire*, recording the evidence on
which Miller-El bases his arguments and on which we base
our result, was before the state courts ....

*Id.*, at 215 fn. 2.

Accordingly, *Johnson II* and *Miller-El II* illuminate the standards
under which Mr. Wright's trial court should have evaluated Mr. Wright's
attempted showing of a *prima facie* case. The question thus becomes the
effect of *Johnson II* and *Miller-El II* on Mr. Wright's appeal.

3.    *Williams v. Runnels*.

*Williams* was an AEDPA habeas proceeding, after a *Batson-
Wheeler* complaint had been denied in a California trial court, with the
denial affirmed by a California Court of Appeal. The Ninth Circuit
articulated its first task as "ascertain[ing] the proper legal standard for
reviewing a claim of purposeful discrimination based on *statistical*

23

*disparity.* ..." *Williams* v. *Runnels, supra,* 432 F.3d at 1105; emphasis added.

The *Williams* court read *Johnson II* and *Miller-El II* as affirming the long-standing Ninth Circuit rule that a *prima facie* showing could be "based on a statistical disparity alone." *Williams* v. *Runnels, supra,* at 1107. While the presumption raised by a statistical disparity "could be dispelled by other relevant circumstances" (*ibid.*), those "'other relevant circumstances' must do more than indicate that the record would support race-neutral reasons for the questioned challenges." *Id.,* at 1108. The *Williams* court ultimately concluded that its "review of the existing record, informed by *Johnson* and *Miller-El,* fails to disclose a refutation of the inference of bias raised by the statistical disparity." *Williams, supra,* at 1109. Habeas relief was granted.

With that legal backdrop, Mr. Wright will now review the proceedings in the trial court leading to the unsuccessful *Batson-Wheeler* the impact of *Johnson II* and *Miller-El II* on his appeal.

C.    The Motion and Ruling in the Trial Court.

After prospective jurors had been called into the jury box (1B-RT 249-250), and after cause challenges had been granted (1B-RT 342-345), the twelve prospective jurors in the box when peremptory challenges began were as follows: (1) Ms. Kilgore; (2) Ms. [Juror 2]; (3) Ms. Hirwe; (4) Ms. Chatman (who was African-American); (5) Ms. [Juror 5]; (6) Mr. [Juror 6]; (7) Ms. [Juror 7]; (8) Ms. Gibson (who was African-American); (9) Ms. Engel; (10) Ms. [Juror 10]; (11) Mr. Gu; and (12) Mr. Tsuyemura. Accordingly, there were three men and nine women in the box, with two of the women being African-American.

24

The prosecutor's first peremptory challenge was against African-American woman Ms. Gibson (seat eight), which led to a bench conference. 1B-RT 358. Ms. Gibson was replaced by Mr. Divis, such that the prospective panel now had one African-American (Ms. Chatman), and a balance of four men and eight women.

After the defense passed the challenge, the prosecutor's second challenge was against Ms. Engel (seat nine). 1B-RT 366. Ms. Engel was replaced by Ms. [Juror 9], which left the racial and gender balance in the jury box unchanged.

After the defense again passed, the prosecutor's third peremptory challenge was against African-American woman, Ms. Chatman. This led to a second bench conference. 1B-RT 371.

The hearing on the *Batson-Wheeler* motions was not held until later that day. See, 1B-RT 436. Defense counsel noted that the *Wheeler-Batson* motions during the bench conferences had been based on the prosecutor's use of two of his first three challenges to remove African-American women Ms. Gibson and Ms. Chatman. However, counsel was also moving based on the prosecutor's use of his first three challenges against older women, those challenges having been used to remove Ms. Engel, Ms. Gibson, and Ms. Chatman. 1B-RT 436-437.

The trial court stated its unwillingness to make a finding of a *prima facie* showing. The court noted that Ms. Chatman's brother had been convicted of "the very offense that we are dealing with here." 1B-RT 437. The court noted further that Ms. Gibson had a family member facing charges in Alameda County. 1B-RT 438. The court could recall nothing noteworthy about Ms. Engel, but the court failed to see "any pattern," for the reason there were still women on the jury, some of

25

whom appeared to be over 40. *Ibid.* The trial court declined to require a statement of reasons from the prosecutor, and the *Wheeler-Batson* motion was denied. *Ibid.*

After the motion had been denied, the prosecutor volunteered as to Ms. Gibson that she had gone to her family member's court proceedings, and on each occasion, the case "did not go forward because the D.A. was still putting the case together." The prosecutor also noted that she had been "wearing sunglasses in court." 1B-RT 438-439.

The prosecutor referred further to Ms. Chatman's lack of opinion as to whether her brother had been "justly treated or not and may have gone to prison for a murder he did not commit." The prosecutor noted further that Ms. Chatman had sought a hardship excusal "based on the fact that she did not want to be here." 1B-RT 439. The prosecutor made no observations with regard to Ms. Engels.

D.    The Trial Court's Ruling Was Based on an Erroneous Legal View

Error occurs where a lower court rules while unaware of the legal parameters controlling its ruling. *See Perko's Enterprises, Inc.* v. *RRNS Enterprises* (1992) 4 Cal.App.4th 238, 245; and *City of Sacramento* v. *Drew* (1989) 207 Cal.App.3d 1287, 1298.

For example, the Supreme Court reversed in *People* v. *Hall* (1983) 35 Cal.3d 161, where the record established that the trial court had not understood its legal duty of inquiry at *Batson*'s "step three." *Id.,* at 168-169. ".... [T]he trial court apparently considered itself bound to accept all of the prosecutor's explanations at face value. ..." *Id.,* at 169.

In *People* v. *Tapia* (1994) 25 Cal.App.4th 984, the Fifth District reversed where the trial court had applied an "objective" standard at "step three," rather than evaluating the prosecutor's stated reasons. *Id.,* at

26

1014-1020. As the *Tapia* court stated the matter: "... [T]here has been no published California case in which a reviewing court has affirmed a lower court's *Wheeler* ruling where, as here, the trial court resolved the issue based upon the wrong legal standard, without even considering the criteria upon which the decision is properly based." *Id.*, at 1015.

Also of relevance are *People* v. *Deloza* (1998) 18 Cal.4th 585, 599-600, where the trial court erred in concluding as a matter of law that it lacked discretion to impose concurrent sentences; and *People* v. *Love* (1961) 56 Cal.2d 720, 728-729, where the trial court misunderstood its obligation to review the evidence and determine whether the evidence was sufficient to support the jury's death verdict at the penalty phase of a capital trial. *See, also, People* v. *Davis* (1984) 161 Cal.App.3d 796, 802-803. *Cf. People* v. *Deloza* (1998) 18 Cal.4th 585, 599-600.

> Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion. [Citation.] If the trial court is mistaken about the scope of its discretion, the mistaken position may be "reasonable", i.e., one as to which reasonable judges could differ. [Citations.] But if the trial court acts in accord with its mistaken view the action is nonetheless error; it is wrong on the law.
>
> *City of Sacramento* v. *Drew*
> (1989) 207 Cal.App.3d 1287,
> 1297-1298.[5]

The trial court's ruling here involved both legal and factual misperceptions. As discussed, the trial court was applying a "more likely

---

[5] ".... [D]iscretion can only be timely exercised if there is no misconception by the trial court as to the legal basis for its action." *In re Carmaleta B.* (1978) 21 Cal.3d 482, 496.

27

than not" rather than a "supports an inference" standard, with the former having been disapproved in *Johnson II*.

The trial court was also unmoved by the statistical disparity in the use of two of thee challenges to remove African-American women, and with the use of three challenges to remove to remove older women. As for two of three challenges against the only two African-American persons in the jury box, the chance probability of such an event -- independent of considerations of race -- is only 3.8%.[6] Moreover, the chance probability of the first three challenges against women is also low (33.3%), even where the panel on each occasion had more women than men.[7] Such chance probabilities are clearly sufficient to "support an inference" of purposeful discrimination.

Furthermore, the trial court's ability to posit its own reasons for challenges to two of the three women jurors did not defeat the inference of purposeful discrimination, since "'other relevant circumstances' must

for the questioned challenges." *Williams* v. *Runnels, supra*, 432 F.3d at 1108. Moreover, a conjectural reason "cannot be mistaken for the actual reasons for a challenge." *Mahaffey* v. *Page* (7th Cir. 1998) 162 F.3d 481, 483-484 fn. 7. Stated another way: "Apparent or potential reasons do not shed any light on the prosecutor's intent or state of mind when

---

[6]  That figure is computed as follows:  2/12 [the first challenge], times 11/12 [the second challenge], times 1/12 [the third challenge], times a factor of three [which must be used where only two of there challenges were against a particular group].

[7]  9/12 x 8/12 x 8/12 = 576/1728.

making the peremptory challenge." *Riley* v. *Taylor* (3d Cir. 1999) 277 F.3d 261, 282 (*en banc*).[8]

The same issue arose in another context in *Paulino* v. *R.A. Castro* (9th Cir. 2004) 371 F.3d 1083. In *Paulino*, the trial court erroneously failed to find that a *prima facie* showing had been made, with the court interrupting defense counsel's arguments in favor of a *prima facie* finding to posit its own reasons for the prosecutor's challenges. The Ninth Circuit stated in *Paulino*, as follows:

> The process employed by the trial court to evaluate Paulino's objection clearly contravened the procedure outlined in *Batson*. The trial court never permitted defense counsel to explain the basis for his objection in the first instance. Instead, the trial court interrupted defense counsel and offered, sua sponte, its *speculation* as to why the prosecutor may have struck the five potential jurors in question. But it does not matter that the prosecutor might have had good reasons to strike the prospective jurors. What matters is the *real* reason they were stricken.

> *Id.*, at 1089-1090; first emphasis added; second emphasis in original.[9]

_____

[8]/ *See, also, Bui* v. *Haley* (11th Cir. 2003) 321 F.3d 1304, 1313-1314 [reasons posited at a post-trial hearing as to bases on which she *might* have exercised a challenge do not satisfy *Batson*]; and *Turner* v. *Marshall* (9th Cir. 1997) 121 F.3d 1248, 1253 ["The arguments that the State has made since the evidentiary hearing do not form a part of the prosecutor's explanation"].

[9]/ Later in *Paulino*, the Ninth Circuit observed that "the trial court never required the prosecutor to [explain her actual motivations for her peremptory challenges], relying instead on its own *speculation as to what might have been* the prosecutor's reasons." *Id.*, at 7062; emphasis added.

Finally, the trial court was of the view that other older women on the panel defeated the *prima facie* showing, despite three-of-three challenges against such women. Since the prosecutor could have used these challenges no more quickly than he did, this suggests the trial court deemed the presence of older women -- alone -- to undermine the defense's showing. No so.

The Ninth Circuit in *United States* v. *Bishop* (9th Cir. 1992) 959 F.2d 820 confronted a claim that a "proportionally representative" trial jury validated an apparently discriminatory use of challenges against black jurors. While the Court of Appeals rightly deemed such a circumstance relevant to the determination whether a *prima facie* case had been made, that circumstance did not validate unconstitutional conduct.

> In this case, the trial judge apparently believed that, the issue of discriminatory intent notwithstanding, *Batson* is satisfied if a "representative jury" remains after jury selection -- i.e., if the percentage of blacks on the jury panel is at least as great as the percentage of blacks on the original venire. *See supra*. This is a question of law which we review *de novo*. [Citation.]

> It is true that representativity and, more generally, a prosecutor's acceptance of black jurors, are factors that a trial judge may take as an indication of non-discriminatory motive. [Citation.] However, there is a critical distinction between using proportional representation as evidence of the government's sincerity and using it to offset a constitutional violation, thereby rendering the violation somehow harmless. The latter scenario collides with the fundamental principle that "under *Batson*, the striking of *one black juror* for a racial reason violates the Equal Protection Clause." [Citations.]

> *Id.*, at 827 [emphasis in original].

30

*See, also, Palmer* v. *Estelle* (9th Cir. 1993) 985 F.2d 456, 458; *United States* v. *Esparsen* (10th Cir. 1991) 930 F.2d 1461, 1467 n. 5; and *United States* v. *Grandison* (4th Cir. 1989) 885 F.2d 143, 147.

In short, this Court should respectfully refuse to follow what will be respondent's inevitable invitation to treat the trial court's ruling as a valid ruling by an informed judge.

E.    The Question of Remedy.

In *People* v. *Snow* (1987) 44 Cal.3d 216, the California Supreme Court discussed the possibility of a limited remand after a finding of error in the *Batson-Wheeler* context, suggesting that, in an appropriate case, a limited remand might be validly ordered. *Id.*, at 226-227. In *People* v. *Gore* (1993) 18 Cal.App.4th 692, the Fifth District ordered such a remand, after a trial court had erroneously denied a *Batson-Wheeler* motion as untimely. *Id.*, at 705-706. Limited remands were also ordered by the Fifth District in *People* v. *Rodriguez* (1996) 50 Cal.App.4th 1013, 1036, and *People* v. *Tapia, supra,* 25 Cal.App.4th at 1031-1032; by the Second District, Division Four, in *People* v. *Williams* (2000) 78 Cal.App.4th 1118, 1125-1126; and by the Fourth District, Division Three, in *People* v. *Garcia* (2000) 77 Cal.App.4th 1269, 1281-1282.

However, such remands should be the exception, rather than the rule, and Mr. Wright believes there should be no such remand here. As explained by Division Three of this Court in *People* v. *Allen* (2004) 115 Cal.App.4th 542:

> While *Wheeler* error has been deemed reversible per se in light of the fundamental right involved, remand for a further hearing on the issue may be ordered in appropriate

31

cases. (*People* v. *Williams* (2000) 78 Cal.App.4th 1118, 1125 [ ]; *People* v. *Gore* (1993) 18 Cal.App.4th 692, 706 [ ]; *People* v. *Snow* (1987) 44 Cal.3d 216, 226-227 [ ].) "Ordinarily, factors to be considered in determining whether remand is appropriate are the length of time since voir dire, the likelihood that the court and counsel will recall the circumstances of the case, the likelihood that the prosecution will remember the reasons for the peremptory challenges, as well as the ability of the trial judge to recall and assess the manner in which the prosecutor examined the venire and exercised other peremptory challenges." (*People* v. *Williams, supra,* 78 Cal.App.4th at p. 1125.) This, however, does not appear to be an appropriate case. Voir dire in this case was conducted over three years ago, it was a short and unremarkable trial, and the limited information in the record [is] unlikely to trigger reasonably accurate memories of Ms. W.'s dress and demeanor by the prosecutor and the judge. (Compare with *People* v. *Gore, supra,* 18 Cal.App.4th at p. 706 [limited remand appropriate because case was a death penalty case, and therefore it was "likely counsel and the court paid close attention to and are more likely to remember the specifics of voir dire as opposed to less serious cases"].)

> *People* v. *Allen, supra,* at 553-554 n. 10.

The question thus becomes whether Mr. Wright's case falls into the *Tapia-Gore* category, or into the *Allen* category, and on that question Mr. Wright submits that his case is much more akin to *Allen.* Mr. Wright had a short, non-capital trial, with little to render it remarkable.

Perhaps more importantly, the practice in Alameda County is to dispose of juror questionnaires. That practice is predicated on the California Supreme Court's implicit approval of such a procedure in *People* v. *Heard* (2003) 31 Cal.4th 946. In that case, the California Supreme Court took the position that, insofar as comparative juror

32

analysis is a disapproved approach in California, and inasmuch as review in California is essentially limited to the matters raised by defense counsel in the trial court, nothing is lost on appeal when the questionnaires have not been retained. *Id.*, at 970-971.

However, we now know from *Johnson II* and *Miller-El II* that these views of the California Supreme Court are not in accord with the views of the United States Supreme Court. Accordingly, the loss of the questionnaires has an effect not only on the trial court's ability to consider "all relevant circumstances" in the event a remand is ordered, but on meaningful appellate review in the event of a remand and ruling adverse to the defense on the *Batson-Wheeler* motion.

The Due Process Clause of the Fourteenth Amendment assures a criminal appellant a record of the proceedings "sufficient to permit adequate and effective appellate review." *People* v. *Howard* (1992) 1 Cal.4th 1132, 1166, citing *Griffin* v. *Illinois* (1956) 351 U.S. 12, 20. *See, also, Draper* v. *Washington* (1963) 372 U.S. 487, 496-499.[10] If an adverse ruling is made on remand, without benefit of the juror questionnaires, that ruling will not be susceptible to challenge by Mr. Wright in a subsequent appeal. For all of these reasons, a limited remand is not appropriate in this case.

Finally, if there is to be a limited remand, Mr. Wright submits that it should be under the parameters set forth in *People* v. *Tapia, supra*, 25 Cal.App.4th at 1031, where "the court will assume the defendant has established a prima facie case...." The prosecutor would state the reasons

---

[10] "On appeal there must exist an adequate record to enable the court to pass upon the questions sought to be raised. *People* v. *Chessman* (1950) 35 Cal.2d 455, 460." *People* v. *Apalatequi* (1978) 82 Cal.App.3d 970, 973. *Accord In re Steven B.* (1979) 25 Cal.3d 1, 7.

for the challenges in question, the trial court can evaluate whether it has sufficient records and memory to evaluate those stated reasons, and a "step three" ruling can be made. If there were to be a ruling adverse to the defense, another appeal could follow.

II

CALJIC 8.25 ERRONEOUSLY FAILS TO REQUIRE
EITHER THAT "LYING-IN-WAIT" BE THE "MEANS"
BY WHICH MURDER IS EFFECTED, OR THAT
THE "WATCHING AND WAITING" BE WITH AN INTENT
AND PURPOSE TO KILL OR INJURE.

A.    Introduction to the Issue.

A third of a century ago, the California Supreme Court stated:

> ....[I]n the case of a killing committed by lying in wait, it
> is not sufficient to merely show the elements of waiting,
> watching and concealment. It must also be shown that the
> defendant did those physical acts with the intent to take his
> victim unawares and for the purpose of facilitating his
> attack. (*People* v. *Tuthill* (1947) 31 Cal.2d 92, 100 [ ].)

> *People* v. *Mattison* (1971) 4
> Cal.3d 177, 183.

This has been California law for decades. In order for lying-in-wait to establish first degree murder, an assaultive intent and purpose must be shown. A concealment and waiting to accomplish other goals will not suffice, even if a murder closely follows the period of concealment and waiting.

Yet CALJIC 8.25, "Murder by Means of Lying in Wait," says nothing about the intent or purpose of the actor while lying in wait. It is flawed.

Variations on this argument have been rejected by the Third District (*People* v. *Laws* (1993) 12 Cal.App.4th 786), and by Division One of this Court (*People* v. *Berberena* (1989) 209 Cal.App.3d 1099). Mr. Wright nonetheless brings the argument anew, because it has federal

35

constitutional underpinnings, because the California Supreme Court has yet to rule on the issue, and because the error infected his case.

There are several problems with CALJIC 8.25. First is the focus of the instruction solely on the *temporal* relationship between the watching and waiting, and the murder. Second is the failure of the instruction to limit the range of "intents" with which one watches and waits, that will support a first degree murder verdict under a lying-in-wait theory.

As the instruction is drafted, one could watch and wait with an intent merely to frighten a person as a joke, and if the "humorous" confrontation were to turn ugly and the person were to be murdered, a first degree murder would be proven irrespective of premeditation or deliberation as to the killing. Similarly, one could watch and wait intending to commit any number of crimes outside the felony murder definition, and a first degree murder would be proven if the defendant thereafter acted with implied malice.

Mr. Wright contends that the policy considerations which lying-in-wait first-degree murder in California favor a doctrine which requires a causal relationship between the lying-in-wait and murder, and an intent during the period of watching and waiting to inflict injury. He further contends that the lying-in-wait decisions of the Supreme Court support his contention on this issue.

In a nutshell, Mr. Wright submits that lying-in-wait murder has causal and "intent and purpose" elements. CALJIC 8.25 does not reflect either element, and the instruction is constitutionally flawed.

B.    The Law on Lying-in-Wait.

Penal Code section 189 defines as first degree murder "[a]ll murder which is perpetrated by means of ... lying-in-wait ...." In this

case, and over defense objection (10-RT 1586-1587), the prosecutor obtained an instruction on the "lying in wait" theory of first degree murder. The instruction given was CALJIC 8.25, which read as follows:

> Murder which is immediately preceded by lying in wait is murder of the first degree.
>
> The term "lying in wait" is defined as a waiting and watching for an opportune time to act, together with a concealment by ambush or some other secret design to take the other person by surprise. The lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.

12-RT 1767.

Lying-in-wait is of ancient origin. Blackstone suggests it was introduced into English law by King Canute "to prevent his countrymen, the Danes, from being privily murdered by the English; and was afterwards continued by William the Conqueror for the like security of his own Normans." Blackstone, *Commentaries on the Law of England*, Book IV (1769) p. 194.

Moreland explains its early development as a response to assassinations by the Saxons of the Normans. Moreland, *The Law of Homicide* (1952), 198-199. Moreland observed that murders by lying-in-wait, poison or torture, are "historic survivors"; and "while originally they had a reason for being in the law, the original reason for their being has largely ceased and they have all been re-rationalized as acts which conclusively indicate deliberate and premeditated murder". *Id.*, at 206.

Lying-in-wait became part of California law by an 1856 amendment to the Act Concerning Crimes and Punishment (Stats. 1850, Ch. 99,

p. 231).  As amended, § 21 of the Act divided murders into degrees,
providing, in part, that murder "perpetrated by ... lying-in-wait ... shall be
deemed murder of the first degree."  (Stats. 1856, Ch. 139, § 1, p. 219).
The amended statute was copied from Pennsylvania's Statute of 1794.
*See, e.g.,* Haywood and Burch, *Penal Code of California, Annotated,* 82,
83 (1874).

Blackstone, who influenced the framers of the Pennsylvania
Statute, viewed lying-in-wait as a form of *proof* of mental state:

> Express malice is when one with a sedate and deliberate
> mind and formed design doth kill another:  which formed
> design is evidenced by external circumstances discovering
> that inward intention; as lying in wait, antecedent menaces,
> former grudges, and concerted schemes to do him some
> bodily harm.

> *Blackstone, supra* at 199.

In 1861 the California Supreme Court addressing the 1856
amendment to the Act Concerning Crimes & Punishment, considered
murder by acts such as poison, lying-in-wait, or torture to "carry with
them conclusive evidence of premeditation."  *People* v. *Bealoba* (1861)
17 Cal. 389, 393-394.  In 1864, the Court reasoned that first-degree
murder was fully defined by whether the murder was willful, deliberate
and premeditated; lying-in-wait, like poison or torture, was merely a form
of proving premeditation.  *People* v. *Sanchez* (1864) 24 Cal. 17, 29.

The degrees-of-murder statute remained unchanged with the
enactment of the Penal Code in 1872.  The Code Commissioner's Notes
as to Section 189 explained lying-in-wait in accordance with the *Sanchez*

decision: lying-in-wait, like torture and poison, reflected conclusive *evidence* of premeditation.[11]

In more recent years, the California Supreme Court has arguably departed from the "re-rationalization" explanation of lying-in-wait, the use of poison, and the use of torture. For example, first-degree torture-murder need not be premeditated, or even intentional. Murder by torture is understood to be a *moral* equivalent of premeditated murder.

Likewise, the California Supreme Court has rejected attempts to equate lying-in-wait murder with willful, deliberate and premeditated murder. Lying-in-wait stands on its own, as a legislatively defined form of first-degree murder. Death need not be intended.

Lying-in-wait in California case law has suffered significant vagueness and inconsistency. In 1947, the California Supreme Court stated "there appears to be no California case precisely defining the phrase 'lying in wait'." *People* v. *Tuthill* (1947) 31 Cal.3d 92. Unfortunately, that observation is equally true today.

The "causal" element of lying-in-wait, and the mental state element, are both illustrated by *Tuthill*, a case of special significance in this area of law, because it first held that the victim need not be attacked while unaware of the "ambush" in order for lying-in-wait to be established. In *Tuthill* the defendant had gone to the cabin where his wife was staying, loaded a rifle, and he lay down with the rifle hidden by his body and fell asleep. When his wife and her friend returned, she woke him, and he rose, revealing the rifle and pointing it at his wife. The wife and

---

[11] The "re-rationalization" which equates murder by poison, lying-in-wait, or torture with premeditated and deliberate murder has been criticized. Lying-in-wait alone does not necessarily entail an intent to inflict serious injury, or to inflict any injury. *See e.g.*, *Moreland*, *supra*, at 206.

friend walked out of the cabin a few feet, but the wife decided to return. As she re-entered the cabin, she was shot fatally. *Id.*, at 94-95.

The defendant in *Tuthill* urged, *inter alia*, that "in order to commit a murder 'by means of ... lying in wait ...' (Pen. Code § 189), the lying in wait must be the 'means,' method or proximate cause by which the defendant is enabled to kill his victim before he can escape; ...." This contention the Supreme Court accepted. The Court did not, however, accept the further contention that the wife's becoming aware of the defendant's presence terminated the lying-in-wait.

> The elements of waiting, watching, and secrecy all were present.... Defendant's presence in the cabin was unexpected, and obviously [the wife] was unaware of her danger, of *the tenacity of his grim objective* and *of his purpose to kill her.* .... The fact that she was shot on her return to the doorway indicates that defendant's action was not hasty, and that his *watch to kill* was continuous and unbroken. *This lying in wait was the "means" through which defendant accomplished his purpose. The evidence was sufficient to* support the inference that the lying in wait was *a part of the defendant's plan to kill* and *the means by which he carried out the plan.*

> *Id.*, at 101; emphasis added.

These concepts of "the 'means' through which defendant accomplished his purpose," of a "watch to kill," and of the lying-in-wait's being "a part of the defendant's plan to kill," have been lost in the current statement of the doctrine, which is concerned with the temporal proximity of the waiting to the killing. Only the most nebulous "mental state" considerations are suggested.

40

Mr. Wright cannot, consistent with the current state of the law, argue that lying-in-wait requires a "plan to kill" while the waiting and watching are ongoing. In *People* v. *Thomas* (1953) 41 Cal.2d 470 the Supreme Court considered a challenge to a set of lying-in-wait instructions which included the following:

> "'The gist of "lying in wait" is that the person places himself in a position where he is *waiting and watching and concealed from the person killed with the intention of inflicting bodily injury upon such person or of killing such person.*'
>
>             *       *       *
>
> "'Where the killing is by "lying in wait," and the act causing death was intentional, it is murder of the first degree, whether the killing was intentional or unintentional, as in such case it is not necessary that there exist in the mind of the perpetrator an intent to kill.'"

*Id.*, at 473-474; emphasis added.

The court found the instruction adequate, albeit "not as exact as it might be." *Id.* at 475.

Subsequent cases distilled from *Thomas* the following definition of lying-in-wait:

> The elements necessary to constitute lying in wait are watching, waiting, and concealment from the person killed *with the intention of inflicting bodily injury upon such person.* (*People* v. *Thomas*, [*supra*, at] 473."

*People* v. *Atchley* (1959)
53 Cal.2d 160, 175.

41

Other cases followed *Thomas* and similarly held that "intent to kill" is not an element of lying-in-wait. *See People* v. *Benjamin* (1975) 52 Cal.App.3d 63, *People* v. *Ward* (1972) 27 Cal.App.3d 218, and *People* v. *Dickerson* (1972) 23 Cal.App.3d 721. *Ward* and *Benjamin* reflect an unfortunate and -- in Mr. Wright's view -- unintended drift away from the *causal* approach to lying-in-wait, and from the necessity of a lying-in-wait done with a specific intent to kill or inflict bodily injury.

For example, in *Ward*, the instruction given retained the significant language, "perpetrated by means of lying-in-wait ..." *People* v. *Ward, supra*, at 228 n. 2. There was no longer, however, any reference to lying in wait *while harboring* an assaultive intent, but rather to striking the fatal blow with such intent. *Id.*, at 229 n. 2.

In *Benjamin* the drift was even further off the course set by *Tuthill* and *Thomas*. The instructions given in *Benjamin* substituted the term "immediately preceded by lying in wait" for "perpetrated by means of lying in wait" (*People* v. *Benjamin, supra*, at 81), and concluded with the following: "To constitute murder by means of lying in wait there must be, in addition to the aforesaid conduct by the defendant, an intentional infliction upon the person killed of bodily harm involving a high degree of probability that it will result in death and which shows a wanton disregard for human life." *Id.*, at 82. In other words, the *Benjamin* instructions did away with the *causal* view of lying-in-wait and substituted a *temporal* approach.

The instructions given in Mr. Wright's case took the last step, by excising all references to what the actor intended while watching and waiting, so long as, whatever he intended, he gave it careful thought.

42

CALJIC 8.25 has no language suggesting that there need be a causal relation between the lying-in-wait and the murder. It did not refer to "perpetrated by," as in *Thomas*, *Atchley*, and *Ward*; or "accomplished by," as in *Ward*; or the "means by which," as mentioned in *Tuthill*. The phrase selected was "immediately preceded by," a term merely of temporal relationship. Furthermore, no "intent" element was included -- neither "plan to kill" (*Tuthill*), nor "intention of inflicting bodily injury ... or of killing" (*Thomas*), nor mere "intention of inflicting bodily injury" (*Thomas*, *Atchley*, *Ward*, *Benjamin*).

The sole -- and doubtless perplexing -- reference to the actor's mental state is that the "duration" of the lying-in-wait must be "such as to show a state of mind equivalent to premeditation or deliberation." Precisely how a juror would have understood this latter reference is highly speculative. Must the "duration" have been "such as [ordinarily] to show a state of mind equivalent to premeditation and deliberation," or must the actor have personally had while watching and waiting "a state of mind equivalent to premeditation or deliberation?"

For that matter, what is "a state of mind equivalent to premeditation or deliberation"? Does this mean *factually* equivalent or *morally* equivalent? The jury would not reasonably understand it to be an exact factual equivalent to premeditation and deliberation in the usual first degree murder sense, as the decision there being weighed is the decision whether or not to kill, which is not required by CALJIC 8.25. Nor could the jury be expected to understand the instruction to tell them they should consider whether there was a state of mind "morally" equivalent to premeditation, as such a charge is virtually incomprehensible.

43

EXHIBIT 4

COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

PEOPLE OF THE STATE OF )
CALIFORNIA, )
) CASE NO. A111006
) 
Plaintiff and Respondent, ) Alameda Co. Superior
) No. H36730
)
vs. )
)
MICHAEL J. WRIGHT, )
)
Defendant and Appellant. )

———————————————

APPELLANT'S REPLY BRIEF

———————————————

Appeal from the Superior Court of Alameda County
Honorable Robert K. Kurtz, Judge

———————————————

KYLE GEE  (SBN 065895)
2626 Harrison Street
Oakland, CA  94612
(510) 839-9230

Attorney for Appellant
MICHAEL J. WRIGHT

Under Appointment
By the Court of Appeal
Under the First District
Appellate Program's
Unassisted Case System

# TOPICAL INDEX

TABLE OF AUTHORITIES CITED . . . . . . . . . . . . . . . . . . . . . . ii.

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . 1

A.    The Judgment Should Be Reversed Because the Trial Court,
      Under the Imperative of California Supreme Court Authori-
      ty, Applied an Erroneous Legal Standard to the *Prima Facie*
      Showing Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B.    CALJIC 8.25 Should Require Either that "Lying-in-Wait" Be the
      "Means" by Which Murder Is Effected, or that the "Watching and
      Waiting" Be with an Intent and Purpose to Kill or Injure. . . . 6

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

i

## TABLE OF AUTHORITIES CITED

### FEDERAL CASES

*Batson* v. *Kentucky* (1986) 476 U.S. 79                    2, 4, 5, 6

*Boyd* v. *Newland* (9th Cir. 2006) 455 F.3d 897                    5

*Johnson* v. *California* (2005) 545 U.S. 162 [                    3, 4

*Miller-El* v. *Dretke, supra*, 545 U.S. 231                    2, 5

*United States* v. *Bishop* (9th Cir. 1992) 959 F.2d 820                    5, 6

### CALIFORNIA CASES

*People* v. *Berberena* (1989) 209 Cal.App.3d 1099                    6

*People* v. *Cornwell* (2001) 37 Cal.4th 50                    2, 3, 4

*People* v. *Fuentes* (1991) 54 Cal.3d 707                    6

*People* v. *Granillo* (1987) 197 Cal.App.3d 110                    6

*People* v. *Hardy* (1992) 2 Cal.4th 86                    5

*People* v. *Johnson* (2006) 38 Cal.4th 1096                    3

*People* v. *Laws* (1993) 12 Cal.App.4th 786                    6

*People* v. *Moore* (1988) 47 Cal.3d 63                    5

*People* v. *Rojas* (1992) 11 Cal.App.4th 950                    6

*People* v. *Tapia* (1994) 25 Cal.App.4th 984                    3

COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

PEOPLE OF THE STATE OF
CALIFORNIA,

      Plaintiff and
        Respondent,

vs.

MICHAEL J. WRIGHT,

      Defendant and
      Appellant.
_____/

## PRELIMINARY STATEMENT

Appellant MICHAEL J. WRIGHT in this Reply Brief will address certain of the contentions and arguments advanced by the People in the Respondent's Brief ("RB").  As for any matter not specifically addressed, Mr. Wright will rely on the points and authorities set forth in his Opening Brief ("AOB").

1

A.  The Judgment Should Be Reversed Because the Trial Court, Under
the Imperative of California Supreme Court Authority, Applied an
Erroneous Legal Standard to the *Prima Facie* Showing Issue.

Mr. Wright raised this issue at AOB 19 through 33, and respon-
dent's position is set forth at RB 7 through 19.  The disagreements be-
tween Mr. Wright and respondent are several.

Respondent's position, as the section heading at RB 7 is entitled, is
that "the record does not support an inference" that any of the three
jurors in question was excused "on the basis of group bias."  Respon-
dent's position is that this record in Mr. Wright's case is such that, *as a
matter of law*, no reasonable trial judge could have found the evidence in
this case to "support an inference" of purposeful discrimination.  It is a
steep hill that respondent seeks to climb.

Respondent at RB 8-9 contends as follows, a contention which is
-- with deference -- a distortion of the quoted United States Supreme
Court language:  "To determine whether the defendant has produced
evidence to support an inference of discrimination, *a reviewing court*
must examine 'the totality of the relevant facts.'  (*Miller-El* v. *Dretke*
(2005) 545 U.S. 231 [125 S.Ct. 2317, 2324]"; emphasis added.  The
United States Supreme Court in *Miller-El* was saying nothing about the
standards and procedures to be followed by "a reviewing court."  The
High Court in *Miller-El*, when it used the term "totality of the relevant
facts," was referring to its prong one holding in *Batson* v. *Kentucky*
(1986) 476 U.S. 79, 93-94, when a *Batson* motion is being considered by
a trial court -- not by a reviewing court.

Respondent cites *People* v. *Cornwell* (2001) 37 Cal.4th 50, in
which the California Supreme Court concluded as a matter of law that the

2

evidence before the trial court did not "support an inference" of purposeful discrimination. The California Supreme Court, in effect, found in *Cornwell* that no reasonable jurist would have viewed the evidence as satisfying the standard articulated in *Johnson* v. *California* (2005) 545 U.S. 162 [162 L.Ed.2d 129, 139], which requires only that the defendant have "produc[ed] evidence *sufficient to permit* the trial judge to *draw on inference* that discrimination has occurred." Emphasis added. The critical term in that holding, in terms of appellate review, is "permit"; the evidence need not "compel" an inference.

The California Supreme Court has made clear that it does not want appellate courts to assume the role of the trial court where the issue cannot be decided on a cold record as a matter of law. In *People* v. *Johnson* (2006) 38 Cal.4th 1096, the California Supreme Court made no effort to do that which respondent alleges should not be done. The California Supreme Court in *People* v. *Johnson, supra,* 38 Cal.4th 1096 elected the remedy approved in *People* v. *Tapia* (1994) 25 Cal.App.4th 984, under which "the court will assume the defendant has established a prima facie case...." *Id.,* at 1031. *Johnson*'s specific direction on remand was to move to "the second and third *Batson* steps." *People* v. *Johnson, supra,* 38 Cal.4th at 1105.

Clearly, the California Supreme Court does not intend that the appellate court should do the trial court's job in every case, which is the position respondent espouses. The matter may be resolved by an appellate court only where the record is such that as a matter of law no reasonable jurist could have found the evidence in this case to "support an inference" of purposeful discrimination.

3

Finally, the question of a *prima facie* showing -- as noted -- turns on the "'totality of the relevant facts ....'" *Johnson* v. *California, supra,* 545 U.S. 162 [162 L.Ed.2d 129, 138], quoting *Batson* v. *Kentucky, supra,* 476 U.S. 79, 93-94. This Court should be reluctant to address a *prima facie* showing issue on a "cold record," with no awareness of the jurors' modes of dress, facial expressions, demeanor, body language, and the like, when the simple expedient of a limited remand will ensure that all relevant circumstances will have been considered.

If this Court does elect to step into the trial court's shoes, Mr. Wright deems it difficult to compare and/or contrast the circumstances of his case with the circumstances of *Cornwell.* Certainly, no juror at issue in Mr. Wrights's case opined -- as did "Juror T" in *Cornwell* -- that "minorities are not treated the same as whites" in the criminal justice system. *Cornwell, supra,* 37 Cal.4th at 67. Ms. Engel and Ms. Gibson had no relative who had been to prison for murder, as did Juror T. in *Cornwell. Ibid.* Nor did any juror in Mr. Wrights's case use the Rodney King trial as an example of a "miscarriage of justice" based on race, as did Juror T. in *Cornwell.*

Moreover, Mr. Wright again refers this Court to the statistical disparity in his case, based both on race and gender. Given the racial composition of the jury when challenges were exercised, the chance probability of two of three challenges being against African-American jurors, without regard to race, was only 3.8%. See, AOB 28 and fn. 6. Given the gender composition of the jury when challenges were exercised, the chance probability of three of three challenges being against women, without regard to gender, was 33.3%. See, AOB 28 and fn. 7.

Mr. Wright notes that another Ninth Circuit case has recognized

4

statistical disparity to be a valid basis on which to make a *prima facie* showing under *Miller-El* v. *Dretke*, *supra*, 545 U.S. 231. *See Boyd* v. *Newland* (9th Cir. 2006) 455 F.3d 897, 905. It is crystal clear on this record that a reasonable trial court could have found the record to *permit* an inference of purposeful discrimination.

At RB 12, respondent urges that this Court should consider the gender composition of the final jury, which is asserted to have consisted of seven women, three men, and two "unknowns." However, the general principle is that trial court rulings are evaluated based on the information before the court at the time of the ruling. *See People* v. *Hardy* (1992) 2 Cal.4th 86, 167 [ruling on motion for severance]; and *People* v. *Moore* (1988) 47 Cal.3d 63, 80 [ruling on motion for self-representation]. Respondent's position, in effect, is that the trial court may have erred when the motion was made, but the trial court would not have erred if the ruling had been made at the conclusion of jury selection.

Moreover, the final composition of the jury -- with more women than men -- may have reflected the fact the prosecutor was dissuaded from subsequent *Batson* violation by the fact of the original *Batson* motion. As held in *United States* v. *Bishop* (9th Cir. 1992) 959 F.2d 820, the issue is not whether the cognizable group was represented on the final jury, but whether there had been systematic exclusion. In *Bishop*, the government claimed a "proportionally representative" trial jury validated an apparently discriminatory use of challenges against black jurors. The Court of Appeals recognized the contention to founder on "the fundamental principle that 'under *Batson*, the striking of *one black juror* for a racial reason violates the Equal Protection Clause.' *United States* v. *David*, 803 F.2d 1567, 1571 (11th Cir. 1986) (emphasis added);

5

[other citations omitted]." *United States* v. *Bishop, supra*, 959 F.2d at 827; emphasis in original. While *Batson* refers to "jurors," the wrongful peremptory challenge to any single member of a cognizable group constitutes a violation of the *Batson/Wheeler* principles. *See People v. Fuentes* (1991) 54 Cal.3d 707, 713-715; *People v. Rojas* (1992) 11 Cal.App.4th 950, 956; and *People v. Granillo* (1987) 197 Cal.App.3d 110, 121-123.

In short, constitutional error occurred. That error requires reversal of the judgment, with a remand for evaluation under *Batson*'s steps two and three.

B.   CALJIC 8.25 Should Require Either that "Lying-in-Wait" Be the "Means" by Which Murder Is Effected, or that the "Watching and Waiting" Be with an Intent and Purpose to Kill or Injure.

This issue was presented by Mr. Wright at AOB 35-48, and he noted that variations on the argument had been rejected by the Third District and Division One of this Court. *See People v. Laws* (1993) 12 Cal.App.4th 786; and *People v. Berberena* (1989) 209 Cal.App.3d 1099. He bought the argument because it has a federal constitutional basis, because the California Supreme Court has yet to rule, because the error had an effect here, and because -- with deference to the *Laws* and *Berberena* courts -- there must be more of a relationship between the period of "watching and waiting," and the homicide, than mere temporal happenstance.

As the instruction now reads, one could hide in order to play a harmless trick on someone. If the joke were to go sour and of a confrontation were to lead to implied malice murder, first degree murder would

6

be proven. This cannot be what the Legislature intended, notwithstanding respondent's arguments at RB 16-19, and error should be found.

## CONCLUSION

For the foregoing reasons, and for the reasons stated in the Opening Brief of Appellant, the judgment of conviction should be reversed. The case should be remanded with appropriate instructions.

Dated: September 18, 2006            Respectfully submitted,

KYLE GEE

Attorney for Appellant
MICHAEL J. WRIGHT

7

CERTIFICATE OF WORD COUNT

IN COMPLIANCE WITH RULE 33, SUBDIVISION (B)

I hereby certify, pursuant to Rule 33, subdivision (b), California Rules of Court, that the attached brief contains 1547 words. In this certificate, I am relying on the word count produced by Wordperfect 5.1.

Dated:  September 18, 2006

KYLE GEE

Attorney for Appellant
MICHAEL J. WRIGHT

## PROOF OF SERVICE

I declare that:

I am employed in the County of Alameda, California. I am over the age of eighteen years and not a party to the within cause; my business address is 2626 Harrison Street, Oakland, California 94612.

On September 18, 2006, I served the within REPLY BRIEF OF APPELLANT on the interested parties in said cause, by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Mail at Oakland, California, addressed as follows:

Attorney General
Department of Justice
455 Golden Gate Avenue
Suite 11000
San Francisco, CA  94102-3664

FDAP
730 Harrison St., #201
San Francisco, CA  94107

Michael J. Wright
V91600
High Desert State Prison
P.O. Box 3030 - B2/250L
Susanville, CA 96127-3030

Hon. Robert K. Kurtz, Judge
c/o Superior Court Clerk
Alameda County
Rene C. Davidson Courthouse
1225 Fallon Street
Oakland, CA 94612-4293

District Attorney
1225 Fallon St., Rm. 900
Oakland, CA 94612

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on September 18, 2006 at Oakland, California.

_Lauren Osher_
Lauren Osher

# EXHIBIT 5



IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

```
┌─────────────────────────────────────────┐
│                  FILED                    │
│  Court of Appeal First Appellate District │
│             APR - 3 2008                  │
│          Diana Herbert, Clerk             │
│  By_____Deputy Clerk           │
└─────────────────────────────────────────┘
```

In re MICHAEL J. WRIGHT,

    on Habeas Corpus.

A121084

(Alameda County
Super. Ct. No. CH 36730)

THE COURT:*

    The petition for a writ of habeas corpus is denied.

Dated: ___APR 3 2008___

**McGuiness, P.J.** P.J.

---

* McGuiness, P.J., Pollak, J., & Siggins, J.

MC-275

Name _MICHAEL J. WRIGHT_

Address _K.V.S.P.; P.O.Box 1502; FB3-114-L_

_DELANO, CA. 93215-1502_

CDC or ID Number _V-91600_

## IN THE COURT OF APPEAL, STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT, DIVISION THREE

(Court)

_MICHAEL J. WRIGHT_

Petitioner

vs.

_A. HEDGPETH; WARDEN_

Respondent _KERN VALLEY STATE PRISON_

PETITION FOR WRIT OF HABEAS CORPUS

No. _____

(To be supplied by the Clerk of the Court)

## INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

_1_

**This petition concerns:**

☒ A conviction                    ☐ Parole

☐ A sentence                      ☐ Credits

☐ Jail or prison conditions       ☐ Prison discipline

☐ Other *(specify):* _____

1. Your name: _____ MICHAEL J. WRIGHT _____

2. Where are you incarcerated? _KERN VALLEY S.P.; 3000 W. CECIL AVE. - P.O. BOX 5102, DELANO, CA 93215_

3. Why are you in custody? ☒ Criminal Conviction ☐ Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

_MURDER, ATT. MURDER, ASSAULT W/F. ARM; POSS. OF COCAINE; VICARIOUSLY_
_ARMED W/F. ARM; PRIOR C/S CONV.; AND PRIOR PRISON TERMS._

b. Penal or other code sections: _187(a), 187(a) 664, 245(a)(2), 11351, 12022(a), & 667.5(b)_

c. Name and location of sentencing or committing court: _SUPERIOR COURT, ALAMEDA COUNTY_
_1225 FALLON ST. OAKLAND, CA. 94612-4293_

d. Case number: _CH 36730_

e. Date convicted or committed: _04-05-2005_

f. Date sentenced: _07-22-2005_

g. Length of sentence: _38 YRS TO LIFE_

h. When do you expect to be released? _____

i. Were you represented by counsel in the trial court? ☒ Yes. ☐ No. If yes, state the attorney's name and address:

_RICHARD HOVE, BAR #53780_
_24072 MYRTLE ST, HAYWARD, CA. 94541_

ʲ. What was the LAST plea you entered? *(check one)*

☒ Not guilty  ☐ Guilty  ☐ Nolo Contendere  ☐ Other: _____

ᵏ. If you pleaded not guilty, what kind of trial did you have?

☒ Jury  ☐ Judge without a jury  ☐ Submitted on transcript  ☐ Awaiting trial

8. Did you appeal from the conviction, sentence, or commitment? ☒ Yes. ☐ No. If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

*CAL. COURT OF APPEAL, FIRST DIST. DIV. 3*

b. Result *AFFIRMED , SEE EXB.*     c. Date of decision: *DEC. 12, 2006*

d. Case number or citation of opinion, if known: *A111006*

e. Issues raised: (1) *SEE EXB.*

(2) *"*

(3) *"*

f. Were you represented by counsel on appeal? ☒ Yes. ☐ No. If yes, state the attorney's name and address, if known:

*KYLE GEE, BR. #65895, 2626 HARRISON ST, OAKLAND, Ca. 94612*

9. Did you seek review in the California Supreme Court? ☒ Yes ☐ No. If yes, give the following information:

a. Result *DENIED*     b. Date of decision: *FEB. 14, 2007*

c. Case number or citation of opinion, if known: *S149404*

d. Issues raised: (1) *SEE EXB*

(2) *"*

(3) *"*

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

*APPELLATE COUNSEL FAILED TO FILE NON-FRIVOLOUS APPELLATE ISSUES, CERTIFIED THAT PROBABLE CAUSE TO APPEAL EXISTED.*

11. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

*N/A*

*N/A*

b. Did you seek the highest level of administrative review available? ☐ Yes. ☐ No. *N/A*

*Attach documents that show you have exhausted your administrative remedies.*

MC-275 (Rev. July 1, 2005)     **PETITION FOR WRIT OF HABEAS CORPUS**     Page ~~six of eleven~~

Ground _____ (if applicable):

THE TRIAL COURT ERRED BY REFUSING TO GIVE REQUESTED INSTRUCTION ON THE PETITIONER'S SECOND DEGREE MURDER THEORY OF THE CASE

a. Supporting facts:

PETITIONER'S THEORY OF THE CASE AT TRIAL WAS THAT HE WAS NOT GUILTY OF FIRST DEGREE MURDER AND HIS TRIAL COUNSEL PROFFERED INSTRUCTIONS ON SECOND DEGREE, THAT WAS REJECTED BY THE TRIAL COURT. (EX.B.          )

THE COURT'S REFUSAL TO INSTRUCT THE JURY ON MURDER IN THE SECOND DEGREE, SO THAT THE JURY MIGHT HAVE A LEGAL BASIS FOR CONSIDERING THE PETITIONER'S THEORY OF THE DEFENSE, DENIED HIM HIS FEDERAL CONSTITUTIONAL RIGHTS UNDER THE 6TH AND 14TH CONSTITUTIONAL AMENDMENTS.

THE ERROR IN REFUSING TO GIVE THE REQUESTED INSTRUCTION ENCOMPASSING PETITIONER'S DEFENSE THEORY IS OF FEDERAL CONSTITUTIONAL MAGNITUDE, AND MUST BE FOUND HARMLESS BEYOND A REASONABLE DOUBT.

b. Supporting cases, rules, or other authority:

U.S. CONST. 6TH AND 14TH AMEND.

PEOPLE V. BIRKS (1998) 19 CAL. 4TH 108

PEOPLE V. GREEN (1980) 27 CAL. 3d 1

CONDE V. HENRY (9TH CIR. 1999) 198 F.3d 734

U.S. V. ESCOBAR DE BRIGHT (9TH CIR. 1984) 742 F.2d 1196

MATHEWS V. U.S. (1988) 485 U.S. 58

Ground _____ (if applicable):

PETITIONER'S TRIAL COUNSEL'S UNPROFESSIONAL
ERRORS WERE UNREASONABLE AND PREJUDICED
AND UNDERMINED THE OUTCOME OF PETITIONER'S
TRIAL.

a. Supporting facts:

PETITIONER'S TRIAL COUNSEL WAS INEFFECTIVE, IN HIS
FAILURE TO PRESENT TESTIMONY OF AN UNAVAILABLE WITNESSE'S
EXCULPATORY INFORMATION, AND DECIDED AGAINST CALLING
THE WITNESS WITHOUT FIRST PERSONALLY INTERVIEWING HIM.

PETITIONER'S TRIAL COUNSEL FURTHER FAILED TO FILE A
IDENTIFICATION SUPPRESSION MOTION, TO CHALLENGE AN OBVIOUS
VIOLATION OF PETITIONER'S RIGHT TO COUNSEL AT LINE-UP;
ABSENT SOME INDICATION THE MOTION WOULD HAVE BEEN
LACKING IN MERIT.

PETITIONER ASSERTS THAT HIS TRIAL COUNSEL'S FAILURE
TO BRING TO THE COURT'S ATTENTION A MAJOR CONSTITUTIONAL
ERROR IN THE PROSECUTION'S CASE IS NOT THE PRODUCT OF
REASONABLE PROFESSIONAL JUDGMENT.

b. Supporting cases, rules, or other authority:

PEOPLE V. JENNINGS (1991) 53 C.3d 334, 279 CAL. RPTR. 780
PEOPLE V. STALLWORTH (1974), 11 CAL. 3d 588, 114 CAL. RPTR. 250
STRICKLAND V. WASINGTON, 466 U.S. 668, 694 (1984)
LORD V. WOOD, 184 F. 3d 1083 (9th CIR. 2000)
TOMLIN V. MYERS, 30 F. 3d 1235 (9th CIR. 1994)

Ground _____ (If applicable):

PETITIONER WAS DEPRIVED OF HIS RIGHT TO
EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL
AND ON APPEAL WHEN COUNSEL FAILED TO RAISE
OR PRESERVE MERITORIOUS ISSUES FOR APPEAL

a. Supporting facts:

PETITIONER ASSERTS THAT HIS TRIAL COUNSEL WAS
INEFFECTIVE AND FAILED TO ESTABLISH THAT THE ITEMS
ADDMITTED INTO EVIDENCE BELONGED TO SOMEONE OTHER
THAN PETITIONER; AND THAT THE RECOVERED SKI MASK THAT
WAS USED IN THE CRIME BELONGED TO SOMEONE ELSE; AND
TRIAL COUNSEL'S FAILURE TO ADEQUATELY INVESTIGATE, AND
CROSS-EXAMINE FORENSIC FINGERPRINT IDENTIFICATION EVIDENCE.

PETITIONER'S COUNSEL ON APPEAL FAILED TO RAISE A
CLAIM OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL THAT
WAS REVIEWABLE ON APPEAL; AND FURTHER FAILED TO ADVISE
PETITIONER THAT THIS CLAIM MAY HAVE BEEN REVIEWED
BY A PETITION FOR WRIT OF HABEAS CORPUS, OR PRESERVE
THE ISSUE FOR APPEAL.

b. Supporting cases, rules, or other authority:

IN RE BANKS (1971) 4 C.3d 337, 93 CAL. RPTR. 591
IN RE SMITH (1970) 3 C.3d 192, 90 CAL. RPTR. 1
IN RE GREENFIELD (1970) 11 CAL. APP. 3d 536, 89 CAL. RPTR. 847
CROTTS V. SMITH, 73 F.3d 891 (9th CIR. 1996)
HARRIS V. WOOD 64 F.3d 1432 (9th CIR. 1995)

MC-275 [Rev. July 1, 2005]     **PETITION FOR WRIT OF HABEAS CORPUS**     Page four of six

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or **issue** in any court?    ☐ Yes. If yes, continue with number 13.    ☒ No. If no, skip to number 15.

13. a.  (1) Name of court: _____ *N/A* _____

     (2) Nature of proceeding (for example, "habeas corpus petition"): _____

     (3) Issues raised: (a) _____

         (b) _____

     (4) Result *(Attach order or explain why unavailable):* _____

     (5) Date of decision: _____

    b.  (1) Name of court: _____ *N/A* _____

     (2) Nature of proceeding: _____

     (3) Issues raised: (a) _____

         (b) _____

     (4) Result *(Attach order or explain why unavailable):* _____

     (5) Date of decision: _____ *N/A* _____

    c.  *For additional prior petitions, applications, or motions, provide the same information on a separate page.*

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

    _____ NONE _____

    _____ NONE _____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)

    _____

    _____

16. Are you presently represented by counsel?    ☐ Yes.    ☒ No. If yes, state the attorney's name and address, if known:

    _____ NONE _____

    _____ NONE _____

17. Do you have any petition, appeal, or other matter pending in any court?    ☐ Yes.    ☒ No. If yes, explain:

    _____

    _____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

    *I DO BELIEVE THIS COURT TO BE THE CORRECT COURT OF*
    *COMPENTENT JURISDICTION*

, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

▶

Date: _____

(SIGNATURE OF PETITIONER)

7

## PRAYER FOR RELIEF

PETITIONER IS WITHOUT REMEDY SAVE FOR
WRIT OF HABEAS CORPUS.

WHEREFORE: PETITIONER PRAYS THAT THE COURT;

1.  ISSUE A WRIT OF HABEAS CORPUS, AND DECLARE
    THE RIGHTS OF ALL PARTIES;

2.  ISSUE AN ORDER TO SHOW CAUSE, AND THAT
    AN EVIDENTUARY HEARING BE HELD, TO
    DETERMINE THE LEGALITY OF PETITIONER'S
    CURRENT RESTRAINT AND CONFINEMENT;

3.  ORDER RESPONDANT'S, AND THEIR ATTORNEYS
    TO REPLY BY WAY OF RETURN, OR INFORMAL
    RESPONCE DENIAL TO PETITIONER'S SUBMITTED
    APPLICATION FOR A WRIT, AND;

4.  GRANT ANY AND ALL OTHER RELIEF DEEMED BY
    THIS COURT PERMISSABLE, JUST, AND PROPER
    FOR THE PETITIONER

DATED: _____          _____

                              MICHALE J. WRIGHT
                              PETITIONER

1  STATE OF CALIFORNIA        )
                              )
2                             : SS    VERIFICATION
3  COUNTY OF                  )
4
5       I  Michael J. Wright   HEREBY VERIFY:
6
7       I AM THE PETITIONER/APPELLANT IN THIS CAUSE
8  OF ACTION, AND I HAVE READ THE FOREGOING PETITION
9  FOR WRIT OF HABEAS CORPUS.
10
11      THE FACTS STATED THEREIN ARE TRUE OF
12 MY OWN KNOWLEDGE, EXCEPT AS TO MATTERS THAT
13 ARE THEREIN STATED ON MY OWN INFORMATION AND
14 BELIEF, AND AS TO THOSE MATTERS I BELIEVE
15 THEM TO BE TRUE.
16
17      I DECLARE UNDER PENALTY OF PERJURY, AND
18 THE LAWS OF THE STATE OF CALIFORNIA, THAT THE FOREGOING
19 IS TRUE AND CORRECT, TO THE BEST OF MY KNOWLEDGE
20 AND BELIEF.
21      EXECUTED ON THIS ____ DAY OF __April__ 2008
22      AT __KVSP-Delano__ CALIFORNIA, 93215
23
24                           RESPECTFULLY SUBMITTED
25                           _____
26                           _MICHAEL J. WRIGHT
27                           PETITIONER/APPELLANT
28

                    9

EXHIBIT 6

MC-275

Name   MICHAEL J. WRIGHT, CDCR# V-91600

Address   K.V.S.P.; P.O. Box 5102; FBB3-114-W

_____ Delano, Ca. 93216-5102 _____

_____

CDC or ID Number   _____

_____ IN THE SUPREME COURT _____

_____ STATE OF CALIFORNIA _____
(Court)

PETITION FOR WRIT OF HABEAS CORPUS

_____ MICHAEL J. WRIGHT _____
Petitioner
                    vs.

No. _____
*(To be supplied by the Clerk of the Court)*

_____ A. HEDGPETH, Warden, K.V.S.P. _____
Respondent

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005). Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page one of six

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 at seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

**This petition concerns:**

[X] A conviction          [ ] Parole

[ ] A sentence            [ ] Credits

[ ] Jail or prison conditions    [ ] Prison discipline

[ ] Other *(specify):* _____

1. Your name: _____ Michael J. Wright

2. Where are you incarcerated? Kern Valley S.P.,3000 W. Cecil Ave./ P.O. Box 5102, Delano, Ca. 93215

3. Why are you in custody?   [X] Criminal Conviction   [ ] Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

Murder; Att. Murder; Assault W/F.Arm; Poss./Cocaine-Sale: vicariously Armed W/F.Arm;

Prior C/S Conv.; and Prior Prison Terms.

b. Penal or other code sections: 187(a), 187(a)/664, 245(a)(2), 11351, 12022(a), & 667.5(b)

c. Name and location of sentencing or committing court: Superior Court, Alameda Co.: 1225 Fallon St.

Oakland, Ca. 94612-4293

d. Case number: _____ CH 36730

e. Date convicted or committed: _____ Apr. 05, 2005

f. Date sentenced: _____ Jul. 22, 2005

g. Length of sentence: _____ 38 yr. to life, Total Term

h. When do you expect to be released? _____ 2043 Parole Date

i. Were you represented by counsel in the trial court?   [X] Yes.   [ ] No. If yes, state the attorney's name and address:

Richard Hove, SBN 53780

24072 Myrtle St. Hayward, Ca. 94541

1. What was the LAST plea you entered? *(check one)*

[X] Not guilty   [ ] Guilty   [ ] Nolo Contendere   [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

[X] Jury   [ ] Judge without a jury   [ ] Submitted on transcript   [ ] Awaiting trial

---

MC-275 [Rev. July 1, 2005]          **PETITION FOR WRIT OF HABEAS CORPUS**          Page two of six

7. Ground 2 or Ground    I    (if applicable):

THE TRIAL COURT ERRED BY REFUSING TO GIVE REQUESTED

INSTRUCTION ON THE PETITIONER'S SECOND DREGREE MURDER

THEORY OF THE CASE, IN VIOLATION OF HIS SIXTH AND

FOURTHEENTH AMENDMENT CONSTITUTIONAL DUE PROCESS RIGHTS

a.  Supporting facts:

Petitioner's theory of the case at trial was that he was not guilty of first

degree murder, and his trial counsel proffered instructions on second degree, that

was rejected by the trial court. (see Exib. A ).

The court's refusal to instruct the jury on murder in the Second Degree, so

that that the jury might have a legal basis for considering the Petitioner's theory

of the defense, denied him his Federal and State Constitutional Rights under the

Sixth, and Fourtheenth Amendments Due process of law.

The error in refusing to give the requested instruction encompassing the

Petitioner's defense theory, is of Federal Constitutional magnitude, and must be

found harmless beyond a reasonable doubt.

Although the court allowed an instruction permitting Petitioner's conviction

of first dregree murder, it was clear from the evidence adduced at trial that pet--

itioner was not he trigger man, nore did he " lay in wait " to committ the murder;

thus the " Murder In The Second Degree " proffered instruction should have been

allowed for jury consideration.

b.  Supporting cases, rules, or other authority:

United States Constitution, 6th, and 14th, Amend.

People v. Birks (1998) 19 Cal. 4th 108, 112-13.

People v. Green (1980) 27 Cal.3d 1

Conde v. Henry (9th Cir. 1999) 198 F.3d 734

U.S. v. Escobar De Bright (9th Cir. 1984), 742 F.2d 1196

Mathews v. U.S. (1988) 485 U.S. 58

MC-275 [Rev. July 1, 2005]                **PETITION FOR WRIT OF HABEAS CORPUS**                Page four of six

7. Ground 2 or Ground __II__ *(if applicable)*:

PETITIONER'S TRIAL COUNSELS UNPROFESSIONAL ERRORS WERE UNREASONABLE

AND PREJUDICIAL, AND UNDERMINED THE OUT COME OF HIS TRIAL.

a. Supporting facts:

Petitioner's trial counsel was ineffictive, in his failure to present test-imonyof an unavailable witnesse's exculpatory information, and decided against calling the witness without first personally interviewing him.

Petitioner's trial counsel further failed to file a identification motion to suppress, to challenge an obvious violation of Petitioner's right to counsel at a line-up; absent indication the motion would have been lacking in merit.

Petitioner asserts that his trial counsel's failure to bring to the court's a major Constitutional error in the prosecutions case is not the product of reasonable professional judgment.

Petitioner further represents that his trial counsel had a duty to conduct careful factual and legal investigations and inquiries with the view to developing matters of defense in order to make informed decisions.

b. Supporting cases, rules, or other authority:

People v. Jennings (1991) 53 Cal. 3d 334, 279 Cal. Rptr. 780

People v. Stallworth (1974) 11 Cal. 3d 588, 144 Cal. Rptr. 250

Strickland v. Washington, 466 U.S. 668, 694(1984)

Lord v. Wood, 184 f. 3d 1235 (9th Cir. 2000)

Tomlin v. Myers, 30 F.3d 1235 (9th Cir. 1994)

Ground  III  (if applicable):

PETITIONER WAS DEPRIVED OF HIS RIGHT TO EFFECTIVE ASSISTANCE

OF COUNSEL AT TRIAL AND ON APPEAL, WHEN COUNSEL FAILED TO

RAISE OR PERSERVE MERITORIOUS ISSUES FOR APPEAL.

a. Supporting facts:

Petitioner asserts that his trial counsel was ineffective, in his

failure to establiss that certin items that were addmitted into evidence at trial

did in fact belong to someone else; and that trial counsel further failed to

adequately investigate, and cross-examine forensic fingerprint identification

evidence found by police inside Petitioner's abandoned vehical.


Petitioner's appointed counsel on Appeal, failed to rais a claim of

ineffective assistance of trial counsel, that was reviewable on Appeal; and futher

failed to advise Petitioner that this claim may have been reviewed by a Petition

For Writ of Habeas Corpus, or perserve this issue for appeal.

b. Supporting cases, rules, or other authority:

In Re Banks (1971) 4 C. 3d 337, 93 Cal. Rptr. 591

In Re Smith (1970) 3 c. 3d 192, 90 Cal. Rprt. 1

In Re Greenfield (1970) 11 Cal. App. 3d 536, 89 Cal. Rptr. 847

Crotts v. Smith 73 F.3d 891 (9th Cir. 1996)

Harris v. Wood 64 F.3d 1432 (9th Cir. 1995)

MC-275 [Rev. July 1, 2005]     **PETITION FOR WRIT OF HABEAS CORPUS**

8. Did you appeal from the conviction, sentence, or commitment?    [X] Yes.    [ ] No.    If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

Court of Appeal, State of California, First Appellate District, Division Three

b. Result   Affirmed, (see Exib. 2 )    c. Date of decision:   Dec. 12, 2006

d. Case number or citation of opinion, if known:   App. Ct. No. A 111006

e. Issues raised: (1) _____ ( see Exib. 3 ) _____

(2) _____ " " _____

(3) _____ " " _____

f. Were you rebresented by counsel on appeal?   [X] Yes.   [ ] No. If yes, state the attorney's name and address, if known:

Kyle Gee, SBN 65895;  2626 Harrison St.:  Oakland, Ca. 94612

9. Did you seek review in the California Supreme Court?   [X] Yes   [ ] No.   If yes, give the following information:

a. Result   Petition For Review Denied; (see Exib. 1 )   b. Date of decision:   Feb. 14, 2007

c. Case number or citation of opinion, if known:   Supreme Ct. No. S 149404

d. Issues raised: (1) _____ ( see Exib. 1 ) _____

(2) _____ " " _____

(3) _____ " " _____

0. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

Appellate counsel failed to file non-frivolous, meritorious Appellate issues, as

certified that probable cause to appeal did exist.

1. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].)  Explain what administrative review you sought or explain why you did not seek such review:

N/A

_____ " _____

_____ " _____

_____ " _____

_____ "" _____

_____ " _____

_____ " _____

N/A

b. Did you seek the highest level of administrative review available?   [ ] Yes.   [ ] No.   N/A
   *Attach documents that show you have exhausted your administrative remedies.*

MC-275 (Rev. July 1, 2005)    PETITION FOR WRIT OF HABEAS CORPUS    Page five of six

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or **issue** in any court?    [X] Yes. If yes, continue with number 13.    [ ] No. If no, skip to number 15.

13. a. (1) Name of court:  Court of Appeal of California, First App. Dist. Div. 3.

   (2) Nature of proceeding (for example, "habeas corpus petition"):  Petition for Writ of Habeas Corpus

   (3) Issues raised: (a)  (see Exib. 5 )

      (b)  "    "

   (4) Result (Attach order or explain why unavailable):  Petition Denied; (see Exib. 5 )

   (5) Date of decision:  Apr. 3, 2008

b. (1) Name of court:  N/A

   (2) Nature of proceeding:  "

   (3) Issues raised: (a)  "

      (b)  "

   (4) Result (Attach order or explain why unavailable):  N/A

   (5) Date of decision:  N/A

c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

   NONE

   NONE

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

   There Has Been No Delay

   "    "    "

16. Are you presently represented by counsel?    [ ] Yes.    [XX] No. If yes, state the attorney's name and address, if known:
   NONE

   NONE

17. Do you have any petition, appeal, or other matter pending in any court?    [ ] Yes.    [XX] No. If yes, explain:
   N/A

   N/A

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

   I Declare, and do believe this Supreme Court to be the correct court of compent

   Jurisdiction

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: April ___ , 2008                              ▶ _____
                                                         (SIGNATURE OF PETITIONER)

MC-275 (Rev. July 1, 2005)        PETITION FOR WRIT OF HABEAS CORPUS        Michael J. Wright        Page six of six

## PRAYER FOR RELIEF

Petitioner is without remedy, save for Writ Of Habeas Corpus:

WHEREFORE: Petitioner prays that the court;

1. Issue a Writ of Habeas Corpus, and declare the rights of all the parties.

2. Issue an ORDER To Show Cause, and that an evidentuary hearing be held, to determine the legality of Petitioner's current restraint and California State Prison confindment.

3. ORDER the Respondents, or their attorneys to reply by way of return, or an informal response denial to Petitioner's hereby submitted Application for a Writ, and,

4. GRANT any and all other such relief deemed by this court to be permissable, just, and proper for the Petitioner.

DATED: April _____ 2008

_____

Michael J. Wright, In Pro Per

Petitioner

[ 8 ]

1  STATE OF CALIFORNIA        )

2                             : SS            V E R I F I C A T I O N

3  COUNTY OF ___KERN___       )

4

5        I, ___Michael J. Wright__, Hereby verify:

6

7        I am the Petitioner in this cause of action, and I have read

8  the foregoing Petition for Writ of Habeas Corpus.

9

10       The facts stated therein are true of my own knowledge, except

11 as to matters that are therein stated on my own information and belief,

12 and as to thoes matters I believe them to be true.

13

14       I declare under penalty of perjury, and the laws  of the State

15 of California, that the foregoing is true and correct, to the best of my

16 knowledge and belief.

17

18       Executed on this ____ Day of __April_____ , 2008

19       at, __KVSP-Delano__ , California, county of Kern, 93216.

20

21

22

23

24

25

26

27

28

T PAPER
OF CALIFORNIA
13 (REV. 3-95)
1 10024

IN THE SUPREME COURT

STATE OF CALIFORNIA

IN RE:                       )                 NO. _____

                             )
        MICHAEL J. WRIGHT,      )         App. Ct. No. A 121084

                             )
        ON HABEAS CORPUS        )         Sup. Ct. No. CH 36730

_____ )

PETITION FOR REVIEW

TO: THE HON. RONALD M. GEORGE, CHIEF JUSTICE, AND TO THE HONORABLE
ASSOCIATE JUSTICES OF THE SUPREME COURT OF THE STATE OF CALIFORNIA

      Petitioner, Michael J. Wright , petitions this court for review fol-
lowing the decision of the Court of Appeal, First Appellate District, Div. Three,
filed in that court on April 3, 2008 , denying the Petition For Writ of Habeas
Corpus.

      A copy of the Opinion or Order of denial, from the Court of Appeal is
attached hereto, and made a part thereof by reference as Exibit 5 .

ISSUES PRESENTED FOR REVIEW

I

DID THE TRIAL COURT'S REFUSAL TO INSTRUCT WITH PETITIONER'S

PROFFERED SECOND DEGREE INSTRUCTION DEPRIVE HIM OF HIS

CONSTITUTIONAL RIGHT TO INSTRUCTION ON HIS THEORY OF THE CASE ?

II

WAS PETITIONER'S TRIAL COUNSEL'S UNPROFESSIONAL ERRORS

UNREASONABLE OR PREJUDICIAL, AND DID IT UNDERMINE THE

OUTCOME OF PETITIONER'S TRIAL ?

PAPER
F CALIFORNIA
3 (REV. 3-95)
10824

III

WAS PETITIONER DEPRIVED OF HIS RIGHT TO EFFECTIVE
ASSISTANCE OF COUNSEL AT TRIAL, AND ON APPEAL, WHEN
COUNSEL FAILED TO RAISE OR PRESERVE MERITORIOUS
ISSUES FOR APPEAL ?

REASONS FOR GRANTING REVIEW

Issue one presents an important question of law concerning
denial and refusal to instruct on a requested instruction on Petitio-
ner's second degree murder theory of the case. The court's refusal
to instruct, so that the jury might have a legal basis for consider-
ing his theory of the defense, denied him his State and Federal Const-
itutional Rights under the Sixth and Fourteenth Amendments.

Issues two and three concerns Petitioner's Trial and Appellate
counsel's conduct, unprofessional errors, that amounted to ineffective
assistance of counsel, and that but for trial counsel's derelections,
the outcome of the trial would have been different.  Deprevation of
Petitioner's right to effective assistance of counsel on appeal, may
be reviewed by way of Petition For Writ Of Habeas Corpus.

All above, and herein issues are proper and adequately raised
and presented for the purpose of exhaustion, and preservation for
Federal review.

///

///

///                              ( 2 )

///

PAPER
F CALIFORNIA
3 (REV. 3-95)

10024

## STATEMENT OF THE CASE

1
2
3       After a trial by jury, petitioner was convicted of first de-
4   gree murder, attempted murder, and felony assault, Cal. Pen. C. Sec-
5   tion(s) 187, 664, and 245(a)? as well as possession for sale of co-
6   caine, H & S Code 11351; Firearm, section 12202(a), and the admission
7   of a controled substance prior prison allegation, of H & S code 11370
8   .2(a); 667.5(b).
9       Jury trial commenced with hearings on motions in limine  on
10  February 28, 2005, (CT. v1,223).³  The jury heard arguments on March
11  30, 2005,(CT.v2,290), with instructions given on April 4, 2005,(CT.2
12  v2,291). Deliberations began the same morning, and the verdicts and
13  findings were returned the following day,(CT.v2,293-389; also on that
14  day, the Petitioner admitted the prior,(CT.v2,294).
15      On July 22, 2005, Petitioner was sentenced to State Prison
16  for a determinate term of twelve years, consecutive to an indetrminate
17  term of twelve years, consecutive to an indeterminate term of twenty-
18  five years to life, enhanced by one-year for firearm arming.
19      Credits were allowed, fines were imposed, and actual restitu-
20  tion was ordered. (CT. v2, 427,429,444). Petitioner filed a timely
21  Notice Of Appeal, on July 25, 2005, see exhibit ___C__ )
22  ///
23  ///
24  ///
25  _____
26          ²/ All code references are to the Peneal Code unless other-
               wise noted.
27          ³/ Clerk's Transcript, vol. pp.
28                              ( 3 )

EXHIBIT A

000394

# People vs. Michael Wright
# Case #H36730

FILED
JEFFERSON COUNTY
APR - 6 2005
CLERK OF THE SUPERIOR COURT
By _D. Rice Nark_
Deputy

## JURY INSTRUCTIONS NOT GIVEN

**CALJIC 8.32**

000395

## SECOND DEGREE FELONY-MURDER
## (PEN. CODE, § 189)

| Requested by People | | Requested by Defendant | | Requested by | | |
|---|---|---|---|---|---|---|
| Given as Requested | | Given as Modified | | Given on Court's Motion | | |
| Refused | ✓ | | | | | |
| Withdrawn | | | | | | Judge |

8.32

The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs [during the commission or attempted commission of] [as the direct causal result of] the crime of _____ is murder of the second degree when the perpetrator had the specific intent to commit that crime.
The specific intent to commit _____ and the commission or at tempted commission of that crime must be proved beyond a reasonable doubt.

# CALJIC 17.01

## VERDICT MAY BE BASED ON ONE OF A NUMBER OF UNLAWFUL ACTS

| | | | | | |
|---|---|---|---|---|---|
| Requested by People | | Requested by Defendant | ✓ | Requested by | |
| Given as Requested | | ✓ Given as Modified | | Given on Court's Motion | |
| Refused | ✓ | | | | |
| Withdrawn | | | _RKC_ | | Judge |

17.01

     The defendant is accused of having committed the crime of
_____ [in Count _____]. The prosecution has introduced
evidence for the purpose of showing that there is more than one [act] [or]
[omission] upon which a conviction [on Count _____] may be based.
Defendant may be found guilty if the proof shows beyond a reasonable doubt that
[he] [she] committed any one or more of the [acts] [or] [omissions]. However, in
order to return a verdict of guilty [to Count _____], all jurors must agree that
[he] [she] committed the same [act] [or] [omission] [or] [acts] [or] [omissions]. It is
not necessary that the particular [act] [or] [omission] agreed up on be stated in
your verdict.

# CALJIC 8.70

000 3 57

## DUTY OF JURY AS TO DEGREE OF MURDER

| Requested by People | | Requested by Defendant - | | Requested by | | |
|---|---|---|---|---|---|---|
| Given as Requested | | Given as Modified | | Given on Court's Motion | | |
| Refused | | | | | | |
| Withdrawn | | | | Judge | | |

8.70

   Murder is classified into two degrees. If you should find the defendant guilty of murder, you must determine and state in your verdict whether you find the murder to be of the first or second degree.

# CALJIC 8.71                                    000358

## DOUBT WHETHER FIRST OR SECOND DEGREE MURDER

| Requested by People | | Requested by Defendant | | Requested by | | |
|---|---|---|---|---|---|---|
| Given as Requested | | Given as Modified | | Given on Court's Motion | | |
| Refused | | | | | | |
| Withdrawn | | | | | Judge | |

8.71

    If you are convinced beyond a reasonable doubt and unanimously agree that the crime of murder has been committed by a defendant, but you unanimously agree that you have a reasonable doubt whether the murder was of the first or of the second degree, you must give defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree [as well as a verdict of not guilty of murder in the first degree].

**EXHIBIT B**

# People vs. Michael Wright
# Case #H36730

000397

COPIES OF REQUESTS FROM
THE JURY DURING DELIBERATIONS

# Request of Jury

People vs. Michael Wright                    Case No.:  H36730

Use this form for requests or questions

Request a white board, or
chart paper and markers

Request 5 additional copies
of instructions

Dated: 4-4-05          Signed by      Juror #6

# Request of Jury

People vs. Michael Wright

Case No.: H36730

Use this form for requests or questions

Request

1. Diagram of House A (Floorplan)    WHITE FIR

2. Photos of Front of WHITE FIR House

3. Photos of Hampton crash site w/ Blue Van

4. Photos of cocaine by curb.

Juror #6

Dated: 4-4-05    Signed by:

# Request of Jury

People vs. Michael Wright                Case No.: H36730

Use this form for requests or questions

Request clarification on the arming clause. The verdict form states "the defendant" was armed, but CALJIC 17.15 states that "a principal" (not necessarily the defendant) was armed. Is the defendant considered "armed" if one of the other principals was armed, but not the defendant?

Dated: 7-5-05        Signed by: _

Juror #6

**EXHIBIT C**

PEOPLE OF THE STATE OF CALIFORNIA vs.
DEFENDANT: **Michael J. Wright**

| H36730 | -A | | -B | | -C | | -D |
|---|---|---|---|---|---|---|---|

FINANCIAL OBLIGATIONS (including any applicable penalty assessments):

Restitution Fine(s):
Case A: $ \_\_\_\_\_      per PC 1202.4(b) forthwith per PC 2085.5;   $\_\_\_\_\_   per PC 1202.45 suspended unless parole is revoked.
Case B: $\_\_\_\_\_      per PC 1202.4(b) forthwith per PC 2085.5;   $\_\_\_\_\_   per PC 1202.45 suspended unless parole is revoked.
Case C: $\_\_\_\_\_      per PC 1202.4(b) forthwith per PC 2085.5;   $\_\_\_\_\_   per PC 1202.45 suspended unless parole is revoked.
Case D: $\_\_\_\_\_      per PC 1202.4(b) forthwith per PC 2085.5;   $\_\_\_\_\_   per PC 1202.45 suspended unless parole is revoked.

Restitution per PC 1202.4(f):
Case A: $\_\_\_\_\_   ☐ Amount to be determined   to:  ☐ victim(s)*    ☐ Restitution Fund
Case B: $\_\_\_\_\_   ☐ Amount to be determined   to:  ☒ victim(s)*    ☐ Restitution Fund
Case C: $\_\_\_\_\_   ☐ Amount to be determined   to:  ☐ victim(s)*    ☐ Restitution Fund
Case D: $\_\_\_\_\_   ☐ Amount to be determined   to:  ☐ victim(s)*    ☐ Restitution Fund
(List victim name(s) if known and amount breakdown in item 11, below.)

Fine(s):
Case A: $\_\_\_\_\_   per PC 1202.5. $\_\_\_\_\_   per VC 23550 or \_\_\_\_\_ days ☐ county jail ☐ prison in lieu of fine   ☐ CC ☐ CS
Case B: $\_\_\_\_\_   per PC 1202.5. $\_\_\_\_\_   per VC 23550 or \_\_\_\_\_ days ☐ county jail ☐ prison in lieu of fine   ☐ CC ☐ CS
Case C: $\_\_\_\_\_   per PC 1202.5. $\_\_\_\_\_   per VC 23550 or \_\_\_\_\_ days ☐ county jail ☐ prison in lieu of fine   ☐ CC ☐ CS
Case D: $\_\_\_\_\_   per PC 1202.5. $\_\_\_\_\_   per VC 23550 or \_\_\_\_\_ days ☐ county jail ☐ prison in lieu of fine   ☐ CC ☐ CS

Lab Fee and Drug Program Fee:
Case A: Lab Fee: $\_\_\_\_\_   per HS 11372.5(a) for counts \_\_\_\_\_.   ☐ Drug Program Fee of $150 per HS 11372.7(a).
Case B: Lab Fee: $\_\_\_\_\_   per HS 11372.5(a) for counts \_\_\_\_\_.   ☐ Drug Program Fee of $150 per HS 11372.7(a).
Case C: Lab Fee: $\_\_\_\_\_   per HS 11372.5(a) for counts \_\_\_\_\_.   ☐ Drug Program Fee of $150 per HS 11372.7(a).
Case D: Lab Fee: $\_\_\_\_\_   per HS 11372.5(a) for counts \_\_\_\_\_.   ☐ Drug Program Fee of $150 per HS 11372.7(a).

TESTING
a. ☐ AIDS pursuant to PC 1202.1    b. ☐ DNA pursuant to PC 296    c. ☐ other (specify):

OTHER ORDERS (specify):  **All fines, orders and information for this page are recorded on form CR-290, page 2.**

EXECUTION OF SENTENCE IMPOSED
a. ☒ at initial sentencing hearing.                    d. ☐ at resentencing per recall of commitment.  (PC 1170(d).)
b. ☐ at resentencing per decision on appeal.           e. ☐ other (specify):
c. ☐ after revocation of probation.

CREDIT FOR TIME SERVED

| CASE | TOTAL CREDITS | ACTUAL | LOCAL CONDUCT | | CASE | TOTAL CREDITS | ACTUAL | LOCAL CONDUCT | |
|---|---|---|---|---|---|---|---|---|---|
|   |   |   | ☐ 4019 | ☐ 2933.1 | C |   |   | ☐ 4019 | ☐ 2933.1 |
| A |   |   | ☐ 4019 | ☐ 2933.1 |   |   |   | ☐ 4019 | ☐ 2933.1 |
| B |   |   | ☐ 4019 | ☐ 2933.1 | D |   |   |   |   |

| DATE SENTENCE PRONOUNCED: | TIME SERVED IN STATE INSTITUTION: ☐ DMH | ☐ CDC | ☐ CRC |
|---|---|---|---|

14. Defendant is remanded to the custody of the sheriff: ☐ forthwith   ☐ after 48 hours excluding Saturdays, Sundays and holidays.
to be delivered to: ☐ the reception center designated by Director, California Department of Corrections: ☐ San Quentin   ☐ Chowchilla
☐ other (specify):

CLERK OF THE COURT

I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

| DEPUTY'S SIGNATURE | DATE |
|---|---|
| *Debbie Sheets* | _____05 |
| DEBBIE SHEETS | |

Wright Abstract (Page 4 of 4)

**ABSTRACT OF JUDGMENT – PRISON COMMITMENT - DETERMINATE**
[not valid without completed page two of CR-290 attached]

CR-290

RIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
RANCH OR JUDICIAL DISTRICT: **Hayward Hall of Justice**

EOPLE OF THE STATE OF CALIFORNIA vs.
EFENDANT: **Michael J. Wright**

KA:

lF: **07766457**

OOKING INFORMATION: PFN: **ARS193**   CEN: **2298311**

DOB: **05-09-68**

H36730   -A

-B

☐ NOT PRESENT

OMMITMENT TO STATE PRISON
BSTRACT OF JUDGMENT

☐ AMENDED
ABSTRACT

-D

**FILED
ALAMEDA COUNTY**

JUL 2 7 2005

CLERK OF THE SUPERIOR COURT
By _Debbie Sheets_
Deputy

ATE OF HEARING
**7-22-2005**

DEPT. NO.
**519**

JUDGE
**Robert K Kurtz**

LERK
**ebbie Sheets**

REPORTER
**Deborah Trujillo, CSR #5088**

PROBATION NUMBER OR PROBATION OFFICER
**Sindy Guinn-Begley, not present**

OUNSEL FOR PEOPLE  ☒ Deputy District Attorney  ☐ State Attorney General
**Scott Patton**

COUNSEL FOR DEFENDANT  ☐ Deputy Public Defender  ☒ Private Counsel
**Richard Hove**

Defendant was convicted of the commission of the following felonies:
☐ Additional counts are listed on attachment
___ (number of pages attached)

| NT. | CODE | SECTION NO. | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION (Month/Date/Year) | JURY | COURT | PLEA | Term (L, M, U) | Concurrent | Consecutive 1/3 Violent | Consecutive 1/3 NON Violent | Consecutive Full Term | Incomplete sentence (refer to item 5) | 654 Stay | Principal or Consecutive Time Imposed YRS. | Principal or Consecutive Time Imposed MOS. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | PC | 187(a)/664 | Attempted Murder | 2002 | 04-05-2005 | X | | | M | | | | | | | 7 | 0 |
| 3 | PC | 245(a)(2) | Assault with a Firearm | 2002 | 04-05-2005 | X | | | | | | X | | | | 1 | 0 |
| | PC | 11351 | Possess for Sale/Control Substanc | 2002 | 04-05-2005 | X | | | | | | | X | | | 1 | 0 |

ENHANCEMENTS charged and found to be true TIED TO SPECIFIC COUNTS (mainly in the PC 12022 series). List each count enhancement horizontally. Enter time imposed for each or "S" for stayed. DO NOT LIST ANY STRICKEN ENHANCEMENT(S).

| CNT. | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 12022(a)(1) | S | | | | | | | 0 | 0 |
| 3 | 12022(a)(1) | S | | | | | | | 0 | 0 |
| | | | | | | | | | | |

ENHANCEMENTS charged and found to be true FOR PRIOR CONVICTION OR PRISON TERMS (mainly in the PC 667 series). List all enhancements horizontally. Enter time imposed for each or "S" for stayed. DO NOT LIST ANY STRICKEN ENHANCEMENT(S).

| ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | TOTAL | |
|---|---|---|---|---|---|---|---|---|---|
| 11370.2(a) | 3 | | | | | | | 3 | 0 |
| | | | | | | | | | |

☐ Defendant was sentenced pursuant to PC 667 (b)-(i) or PC 1170.12 (two-strikes).

INCOMPLETED SENTENCE(S) CONSECUTIVE

| COUNTY | CASE NUMBER |
|---|---|
| | |
| | |

6. ☐ TOTAL TIME ON ATTACHED PAGES:
7. ☒ Additional indeterminate term (see CR-292).

8. ☐ TOTAL TIME excluding county jail term: **12** | **0**

‸ form is prescribed under PC 1213.5 to satisfy the requirements of PC 1213 for determinate sentences. Attachments may be used but must be referred to in this document.

dopted for Mandatory Use
ial Council of California

ABSTRACT OF JUDGMENT – PRISON COMMITMENT – DETERMINATE
(not valid without completed page two of CR-290 attached)

Penal Code §§ 1213, 1213.5
CR –290 (Rev. Jan. 1, 2003)

Wright Abstract (Page 1 of 4)

PEOPLE OF THE STATE OF CALIFORNIA vs.
DEFENDANT: **Michael J. Wright**

| H36730 | -A | | -B | | -C | | -D |
|---|---|---|---|---|---|---|---|

FINANCIAL OBLIGATIONS (including any applicable penalty assessments):

Restitution Fines(s):

Case A: **$1,000.00**  per PC 1202.4(b) forthwith per PC 2085.5;   **$1,000.00**  per PC 1202.45 suspended unless parole is revoked.
Case B: $_____  per PC 1202.4(b) forthwith per PC 2085.5;   $_____  per PC 1202.45 suspended unless parole is revoked.
Case C: $_____  per PC 1202.4(b) forthwith per PC 2085.5;   $_____  per PC 1202.45 suspended unless parole is revoked.
Case D: $_____  per PC 1202.4(b) forthwith per PC 2085.5;   $_____  per PC 1202.45 suspended unless parole is revoked.

Restitution per PC 1202.4(f):

Case A: **$3,891.00**  ☐ Amount to be determined to:  ☒ victim(s)*  ☐ Restitution Fund
Case B: $_____  ☐ Amount to be determined to:  ☐ victim(s)*  ☐ Restitution Fund
Case C: $_____  ☐ Amount to be determined to:  ☐ victim(s)*  ☐ Restitution Fund
Case D: $_____  ☐ Amount to be determined to:  ☐ victim(s)*  ☐ Restitution Fund

(*List victim name(s) if known and amount breakdown in item 11, below.)

Fine(s):

Case A: $_____  per PC 1202.5. $_____  per VC 23550 or: _____ days  ☐ county jail ☐ prison in lieu of fine ☐ CC ☐ CS
Case B: $_____  per PC 1202.5. $_____  per VC 23550 or: _____ days  ☐ county jail ☐ prison in lieu of fine ☐ CC ☐ CS
Case C: $_____  per PC 1202.5. $_____  per VC 23550 or: _____ days  ☐ county jail ☐ prison in lieu of fine ☐ CC ☐ CS
Case D: $_____  per PC 1202.5. $_____  per VC 23550 or: _____ days  ☐ county jail ☐ prison in lieu of fine ☐ CC ☐ CS

Lab Fee and Drug Program Fee:

Case A: Lab Fee: $_____  per HS 11372.5(a) for counts _____.  ☐ Drug Program Fee of $150 per HS 11372.7(a).
Case B: Lab Fee: $_____  per HS 11372.5(a) for counts _____.  ☐ Drug Program Fee of $150 per HS 11372.7(a).
Case C: Lab Fee: $_____  per HS 11372.5(a) for counts _____.  ☐ Drug Program Fee of $150 per HS 11372.7(a).
Case D: Lab Fee: $_____  per HS 11372.5(a) for counts _____.  ☐ Drug Program Fee of $150 per HS 11372.7(a).

TESTING
a. ☐ AIDS pursuant to PC 1202.1   b. ☒ DNA pursuant to PC 296   c. ☐ other (specify):

Other orders (specify): Probation Investigation Fee $100.00 pursuant to §1203.1b PC
Restitution in 9b is through Victim's Compensation Board ($3,751.00 Claim #750579, $140.00 Claim #766373)
Further restitution is reserved

EXECUTION OF SENTENCE IMPOSED
☒ at initial sentencing hearing.    d. ☐ at resentencing per recall of commitment. (PC 1170(d).)
☐ at resentencing per decision on appeal.   e. ☐ other (specify): _____.
☐ after revocation of probation.

CREDIT FOR TIME SERVED
Case A: Total Credits: 1,107  Actual: 966  Local Conduct: 141  ☐ 4019 ☒ 2933.1
Case B: Total Credits: _____  Actual: _____  Local Conduct: _____  ☐ 4019 ☐ 2933.1
Case C: Total Credits: _____  Actual: _____  Local Conduct: _____  ☐ 4019 ☐ 2933.1
Case D: Total Credits: _____  Actual: _____  Local Conduct: _____  ☐ 4019 ☐ 2933.1

| DATE SENTENCE PRONOUNCED: 07-22-2005 | TIME SERVED IN STATE INSTITUTION: ☐ DMH  ☒ CDC  ☐ CRC |
|---|---|

1. Defendant is remanded to the custody of the Sheriff: ☒ forthwith ☐ after 48 hours excluding Saturdays, Sundays, and holidays.
to be delivered to: ☐ reception center designated by Director, California Department of Corrections: ☒ San Quentin ☐ Chowchilla
☐ Other (specify):

**CLERK OF THE COURT**
I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

DEPUTY'S SIGNATURE  *Debbie Sheets* Debbie Sheets   DATE 7-27-2005

CR-290 (Rev. Jan. 1, 2003)   **ABSTRACT OF JUDGMENT – PRISON COMMITMENT – DETERMINATE**   Page 2 of 2

Wright Abstract (Page 2 of 4)

## ABSTRACT OF JUDGMENT – PRISON COMMITMENT - INDETERMINATE
### [NOT VALID WITHOUT COMPLETED PAGE TWO OF CR-292 ATTACHED]

CR-292

| | |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA | |
| BRANCH OR JUDICIAL DISTRICT: **Hayward Hall of Justice** | |

PEOPLE OF THE STATE OF CALIFORNIA vs.    DOB: **05-09-68**    H36730    -A

DEFENDANT: **Michael J. Wright**    -B

AKA:

CII: **07766457**

BOOKING INFORMATION: PFN: **ARS193**  CEN: **2298311**    ☐ NOT PRESENT    -C

COMMITMENT TO STATE PRISON    ☐ AMENDED ABSTRACT OF JUDGMENT    ☐ AMENDED ABSTRACT    -D

| DATE OF HEARING | DEPT. NO. | JUDGE |
|---|---|---|
| **07-22-2005** | **519** | **Robert K Kurtz** |
| CLERK | REPORTER | PROBATION NUMBER OR PROBATION OFFICER |
| **Debbie Sheets** | **Deborah Trujillo, CSR #5088** | **Sindy Guinn-Begley, not present** |
| COUNSEL FOR PEOPLE | | COUNSEL FOR DEFENDANT  ☐ Deputy Public Defender  ☒ Private Counsel |
| ☒ Deputy District Attorney  ☐ State Attorney General | | |
| **Scott Patton** | | **Richard Hove** |

Defendant was convicted of the commission of the following felonies:

| | | | | | | | CONVICTED BY | | | Con-current | Con-secu-tive | 654 Stay |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CNT. | CODE | SECTION NO. | CRIME | | | YEAR CRIME COMMITTED | DATE OF CONVICTION (Month/Date/Year) | Jury | Court | Plea | | | |
| 1 | PC | 187(a) | Murder 1st Degree | | | 2002 | 04-05-05 | X | | | | | |

ENHANCEMENTS charged and found to be true TIED TO SPECIFIC COUNTS (mainly in the PC 12022 series). List each count enhancement horizontally. Enter time imposed for each or "S" for stayed. DO NOT LIST ANY STRICKEN ENHANCEMENT(S).

| | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 12022(a)(1) | 1 | | | | | | | 1 0 |

ENHANCEMENTS charged and found to be true FOR PRIOR CONVICTION OR PRISON TERMS (mainly in the PC 667 series). List all enhancements horizontally. Enter time imposed for each or "S" for stayed. DO NOT LIST ANY STRICKEN ENHANCEMENT(S).

| ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | ENHANCEMENT | Y/S | TOTAL |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

Defendant was sentenced to State Prison for an INDETERMINATE TERM as follows:

☐ LIFE WITHOUT THE POSSIBILITY OF PAROLE on counts _____
☐ LIFE WITH THE POSSIBILITY OF PAROLE on counts _____
a. ☐ 15 years to Life on counts _____
b. ☒ 25 years to Life on counts __1__
c. ☐ _____ years to Life on counts _____
d. ☐ _____ years to Life on counts _____
PLUS enhancement time shown above.
☒ Additional determinate term (see CR-290).
☐ Defendant was sentenced pursuant to  ☐ PC 667(b)-(i) or PC 1170.12  ☐ PC 667.61  ☐ PC667.7  ☐ other (specify):

This form is prescribed under PC 1213.5 to satisfy the requirements of PC 1213 for indeterminate sentences. Attachments may be used but must be referred to in this document.

Form Adopted for Mandatory Use
Judicial Council of California
CR-292 (Rev. January 1, 2003)

ABSTRACT OF JUDGMENT – PRISON COMMITMENT – INDETERMINATE
[NOT VALID WITHOUT COMPLETED PAGE TWO OF CR-292 ATTACHED]

Penal Code
§§ 1213, 1213.5

**EXHIBIT D**

## CALJIC 8.10

MURDER--DEFINED
(PEN. CODE, § 187)

000347

| Requested by People | · | Requested by Defendant | | Requested by       ⸱ | |
|---|---|---|---|---|---|
| Given as Requested | | Given as Modified | X | Given on Court's Motion | |
| Refused | | | | | |
| Withdrawn | | | | Judge | |

8.10

   [Defendant is accused [in Count 1] of having committed the crime of murder, a violation Section 187 of the Penal Code.]

   Every person who unlawfully kills a [human being] [with malice aforethought] [or] [during the commission or attempted commission of robbery or burglary] is guilty of the crime of murder in violation of Penal Code Section 187.

   [A killing is unlawful, if it [was] [neither] [justifiable] [nor] [excusable].]

   [In order to prove this crime, each of the following elements must be proved:

1. A human being was killed;]

2. The killing was unlawful; and

3. The killing [was done with malice aforethought] [or] [occurred during the commission or attempted commission of robbery or burglary.].

## CALJIC 3.02

## PRINCIPALS--LIABILITY FOR NATURAL AND PROBABLE CONSEQUENCES

| Requested by People | | Requested by Defendant | | Requested by ⟶ | |
|---|---|---|---|---|---|
| Given as Requested | | Given as Modified | | Given on Court's Motion | |
| Refused | | | | | |
| Withdrawn | | | | Judge | |

3.02 - 1 of 2

One who aids and abets [another] in the commission of a crime [or crimes] is not only guilty of [those crimes], but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime[s] originally aided and abetted. In order to find the defendant guilty of the crime[s] of murder, attempt murder, or assault with a firearm [as charged in Count[s] 1, 2 and 3,] you must be satisfied beyond a reasonable doubt that:

1. The crime [or crimes] of robbery or burglary [were] committed;
2. That the defendant aided and abetted [those] crime[s];
3. That a co-principal in that crime committed the crime[s] of murder, attempt murder or assault with a firearm; and
4. The crime[s] of murder, attempt murder or assault with a firearm [were] a natural and probable consequence of the commission of the crime[s] of robbery or burglary.

[In determining whether a consequence is "natural and probable," you must apply an objective test, based not on what the defendant actually intended, but on what a person of reasonable and ordinary prudence would have expected likely to occur. The issue is to be decided in light of all of the circumstances surrounding the incident. A "natural" consequence is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened. "Probable" means likely to happen.]

[You are not required to unanimously agree as to which originally contemplated crime the defendant aided and abetted, so long as you are satisfied beyond a reasonable doubt and unanimously agree that the defendant aided and abetted the commission of an identified and defined target crime and that the murder,